UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA



WASHINGTON METRORAIL SAFETY
COMMISSION,

                Petitioner,

v.

THE WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,

                Respondent.

Case: 1:24-mc-00144
Assigned To : Judge Loren L. AliKhan
Assign. Date : 10/31/2024
Description: Misc. (O-DECK)

**WASHINGTON METRORAIL SAFETY COMMISSION'S PETITION FOR SUMMARY ENFORCEMENT OF ADMINISTRATIVE SUBPOENA**

Petitioner, the Washington Metrorail Safety Commission (the "WMSC"), through its counsel and pursuant to the Washington Metrorail Safety Commission Interstate Compact, Pub. L. No. 115-54, 131 Stat. 1093–1104 (2017) (the "WMSC Compact"), respectfully petitions this Court for an Order compelling the respondent, the Washington Metropolitan Area Transit Authority ("WMATA"), to comply with the WMSC's administrative subpoena *duces tecum* issued and served on April 8, 2024 ("Subpoena"). A proposed Order Enforcing the Subpoena and a proposed Order to Show Cause are submitted herewith for the Court's consideration.

Jurisdiction and Venue

1.      This Court has jurisdiction over this matter pursuant to the interstate compact entered into by the Commonwealth of Virginia, State of Maryland, and the District of Columbia, and approved by Congress on August 22, 2017, codified at D.C. Code § 9-1109.11 (2017), Va. Code §§ 33.2-3101 (2017), Md. Code, Transp. § 10-208 (2017), and Pub. L. No. 115-54, 131 Stat. 1093–1104 (2017). WMSC Compact § 48 (providing that this court is one of three courts with

"exclusive and original jurisdiction of all actions brought by or against the [WMSC] and to enforce subpoenas"), attached as Exhibit 1.

2. Venue is proper under 28 U.S.C. § 1391(b)(2) (a civil action may be brought in the district where "a substantial part of the events or omissions giving rise to the claim occurred") and 28 U.S.C. § 1391(b)(1), (c)(2) (an entity may be sued where it resides, namely "any judicial district in which [it] is subject to the court's personal jurisdiction") because a substantial part of WMATA's noncompliance with the WMSC's safety oversight authority and subsequent administrative subpoena occurred in Washington, D.C., and the United States District Court for the District Columbia has personal jurisdiction over actions brought by or against WMATA.

## Parties

3. Petitioner is the Washington Metrorail Safety Commission, a State Safety Oversight Agency established by Pub. L. No. 115-54, 131 Stat. 1093–1104 (2017), and certified by the Federal Transit Administration pursuant to 49 U.S.C. § 5329(e) and 49 C.F.R. Part 674.

4. Respondent is the Washington Metropolitan Area Transit Authority, which operates the Metro rail system, a fixed guideway public transportation system that serves Washington, D.C., and its metropolitan area in Virginia and Maryland and is subject to oversight under 49 U.S.C. § 5329(e).

## The WMSC's Oversight Authority Over WMATA to Conduct Investigations and to Issue Administrative Subpoenas

5. Congress and the signatory States (including the District of Columbia) empowered the WMSC with "exclusive safety oversight authority and responsibility over the WMATA Rail System pursuant to federal law, including, without limitation, the power to . . . [m]eet other requirements of federal and State law relating to safety oversight of the WMATA Rail System." WMSC Compact § 3(a), (f).

6. The WMSC Compact authorizes the WMSC to "investigate hazards, incidents, and accidents on the WMATA Rail System[,]" to "[i]mplement and enforce relevant federal and State laws and regulations relating to the safety of the WMATA Rail System[,]" and to "[c]onduct, or cause to be conducted, inspections, investigations, examinations, and testing of WMATA personnel and contractors, property, equipment, facilities, rolling stock, and operations of the WMATA Rail System, including, without limitation, electronic information and databases through reasonable means, *which may include issuance of subpoenas*." *Id.* §§ 3(d), 30(d), 31(a) (emphasis added). The "WMATA Rail System" is defined to mean "the rail fixed guideway public transportation system and all other real and personal property owned, leased, operated, or otherwise used by WMATA rail services." *Id.* § 1(m).

7. The WMSC Compact further directs that its terms are to be construed "liberally." *Id.* § 57. The WMSC Compact does not limit the reach of the terms "safety" or "hazards."

8. The WMSC's investigative and subpoena authority therefore extends to "hazards" and "safety" in the entire Metro rail "system" under WMATA's control and is not limited to the physical rail lines.

9. The WMSC is also authorized to oversee WMATA because the WMSC is a State Safety Oversight ("SSO") Agency.

10. The Federal Transit Administration's ("FTA") State Safety Oversight Program requires each State that maintains a fixed guideway public transportation system that is not subject to the jurisdiction of the Federal Railroad Administration to establish an SSO Agency and a comprehensive Public Transportation Agency Safety Plan (a "Safety Plan") pursuant to 49 C.F.R. Part 673. The SSO Agency must be certified by the Secretary of Transportation. 49 U.S.C. § 5329(e)(7).

11. The WMSC was and remains certified through the FTA's SSO Program pursuant to 49 C.F.R. Part 674 (2016), and is the SSO Agency with statutory oversight authority over WMATA. 49 U.S.C. § 5329(e).

12. As a certified SSO Agency, the WMSC has explicit "investigative, inspection, and enforcement authority" over WMATA and is granted "authority to review, approve, oversee, and enforce the implementation" of WMATA's Safety Plan. *Id.* § 5329(e)(4)(A)(iv)–(v). The WMSC is required to audit WMATA's compliance with the Safety Plan "at least once triennially." *Id.* § 5329(e)(4)(A)(vi).

13. WMATA's Safety Plan contains WMATA's policies and procedures to implement, manage, and measure the efficacy of its safety measures, including safety-promoting practices for WMATA employees. The Safety Plan reaches all aspects of employee safety, including employee fitness, occupational health, training, various bodily and environmental safety programs, drug and alcohol testing, and exposure to hazardous substances. The WMSC's oversight authority is referenced throughout the Safety Plan. Public Transportation Agency Safety Plan, Doc. No. 4100-1-01/04, §§ 3.0–5.0 (Dec. 31, 2023), attached as Exhibit 2.

14. The Safety Plan affirms WMATA's commitment to "comply with, and wherever possible exceed, legislative and regulatory requirements and standards." *Id.* § 2.1 (Safety Management Policy Statement). Those requirements include formal audits performed by the WMSC. 49 U.S.C. § 5329(e)(4)(A)(vi) (directing the WMSC to audit WMATA's rail fixed-guideway system "at least once triennially"); 49 C.F.R. § 674.31 (providing that, "[a]t least once every three years, [the WMSC] must conduct a complete audit of [WMATA's] compliance with its Public Transportation Agency Safety Plan").

15. The Safety Plan specifically describes WMATA's occupational safety and health strategies and programs. The discussion of these topics includes an explanation of the role of the

4

Office of Occupational Safety and Health in ensuring compliance with relevant occupational safety and health standards and in minimizing illnesses and injuries among the WMATA workforce, a statement that WMATA maintains a Pandemic Response Plan that outlines strategies to minimize the risk of infectious disease exposure, and a requirement that certain employees receive training covering various occupational safety and health topics. Safety Plan, §§ 1.3.1, 2.4.2, 3.2.1, 5.1.2.

<u>The WMSC Initiates an Audit of WMATA's Compliance with Employee Safety, Training, and Occupational Health</u>

16. The WMSC served the Subpoena after an informal, months-long exchange of information between the WMSC and WMATA failed to resolve certain safety concerns.

17. On October 6, 2023, in a response to a separate request for information not directly related to the Subpoena, WMATA provided a report dated July 14, 2023, disclosing the presence of lead dust in cabinets that WMATA used to store emergency medical equipment on at least one station platform. *See* Email Exchange Regarding Lead Results, attached as Exhibit 3.

18. WMATA's delayed disclosure about a significant health concern to employees, emergency medical professionals, and passengers led the WMSC to make further information requests.

19. Although WMATA was largely responsive to the WMSC's informal information requests related to the lead dust issue for the initial months following WMATA's disclosure to the WMSC of the hazard, that issue, coupled with workplace safety issues uncovered in other audits, contributed to the WMSC's decision to add a specific focus on workplace safety to an audit. In the course of other audits and investigations, the WMSC observed workplace safety issues, including a failure to use personal protective equipment, potential asbestos exposure, and a lack of safety rails in certain WMATA facilities. The WMSC was about to begin its second triennial audit

of WMATA's fitness for duty programs, and it was logical to include occupational health programs in that audit.

20. Accordingly, on February 9, 2024, the WMSC provided written notice of a "safety audit of WMATA's fitness for duty and occupational health programs" pursuant to 49 C.F.R. Part 674 and the WMSC Audit Practice procedure established in the Program Standard. WMSC Program Standard, rev. 6 § 5(D) (September 10, 2023);[1] *see* Notification of WMSC Audit, attached as Exhibit 4. The Program Standard incorporates statutory policies and procedures established for inspections by SSO Agencies. 49 U.S.C. § 5329(k)(3)(A); *see also* 49 C.F.R. § 674.27 (State Safety Oversight Program Standards).

21. To gather information for the audit, on February 9, 2024, the WMSC also served on WMATA an Initial Request for Documents. *See* Initial Request for Documents, attached as Exhibit 5.

22. In the Initial Request, the WMSC made twenty-eight (28) requests for information related to employee fitness, occupational health, training, various bodily and environmental safety programs, drug and alcohol testing, and exposure to hazardous substances. The majority of the twenty-eight (28) requests called only for forms, reports, or data that WMATA had already "completed" or generated, or information or documents that were "current" or already "existing." *See* Exhibit 5 ¶¶ 2, 3, 4, 5, 9, 13, 15, 16. 17, 18, 20, 21, 22, 25, 26, 27, and 28.

23. Pursuant to section 5(E)(1) of the Program Standard, the WMSC initially granted WMATA thirty-one (31) days to respond in full to the request, up to and including March 11, 2024.

---

[1] Available at: https://wmsc.gov/wp-content/uploads/2023/08/WMSC-Program-Standard-version-6.0_ADOPTED.pdf. The Program Standard linked here was current on February 9, 2024.

24. Three (3) days prior to the deadline, WMATA sent an email titled "WMATA REQUEST TO CHANGE SCOPE | Audit of Fitness for Duty and Occupational Health & Safety Programs (03-08-24)" stating that it "disagree[d]" with the WMSC's authority to audit fitness for duty and occupational health, and "request[ed]" that the WMSC "abstain from conducting the Audit." Further, WMATA claimed that an audit of employee drug and alcohol testing would be duplicative of WMATA's own internal audit and that federal and/or state occupational safety and health agencies, such as the U.S. Occupational Safety and Health Administration and its Maryland and Virginia counterparts, "are the primary enforcers of applicable occupational safety and health standards within their respective jurisdictions." *See* WMATA Email Dated March 8, 2024, attached as Exhibit 6.

25. Repeated communications to WMATA urging compliance with the Initial Document Request were met with consistent noncooperation. On March 14, 2024, WMATA stated by email that it would "pause further discussion" concerning the scope of the WMSC's audit authority. *See* WMATA Email Terminating Audit Discussion, attached as Exhibit 7.

### WMSC Issues the Subpoena to Compel Production of Information

26. Because WMATA refused to produce any documents or information in response to the Initial Document Request, the WMSC exercised its statutory and regulatory authority to issue a subpoena to WMATA to compel production of documents and information.

27. On April 8, 2024, thirty-one (31) days after receiving WMATA's refusal to comply with the initial request for documents, the WMSC duly served the Subpoena upon Kimberly Nelson-Wright, designee of Amy Espy-Smith, M.D., Medical Custodian of Records, an authorized agent of WMATA. WMATA confirmed its acceptance of service via email on April 12, 2024. *See* Email from Patricia Y. Lee Accepting Service of Subpoena, attached as Exhibit 8.

### WMATA's Failure to Comply with the Subpoena

28. The Subpoena serves as a formal enforcement action of the written notification and Initial Request for Documents submitted to WMATA on February 9, 2024, pursuant to the WMSC's exclusive safety oversight authority. WMSC Program Standard, rev. 6, § 11(C)(1)(g) (Enforcement: Powers Available to the WMSC); WMSC Compact § 31(a).

29. The Subpoena does not expand the scope of the Initial Request.

30. The Subpoena contained a return date of April 22, 2024. After discussions with WMATA, WMSC agreed to give WMATA until May 6, 2024, to provide written objections and responses to the Subpoena and through May 31, 2024, to complete the production of responsive documents.

31. On May 6, 2024, WMATA provided its written responses and objections to the Subpoena, a copy of which is attached at Exhibit 9. Those responses repeated WMATA's objections to the WMSC's authority to audit WMATA's fitness for duty and occupational health programs because other federal and state agencies also have authority to oversee those programs. WMATA also claimed that complying with the Initial Document Request and Subpoena would impose an undue burden.

32. WMATA produced only a few documents by May 31, 2024, and left many requests unaddressed.

33. On June 6, 2024, the WMSC provided a detailed response to WMATA's May 6 objections, a copy of which is attached as Exhibit 10. That response provided a comprehensive basis for the WMSC's authority to conduct the audit and to make each of the Initial Document Requests. The WMSC also offered to work with WMATA to address any concerns about undue burden with respect to specific requests. WMATA has not provided a written response to the WMSC's June 6 letter.

34.     Beginning in June and continuing through early October 2024, the WMSC and WMATA met and had numerous telephone conferences and email exchanges in an attempt to resolve the dispute, including discussions of how to reduce any undue burden caused by the Initial Document Request. Those efforts were partially successful, and WMATA has now provided acceptable initial responses to fitness for duty requests and most drug and alcohol program-related requests (Request Nos. 1, 2(a), 4, 5, 6, 7, 8, 9, 10, part of 11, part of 12, 13, 14 (in-person computer-based access provided but not downloaded reports or remote access), 15, 16, 17, 18, 19, 20, 21, and part of 23). However, WMATA continues to refuse to produce information in response to the requests regarding workplace health (Request Nos. 2(b), 3, part of 11, part of 12, 22, part of 23, 24, 25, 26, 27, and 28[2]) based on its position that the WMSC does not have authority to audit WMATA's workplace health and safety programs.

35.     WMATA's objections are based on its position that the WMSC cannot audit WMATA's workplace health and safety programs because, in summary, other agencies – namely, federal and state occupational safety and health agencies – oversee workplace health and safety, allegedly displacing the WMSC's authority over those areas and creating an undue burden for WMATA to respond to the Initial Document Request. *Supra* ¶¶ 24, 31. WMATA's objections were further based on the notion that WMATA should not be required to respond to audits from different agencies that cover similar subject matter and on the contention that other agencies are better suited to address issues relating to occupational safety and health. There is no legitimate basis for these claims.

36.     WMATA's position cannot be sustained under a plain reading of the WMSC Compact, which gives the WMSC the "exclusive safety oversight authority and responsibility over

---

[2] WMATA has partially responded to Request Nos. 11, 12, 22, and 23 by providing information related to fitness for duty issues, but continues to refuse to produce responsive information related to workplace health and safety issues.

9

the WMATA rail system," WMSC Compact § 3(a), and the authority to "[i]mplement and enforce relevant federal and State laws and regulations relating to the safety of the WMATA Rail System," *id.* § 30(d). Those express authorizations in the WMSC Compact, which amounts to a federal statute, preempt any applicable state laws. *See Parkridge 6 LLC v. United States DOT*, 2010 U.S. Dist. LEXIS 34182, at *17 (E.D. Va. Apr. 6, 2010) (confirming federal nature of interstate compact creating Metropolitan Washington Airports Authority); *New Jersey v. New York*, 523 U.S. 767, 811 (1988) ("[C]ongressional consent transforms an interstate compact within [the Compact Clause] into a law of the United States.").

37. Nor does the other relevant federal statute, the Occupational Safety and Health Act, displace the WMSC's authority. Nothing in that statute suggests that SSO Agencies like the WMSC lack authority to audit compliance with occupational safety and health standards. The fact that two federal statutes overlap does not mean that one necessarily displaces the other. To the contrary, "[w]hen two federal statutes overlap, courts must give effect to both, if at all possible." *United States v. Philip Morris*, 263 F. Supp. 2d 72, 76 (D.D.C. 2003) (emphasis omitted); *see also FTC v. Ken Roberts Co.*, 276 F.3d 583, 593 (D.C. Cir. 2001) ("Because we live in an age of overlapping and concurring regulatory jurisdiction, a court must proceed with the utmost caution before concluding that one agency may not regulate merely because another may." (quotation marks and internal citation omitted)). Indeed, "mere overlap between or among federal statutes is not enough to show that one of them is meant to be exclusive over a given subject matter." *Philip Morris*, 263 F. Supp. 2d at 76. Even if there were a conflict, "a more specific statute will be given precedence over a more general one." *Corley v. United States*, 556 U.S. 303, 316 (2009) (quotation marks omitted).

38. The WMSC Compact requires the WMSC to audit WMATA's compliance with its Agency Safety Plan, to enforce the laws of other agencies, including OSHA, and to ensure overall

10

safety on the Metro Rail System. Moreover, because the WMSC Compact and 49 U.S.C. § 5329(e) apply more specifically to WMATA than nationwide statutes governing safety standards across countless industries, the Court should give the more specific statutes full effect.

39. Similarly, as the SSO Agency with responsibility for WMATA, WMSC Compact § 2, the WMSC is required to ensure WMATA's compliance with its Agency Safety Plan. 49 U.S.C. § 5329(e)(4)(A)(iv), (vi); WMSC Compact § 30(b), (e); 49 C.F.R. § 674.25(b), (c). WMATA's Agency Safety Plan, in turn, must include "strategies to minimize the exposure of the public, personnel, and property to hazards and unsafe conditions," 49 U.S.C. § 5329(d)(1)(D), with hazards defined to include "any real or potential condition that can cause injury, illness, or death," 49 C.F.R. §§ 670.5, 673.5, 674.7.

40. Consequently, an Agency Safety Plan is required to include strategies to mitigate risks of illness and injury that agency employees face at their job sites, and the WMSC is required to ensure WMATA's compliance with those strategies. The Initial Document Request seeks to do just that.

41. As the WMSC showed in its June 6, 2024 letter, each of the Initial Document Requests ties directly to an element of WMATA's Agency Safety Plan or to an obligation of WMATA under federal law. Because the WMSC has express authority to assure compliance with the Agency Safety Plan and applicable federal law, the Initial Document request is clearly within the WMSC's authority and WMATA is obligated to comply with the Initial Document Request and Subpoena.

42. Moreover, the FTA's certification of the WMSC as an SSO Agency represents the FTA's recognition that the WMSC is well suited to handle matters relating to occupational safety and health in the WMATA Rail System.

43. The WMSC's responsibility to oversee occupational safety and health in the WMATA Rail System makes practical sense because the WMSC's rail-specific expertise gives it insights into occupational hazards that federal and state occupational safety and health agencies lack. For example, the WMSC is the agency best positioned to know what parts of a rail system are likely to create lead hazards that must be mitigated, and which employees of a passenger railroad are most likely to be at risk of exposure to lead.

<u>The WMSC Is Entitled to an Order Compelling WMATA to Produce the Documents and Information Requested in the Subpoena</u>

44. WMATA continues to refuse to comply with the Subpoena, without justification, as of the date of this Petition.

45. Because WMATA has refused without legal justification to produce documents and information in response to the Initial Document Request and the Subpoena, the WMSC is entitled to an Order compelling WMATA to produce the documents and information requested in the Subpoena.

46. District courts "play[] a limited role in the enforcement of administrative subpoenas." They do not "analyze the underlying claim on its merits" but instead ensure that the agency meets the low bar of establishing the validity of its subpoena. *United States EEOC v. Stanley Black & Decker, Inc.*, 2021 U.S. Dist. LEXIS 93627, at *4–5 (D. Md. May 17, 2021) (citing *EEOC v. Randstad*, 685 F. 3d 422, 442 (4th Cir. 2012)). The agency need only demonstrate that "(1) it is authorized to make such investigation; (2) it has complied with statutory requirements of due process; and (3) the materials requested are relevant." *Id.* The subpoena need only be relevant to the "lawful purpose of the agency." *FTC v. Texaco Inc.*, 555 F.2d 862, 879 (D.C. Cir. 1977).

47. The WMSC meets all three prongs.

12

48. First, the WMSC is authorized to conduct a safety investigation of WMATA regarding employee fitness for duty and occupational health, including seeking the production of information and documents. *See supra* ¶¶ 5–15, 35–43.

49. Second, the WMSC has complied with the statutory requirements of due process by providing WMATA with more than the prescribed amount of time to respond to both the Initial Request for Documents and the Subpoena. *See supra* ¶¶ 21–34. Further, the WMSC has worked with WMATA to resolve issues related to fitness for duty programs and has offered to address WMATA's concerns regarding the alleged undue burden of responding to the requests related to workplace health and safety. The statutory procedures provide constitutionally adequate process.

50. Third, the information and documents requested are strictly relevant to the safety investigation and the WMSC's lawful purpose as a State Safety Oversight Agency and pursuant to the WMSC Compact. *See supra* ¶¶ 13, 15, 22, 28–29, 38–43.

51. None of WMATA's objections justify its failure and refusal to produce the requested information and documents. *See supra* ¶¶ 35–43.

52. Consequently, the Subpoena is ripe for immediate judicial enforcement.

WHEREFORE, petitioner Washington Metrorail Safety Commission respectfully requests that this Court enter an Order granting this Petition and:

53. ORDER the Washington Metropolitan Area Transit Authority to produce to the WMSC, within ten (10) calendar days of the entry of the Court's Order, all items described in the Subpoena; and

54. GRANT such other and further relief to the WMSC that this Court deems necessary and appropriate.

Respectfully,

KAPLAN KIRSCH LLP

Dated: October 31, 2024

By: _____
W. Eric Pilsk (DC Bar No. 419901)
Charles A. Spitulnik
1634 I (Eye) Street, NW, Suite 300
Washington, DC 20006
(202) 955-5600 Phone
(202) 955-5616 Facsimile

M. Riley Scott
1675 Broadway, Suite 2300
Denver, CO 80202
(303) 825-7000 Phone

Grant M. Glovin
1500 Broadway, Suite 1605
New York, NY 10036
(646) 883-5110 Phone

ATTORNEYS FOR WASHINGTON
METRORAIL SAFETY COMMISSION

14