# EXHIBIT 10



750 First St. NE • Ste. 900 • Washington, D.C. 20002          Office: 202-384-1520 • Website: www.wmsc.gov

June 6, 2024

**VIA EMAIL**

Patricia Y. Lee
Chief Legal Officer & General Counsel
(pylee@wmata.com)
Washington Metropolitan Area Transit Authority
300 7th Street, SW
Washington, DC 20024

   Re: WMSC Subpoena SDT-2024-0001 – Reply to WMATA Written Objections

Dear Ms. Lee:

   The Washington Metrorail Safety Commission ("WMSC") writes in response to your letter of May 6, 2024 ("the WMATA Response"), in which you broadly object to producing documents in response to the WMSC's February 9, 2024 Initial Request for Documents related to the WMSC's Audit of the Washington Metropolitan Area Transit Authority Metrorail's ("WMATA" or "Metrorail") Fitness for Duty and Occupational Health Programs (the "Audit"), and to the corresponding Subpoena Duces Tecum the WMSC issued on April 8, 2024 (the "Subpoena").

   The WMSC is surprised by WMATA's resistance to participating in the Audit and to complying with the WMSC's requests. The Audit was prompted by a number of incidents and discoveries in recent years, including the discovery of lead-contaminated dust in Metrorail facilities, damaged and repositioned flooring materials marked as containing asbestos in Metrorail train control rooms, lack of personal protective equipment being used in certain locations, the lack of protective railing and other safety equipment in areas used by Metrorail personnel, and incidents of train operators falling asleep while operating trains. These and other incidents prompted the WMSC to specifically identify occupational health programs for this Audit, and notification of this change was sent in November 2023.

   The Audit is vital because Metrorail personnel should work in a safe environment. Further, the health and safety of Metrorail personnel relates directly to the safety of the entire Metrorail system and its passengers. If Metrorail personnel become sick or injured due to unsafe workplace conditions or are not able to perform their duties due to fatigue or substance use, the safety of the Metrorail system faces significant risk, as does WMATA's ability to meet its safety obligations.

   WMATA understands this. WMATA has personnel dedicated to promoting workplace safety and ensuring compliance with applicable laws. WMATA's Public Transportation Agency

Safety Plan ("PTASP" or "Agency Safety Plan") includes both fitness for duty and occupational health matters, as it is required to do under federal law. The connection between fitness for duty and occupational health and the overall safety of the Metrorail system is clear. The WMSC is concerned that WMATA would object to an audit intended to assess whether WMATA is meeting its own goals and legal obligations regarding worker health and safety and is perplexed by the claim that occupational health and safety is beyond the WMSC's authority.

WMATA's position is a stark departure from our historic ability to work through issues in a constructive and cooperative manner. WMATA has generally complied with previous WMSC audits and investigations when they have addressed fitness for duty and workplace safety and health matters. During prior audits, WMATA has never refused to engage in constructive discussions nor denied that it has any obligation to cooperate. Nor has WMATA claimed that the WMSC's safety oversight authority over Metrorail does not extend to fitness for duty and occupational health programs expressly identified in WMATA's PTASP. That unequivocal "line in the sand" is unprecedented in our relationship, never occurred during the past 21 audits, and compelled the WMSC to issue the Subpoena in the interest of ensuring public safety and pursuant to the WMSC's own legal duties. The characterization of the Subpoena in your May 6 letter as inconsistent with our past practices ignores the fact that the WMSC was compelled to issue the Subpoena due to WMATA's unprecedented refusal to cooperate with the WMSC's oversight.

Further, WMATA's sweeping objections to the WMSC's authority are unfounded given the clear language of the Interstate Compact forming the WMSC ("the WMSC Compact") and related federal law. As the WMSC explains further in Attachment A, the WMSC Compact gives the WMSC broad and "exclusive safety oversight authority and responsibility over the WMATA Rail System." The WMSC is authorized to "investigate hazards, incidents, and accidents on the WMATA Rail System" and to "conduct . . . inspections, investigations, examinations, and testing of WMATA personnel and contractors, property, equipment, facilities, rolling stock, and operation of the WMATA Metro Rail System." The WMSC Compact mandates that the WMSC "Audit every 3 years the compliance of WMATA with WMATA's Public Transportation Agency Safety Plan or conduct such an audit on an ongoing basis over a 3-year time frame."[1] The WMSC Compact further directs that its terms are to be construed "liberally." Read separately and together, those provisions of the WMSC Compact make clear that the WMSC's broad safety oversight authority includes WMATA's fitness for duty and the occupational health and safety programs that cover Metrorail personnel.[2]

Moreover, federal law and the WMSC Compact grant the WMSC broad authority to enforce applicable federal and state laws that encompass fitness for duty and occupational health and safety. The WMSC is the FTA-certified state safety oversight agency ("SSOA") that oversees WMATA under federal law. As the SSOA, the WMSC is required to ensure WMATA's compliance with its PTASP, which expressly identifies WMATA's programs to assure fitness for duty and occupational health. More broadly, the WMSC Compact expressly empowers the WMSC to "implement and enforce" all federal and state laws applicable to

---

[1] The WMSC Compact, § 30(e).

[2] The WMSC Compact, §§ 3(a), (d), (f), 31(a), and 57.

WMATA, including laws regarding fitness for duty and occupational health and safety.[3] Critically, none of the applicable federal laws relating to fitness for duty or occupational health programs give exclusive enforcement authority to any one agency, and, in any event, the WMSC Compact's specific grant of enforcement authority to WMSC makes clear that the WMSC may enforce those laws and regulations and monitor WMATA's compliance with other agencies' regulations.

Given the breadth and clarity of the WMSC's safety oversight authority under federal law and the WMSC Compact, WMATA's position is both without legal merit and inconsistent with its own acknowledgement of the need to address fitness for duty and occupational health obligations as part of assuring Metrorail safety.

In addition to the clear legal authority to conduct the Audit, the WMSC was prompted to review WMATA's occupational health and fitness for duty programs by a number of recent incidents that highlighted the need to address fitness for duty and occupational health issues in a focused manner. To provide additional context for the Audit and the Subpoena, and to correct WMATA's selective recounting of the relevant events, the WMSC will briefly summarize why it is pursuing the Audit.

Although the WMSC has never conducted an audit dedicated specifically to occupational health, it has addressed fitness for duty and occupational health in much of its prior safety oversight work. The Audit of Fitness for Duty Programs, with which WMATA complied, was included in the WMSC's Triennial Audit Cycle 1. That audit focused on employee health screening and drug and alcohol testing; other facets of occupational health have been addressed when relevant to other aspects of WMSC oversight. For example, the Audit of Automatic Train Control and Signals found in control rooms damaged and disturbed floor tiles, one marked as containing asbestos, that were not being identified and mitigated to protect the health of WMATA personnel as required by the PTASP.[4] WMATA began to address this issue by drafting a corrective action plan, but abruptly stopped and stated that requiring the mitigation was beyond the WMSC's authority. Occupational health and safety topics, such as the lack of proper electrical safety gloves, inadequate protective railing, and outdated policies and training have arisen in conjunction with other audits as well. In 2020 the WMSC Rail Operations Control Center Audit found Metrorail in violation of the Rail Controller Fatigue policy. Several

---

[3] The WMSC Compact § 30(d).

[4] WMATA asserts that the WMSC directed WMATA to physically remove asbestos tiles contrary to direction from OSHA. The WMSC has no record of providing such a directive. Rather, the WMSC directed WMATA to mitigate the hazard caused by disturbed or damaged tiles, giving WMATA the discretion to select the best way to do so. To be clear, the WMSC discovered the issue while inspecting a control room at the Arlington Cemetery Station when it saw a label on a floor tile that stated, "Do Not Remove – Asbestos," and noted other damaged and disturbed tiles. Given the potential exposure to asbestos in a place where WMATA employees walked, the WMSC required WMATA to mitigate the issue. Further discussions between WMATA and the WMSC centered on whether WMATA's proposed mitigation was sufficient to effectively remediate the hazard. WMATA did not provide, and the WMSC is not aware of, any record that any other agency approved WMATA's proposed mitigation of leaving a "do not remove" sign on the one tile.

WMSC Audits, including the 2021 High Voltage and Traction Power Programs Audit and the 2022 Communications Systems Audit, found some outdated job descriptions–as much as 40 years old—that lacked the current requirements for training and job hazard understanding.

The WMSC also identified occupational health and safety concerns through inspections and safety certification processes. WMSC Commissioner Brief W-0290, (WMATA ID: E23344) assesses a May 23, 2023 event when a Rail Supervisor removed an object located close to the energized third rail without the proper protective equipment or other safety equipment, risking serious injury or death from electrocution. Also, during the safety certification process for the opening of the Silver Line, Phase 2, specifically the N99 Yard temporary use notice, the WMSC identified that the alternating stairs lacked safety signage. This signage warns to maintain three points of contact on the stairs and the risk of carrying tools while climbing the stairs. In response, WMATA updated the temporary use notice, and placed temporary and permanent safety signs at the alternating stairs. These and other occupational health and safety related findings resulted in Metrorail immediately mitigating the hazard or presenting acceptable corrective action plans to mitigate the safety hazards.

The unexpected discovery of lead dust in Metrorail facilities made clear to the WMSC that occupational safety and health needed to be assessed in a standalone manner rather than as a part of other oversight work. In February 2022, as part of its "Emergency Management and Fire Life Safety Programs Audit," the WMSC discovered that emergency equipment and medical supplies in closets on station platforms were covered in what appeared to be a thick layer of dirt. In April 2023, WMATA learned from the contractor it hired to clean the dirt that the sediment contained lead. In July 2023, WMATA learned from a test report provided by the contractor that the sediment contained higher than permissible levels of lead, based upon the agreed-to detection levels. WMATA did not report those findings to the WMSC until October 6, 2023, and only when prompted by related questions from the WMSC. Over the next few months, WMATA complied with the WMSC's requests for information, but did so narrowly.

Accordingly, the WMSC expanded the scope of the planned Audit of Metrorail's Fitness for Duty Programs to include occupational health programs as part of the Second Triennial Audit cycle. As noted, WMATA was notified of this change months before the Audit began. The specific topics of the Audit, and requests for information, were carefully designed to assess WMATA's compliance with obligations WMATA itself set forth in its PTASP and with the related laws and regulations over which the WMSC has oversight and enforcement authority under the terms of the WMSC Compact, 49 U.S.C. § 5329(e), and 49 C.F.R. Part 674.

The WMSC provided the formal audit notice and related request for documents to WMATA on February 9, 2024. The WMSC  set the deadline to provide responsive documents by March 11 in adherence to the response time provided in the Program Standard.

WMATA refused to respond to the majority of requests. On March 8, 2024, just three days before its response was due, WMATA sent an email claiming the WMSC's audit of drug and alcohol and occupational health programs is duplicative, burdensome to WMATA, and beyond the WMSC's authority, without providing a detailed basis for that position or reconciling that position with prior collaboration on safety-promoting efforts. On March 11, WMATA

produced a limited number of documents relating only to fitness for duty. On March 14, WMATA stated that it would stop providing information regarding the lead-contaminated dust based on WMATA's assertion that the issue was also beyond the WMSC's authority.

On March 15, the WMSC responded and identified the legal authority and oversight obligations that make clear that the full scope of the Audit is well within the WMSC's authority. On March 18, WMATA informed the WMSC that it stood by its March 8 claim and that "[n]o further materials will be shared on those topics."[5] WMATA did not, however, provide any legal or other authority to support its refusal to cooperate with the Audit.

WMSC officials sought to resolve the issue through informal discussions, but it became clear throughout March and early April that WMATA's position was held at the highest levels of the organization and that it would not comply. In discussions on March 21 and 22, senior WMATA executives confirmed that WMATA would not respond to the Audit with respect to occupational safety issues. They suggested that the WMSC could tag along with other agencies, such as the state OSH programs and the FTA, whom WMATA asserted were—or would be— conducting investigations or audits.

Finally, on April 4, in an in-person conversation, Ms. Impastato, WMATA's Executive Vice President and Chief Safety & Readiness Officer, made clear to Dr. Mayer, the WMSC's Chief Executive Officer, that she viewed the WMSC and WMATA to be at odds on the issue of the WMSC's authority.

Given WMATA's blunt refusal to comply, the WMSC had no option but to issue the Subpoena, which it did on April 8. The WMSC did not decide to issue the Subpoena lightly, but had no choice given WMATA's broad challenge to the WMSC's safety oversight authority and WMATA's continued noncompliance. The WMSC will continue to take the steps necessary and permitted by law to assure WMATA's compliance.

As summarized above and detailed in the attached responses to WMATA's objections and responses, WMATA's threshold objections to the WMSC's authority and the scope of the Audit are without merit and do not justify WMATA's refusal to produce responsive documents and comply with the Audit. Also, as detailed in Attachment B, the WMSC is sensitive to WMATA's concerns about the quantity of responsive paper records and the need to protect confidential personal information of WMATA employees. As you know, the WMSC and WMATA have successfully addressed similar concerns in prior audits and investigations. The WMSC will continue to work with WMATA to review responsive information without undue burden and to preserve the confidentiality of personal information.

The WMSC continues to seek a collaborative approach to these issues and appreciates WMATA's stated willingness to cooperate and resolve any differences without the need to resort to further enforcement measures. It is the WMSC's strong desire that, having now exchanged formal written statements of our respective positions, the WMSC and WMATA can resume our historic practice of finding practical solutions to differences of perspective to assure the safety of

---

[5] Email from Jayme Johnson, SVP and Assistant Chief Safety Officer, to Ashley Rhodes on March 18, 2024,

Metrorail operations. The WMSC herein provides a detailed response to your May 6 objections, and trusts that our explanation of the unambiguous legal authority underlying the Subpoena will allow us to engage in productive discussions.

Now that WMATA and the WMSC have exchanged detailed written objections and responses, I suggest that we meet as soon as possible to discuss the remaining issues regarding the production of documents to allow the Audit to proceed without further delay. I will call your office this week to arrange a convenient time.

Sincerely,

*Kathleen Silbaugh*

Kathleen Silbaugh
General Counsel

Cc: The WMSC Commissioners

## ATTACHMENT A

### Responses to General Objections

In its general objections, WMATA argues that several areas of the Audit are beyond the scope of the WMSC's statutory authority.[6] That argument is based on a strained interpretation of selected provisions of the WMSC Compact that ignores the controlling provisions that grant the WMSC the authority to pursue the Audit.

Response to General Objections 1–3

Objections 1–3 do not object to the Subpoena nor any request in it. The WMSC reserves the right to dispute the invocation of the rights asserted therein.

Response to General Objection 4(a)

WMATA objects to the Subpoena generally on the ground that the WMSC lacks the authority to address "occupational workplace safety." WMATA Response at 4. Multiple provisions of the WMSC Compact and federal law make clear, however, that the WMSC has the power, if not the obligation, to audit WMATA's occupational health and safety programs.

*First*, a plain reading of the WMSC Compact makes clear that the WMSC has the authority to audit WMATA's occupational health programs. The WMSC is empowered to "[i]nvestigate hazards, incidents, and accidents on the WMATA Rail System." WMSC Compact § 3(d). That authority encompasses occupational health and fitness for duty issues that are, or may contribute to, "hazards, incidents, and accidents." The Audit seeks, among other things, to investigate hazards that might lead to worker injuries or illness. Additionally, the WMSC is authorized to "[c]onduct, or cause to be conducted, inspections, investigations, examinations, and testing of WMATA personnel and contractors, property, equipment, facilities, rolling stock, and operations of the WMATA Rail System." WMSC Compact § 31(a). That authority expressly recognizes the WMSC's responsibility to investigate the safety of Metrorail personnel.

Metrorail personnel should work in a safe environment. The WMSC's authority extends to ensuring that is so because the occupational health and safety of Metrorail employees is critical to assure the safe operation of Metrorail. For example, if workers become ill due to a workplace hazard under WMATA's control, leading to a train accident due to insufficient staffing, the WMSC would investigate the cause of the worker shortage. Similarly, a broken chair in a Metrorail facility that distracted a controller or train operator could lead to a safety event endangering passengers. Under WMATA's narrow reading of the WMSC's authority, the WMSC could not pursue an investigation into the causes of those safety events because the cause included the health of workers. Such a limited investigation would not allow the WMSC, or WMATA, to fully address the cause of the safety event and would leave unaddressed a clear safety problem. Nothing in the WMSC Compact contemplates, much less requires, such a hamstrung investigation, and the

---

[6] Specifically, WMATA claims that Requests 2, 3, 11, 12, and 21-28 are beyond the WMSC's authority because they relate to "workplace safety" and that Requests 9, 13-16, and 18 are improper because they seek information "that overlaps or exceeds information WMATA provides to FTA during regular on-site audits." WMATA Response at 4–5.

investigation report would not comply with the FTA requirements of identifying the factors that caused or contributed to the event.[7]

WMATA attempts to draw a distinction between "Metrorail safety" and "the general health and welfare of WMATA employees." WMATA Response at 4. But nothing in the WMSC Compact or applicable law supports that distinction. WMATA must provide a safe work environment for its personnel. Also, it is impossible to separate "Metrorail safety" from "occupational health" because Metrorail cannot operate safely without healthy staff, and a workplace with occupational health and safety dangers necessarily impairs the safety of the entire Metrorail system and its passengers.[8]

More broadly, the WMSC Compact grants the WMSC the "exclusive safety oversight authority and responsibility over the WMATA Rail System pursuant to federal law." WMSC Compact § 3(a). The WMSC Compact does not define the term "safety," but the plain meaning of the term demonstrates that it includes the safety of workers from dangers within their workplace that are the focus of the Audit. Nothing in the WMSC Compact suggests otherwise. Contrary to WMATA's repeated assertion that the WMSC Compact somehow narrowly defines the WMSC's authority, Section 57 instructs that the WMSC Compact "shall be liberally construed," making clear that the WMSC's safety oversight authority is broad in nature. Occupational health and safety falls within that authority for the simple reason that personnel should work in a safe environment, and sick or injured personnel cannot perform their duties with the requisite attention and diligence needed to ensure a safe rail system.

Also contrary to WMATA's assertion, the definition of the term "WMATA Rail System" does not exclude occupational health and safety. That term is used to define *where* the WMSC's authority and responsibility extends, not the facets of safety that the WMSC must oversee. The WMSC Compact defines the "WMATA Rail System" to mean "the rail fixed guideway public transportation system and *all other real and personal property* owned, leased, *operated, or otherwise used* by WMATA rail services." WMSC Compact § 1(m) (emphasis added). Reading the definition as a limit on the subjects that WMSC can oversee would prevent the WMSC from overseeing anything relating to WMATA personnel, including fitness for duty and even training, leading to the illogical results discussed above. Accordingly, the definition shows only that the WMSC's safety oversight authority extends not only to tracks and tunnels but also to stations and employee break areas. The occupational health aspects of the Audit seek information about how Metrorail property may present dangers to Metrorail employees as they use that property to operate Metrorail. Accordingly, occupational health and safety is plainly encompassed within the WMSC's "exclusive safety oversight authority and responsibility over the WMATA Rail System" which must be construed "liberally." WMSC Compact § 57.

*Second*, the WMSC Compact makes the WMSC the state safety oversight agency ("SSOA") with responsibility for WMATA. WMSC Compact § 2. As an SSOA—and by the plain terms of the WMSC Compact—the WMSC is required to ensure WMATA's compliance

---

[7] *See* 49 C.F.R. § 674.35.

[8] The WMSC further notes that the Audit is focused on health and safety issues that arise from Metrorail property, facilities, and operations, not on health and safety issues Metrorail employees may encounter outside of their work duties. The occupational health aspects of Audit address how Metrorail property and operations might adversely affect the health and safety of Metrorail employees.

with its PTASP. 49 U.S.C. § 5329(e)(4)(A)(iv), (vi); WMSC Compact § 30(b), (e); 49 C.F.R. § 674.25(b), (c). WMATA's PTASP, in turn, must include "strategies to minimize the exposure of the public, personnel, and property to hazards and unsafe conditions," 49 U.S.C. § 5329(d)(1)(D), with hazards defined to include "any real or potential condition that can cause injury, illness, or death," 49 C.F.R. §§ 670.5, 673.5, 674.7. Consequently, a PTASP is required to include strategies to mitigate risks of illness and injury that agency employees face at their job sites, and the WMSC is required to ensure WMATA's compliance with those strategies.[9]

To carry out that statutory mandate, WMATA's PTASP details its occupational safety and health strategies and programs. The PTASP describes the role of the Office of Occupational Safety and Health, lays out future steps the agency will take to promote occupational safety and health, explains how occupational safety and health ensures employees can carry out their duties safely, and provides for occupational safety and health training. PTASP at 31, 42–43. It notes the agency's role in ensuring compliance with relevant occupational safety and health standards in 29 C.F.R. Parts 1910 and 1926. PTASP at 31. The PTASP also discusses particular components of an occupational health program: it lists certain infectious disease control measures, identifies the division of WMATA responsible for administering substance abuse testing, and states that bloodborne pathogen training is provided to certain employees. PTASP at 5, 17, 41. Pursuant to 49 U.S.C. § 5329(d), 49 C.F.R. Part 674, and the WMSC Compact, the WMSC is required to audit WMATA's occupational health programs.

*Third*, the WMSC Compact directs the WMSC to "[i]mplement and enforce relevant federal and State laws and regulations relating to the safety of the WMATA Rail System." WMSC Compact § 30(d). Accordingly, the WMSC must implement and enforce safety standards—including occupational health and safety standards—promulgated by other agencies. Rather than limit the WMSC's authority as WMATA asserts, the WMSC Compact expressly *extends* the WMSC's authority to include the implementation and enforcement of laws and regulations enforced or promulgated by other agencies. Further, in the event of a conflict between the WMSC Compact and other laws, the WMSC's authority under the WMSC Compact takes precedence over "[a]ll other general or special laws inconsistent with" it. WMSC Compact § 61. Under the terms of the WMSC Compact, therefore, the WMSC's authority is not limited by OSHA's (or any other agency's) authority.

WMATA's arguments to the contrary ignore the statutory and regulatory text, relying instead on inapposite legal concepts. WMATA argues that Congress granted OSHA exclusive

---

[9] In recent correspondence WMATA has stated that "**Federal regulation requires a PTASP to be established but does not mandate compliance with its end-state. It is aspirational,** recognizing that implementation of a Safety Management System takes time. Therefore, WMATA requests that WMSC not base audit findings on elements of the plan that are not fully executed yet or inapplicable to Metrorail safety." Letter from Randy Clarke, General Manager and C.E.O., WMATA, to David Mayer, WMSC C.E.O. (Apr. 29, 2024) (emphasis added). WMATA cites no authority for its position, and there is none. As summarized above, the obligations of WMATA and the WMSC are clear and straightforward. WMATA is required to adopt a PTASP that addresses a wide range of safety issues. *See* 49 U.S.C. § 5329(d). The WMSC, as WMATA's dedicated SSOA, is required to assure compliance with the PTASP. There is nothing in the statute or regulations that suggests that any aspect of a PTASP is merely "aspirational" or that limits the oversight authority of the SSOA. Indeed, because WMATA is currently operating a large and heavily used transit system, the WMSC is concerned that WMATA would consider any element of the PTASP to be merely "aspirational." That said, the WMSC recognizes the practical reality that a transit agency may not have fully realized all aspects of its PTASP. But the purpose of an SSOA audit is to assist the transit agency in fulfilling its safety obligations by identifying areas of concern. The WMSC would expect WMATA to welcome the WMSC's audit as a means to help WMATA realize its aspirations.

authority to regulate occupational health and safety, and so the WMSC, "a different agency," cannot audit WMATA's programs in this area. WMATA Response at 4–5. However, WMATA relies on generalized statements about OSHA's authority to issue regulations regarding workplace hazards or on the faulty premise that the term "occupational health and safety" is not explicitly stated in the WMSC Compact. As detailed above, however, Congress and the Signatories have given the WMSC that authority as part of the WMSC's broad safety oversight authority, authority to enforce the PTASP, and the authority to implement and enforce the regulations that OSHA (and other agencies) issue. WMATA's generalized arguments do not show that OSHA has exclusive jurisdiction to oversee or regulate occupational health and safety at WMATA.

To the contrary, "[w]hen two federal statutes overlap, courts must give effect to both, if at all possible."[10] "Mere overlap between or among federal statutes is not enough to show that one of them is meant to be exclusive over a given subject matter . . . ."[11] Even if there were a conflict, "a more specific statute will be given precedence over a more general one,"[12] and the WMSC Compact, with its requirement for the WMSC to audit WMATA's compliance with its PTASP, to enforce the laws of other agencies, including OSHA, and to assure overall safety on Metrorail, is more specific than a nationwide statute governing safety standards across countless industries.

Moreover, in addition to Section 30(d) of the WMSC Compact, the Occupational Safety and Health Act, too, envisions that state agencies can play a role in enforcing occupational safety and health standards.[13] Pursuant to the WMSC Compact, the WMSC, as an SSOA, stands in the shoes of a state agency. The WMSC Compact and 49 U.S.C. § 5329(e) make clear that the WMSC has the authority to audit compliance with occupational safety and health requirements, including areas regulated by OSHA.

That result makes practical sense. Despite WMATA's protests that the WMSC has no relevant expertise, the WMSC's rail-specific expertise gives it insight into occupational hazards that OSHA and its state counterparts may not have. For example, although the WMSC does not prescribe regulations that govern acceptable levels of lead exposure, it does know what parts of a rail system are likely to create lead hazards that must be mitigated, and which employees might be at risk of lead exposure. As an SSOA, the WMSC has particular insight into rail operations, and it can use that insight to most effectively apply safety standards developed by different subject matter experts. The WMSC has carefully developed the document requests in the Audit and Subpoena that are tied to the WMSC Compact, the PTASP, and other applicable laws, to implement its rail-specific expertise.

Finally, the WMSC notes that much of WMATA's overall view of the WMSC's authority rests not on the language of the WMSC Compact and the federal law discussed above, but on contradictory arguments about the WMSC's authority that exposes WMATA's position as a "heads-I-win, tails-you-lose" argument of convenience. In response to several requests, WMATA objects that the WMSC seeks information that is not required by any other agency. In response to

---

[10] *United States v. Philip Morris*, 263 F. Supp. 2d 72, 76 (D.D.C. 2003) (emphasis omitted); *see also FTC v. Ken Roberts Co.*, 276 F.3d 583, 593 (D.C. Cir. 2001) ("Because we live in an age of overlapping and concurring regulatory jurisdiction, a court must proceed with the utmost caution before concluding that one agency may not regulate merely because another may." (quotation marks and internal citation omitted)).

[11] *Philip Morris*, 263 F. Supp. 2d at 76 (quoting *United States v. Borden Co.*, 308 U.S. 188, 198 (1939)).

[12] *Corley v. United States*, 556 U.S. 303, 316 (2009) (quotation marks omitted).

[13] *See* 29 U.S.C. § 667(a).

other requests, WMATA objects that the WMSC seeks information that *is* required by other agencies. In other words, WMATA seeks to avoid the WMSC's oversight authority entirely, regardless of whether certain activities are regulated by another agency.

In addition to the obvious contradiction, neither argument gives effect to the express provisions of the WMSC Compact. First, the WMSC Compact authorizes the WMSC to implement and enforce applicable federal and state law, which gives the WMSC authority to seek documents required by other agencies. Second, the WMSC Compact grants the WMSC broad and exclusive safety oversight authority and the authority to enforce WMATA's PTASP, neither of which are limited by the terms of applicable federal or state laws. In short, there is no legal basis for WMATA's objections based on the presence or absence of federal or state law in light of the broad and multi-faceted authority conferred in the WMSC Compact.

Response to General Objection 4(b)

WMATA argues that the WMSC's ability to subpoena information relating to its drug and alcohol testing is limited to the information that WMATA submits to the FTA when WMATA provides information to the FTA. WMATA Response at 5-6. WMATA provides no on-point legal authority for that proposition, relying instead on inapposite cases addressing potential agency conflicts in the absence of clear Congressional action. WMATA Response at 6 n.5. Here, Congress and the Signatories have expressly provided the WMSC with broad and exclusive safety oversight authority over WMATA, authorized the WMSC to enforce applicable federal laws, and stated that conflicts between the WMSC Compact and other laws are resolved in favor of the WMSC and its activities. The WMSC Compact § 61. Thus, the WMSC's authority is not limited by FTA's audit activities. Additionally, the WMSC cannot agree to tag along with investigations by FTA (or state OSH programs) because those investigations are narrower in scope than the Audit, and doing so would undermine the very purpose for which the WMSC was established as the State Safety Oversight Agency for the WMATA Rail System. Although the WMSC is happy to receive information WMATA provided to those agencies to streamline WMATA's responses, that information is not sufficient to fully respond to the Audit.

Moreover, WMATA is wrong for many of the same reasons addressed in the WMSC's response to General Objection 4(a). Drug and alcohol testing is a component of safety under the WMSC Compact and is included in the PTASP—the WMSC does not understand WMATA to argue otherwise. Further, the WMSC may enforce FTA's rules pursuant to Section 30(d) of the WMSC Compact. Accordingly, the document requests in the Audit and Subpoena related to drug and alcohol testing are grounded in the WMSC's Compact-derived and statutory powers. There is no requirement in the WMSC Compact or other law that the WMSC base any document requests on the FTA's program audits. Moreover, WMATA's concern about independent audits resulting in conflicting rules is premature, because the WMSC has not issued any rules or orders nor indicated an intent to do so. The WMSC is currently exercising its audit authority only.

WMATA's concerns are further premature because there is no ongoing FTA audit of WMATA's drug and alcohol testing program. FTA's last relevant audit of WMATA closed in 2020. We understand that at some point *after* receiving the Subpoena, WMATA itself *requested* that FTA initiate an audit. WMATA cannot object to the Subpoena based on a potential problem that WMATA itself has intentionally created. In any event, if WMATA is willing to be audited by FTA it cannot reasonably object to being audited by the WMSC. Nor can WMATA decide for itself who its auditors or regulators will be. Congress and the Signatories already decided that

11

WMATA is subject to audit and safety oversight, and enforcement action, by the WMSC *and* by other agencies, including FTA.

### Response to General Objection 5

WMATA's next set of objections concerns the WMSC's alleged lack of experience and expertise. First, the WMSC has the expertise required by FTA under its Technical Training Plan for SSOAs. If the results of the Audit suggest the need for additional expertise, the WMSC is authorized to hire outside "inspectors, engineers, and . . . other experts" to complement its existing expertise. WMSC Compact § 33(e). The WMSC has utilized outside experts routinely, including during many of the previous audits. Similarly, WMATA argues that the WMSC has refused to use "auditing best practices," WMATA Response at 8, but the WMSC disputes that claim and notes that it uses the auditing techniques and practices that fulfill the Compact's mandate issued by Congress and the jurisdictions. Moreover, WMATA fails to show how any failure to use "auditing best practices," even if that were true, excuses WMATA from complying with the Audit. Second, even if WMATA has doubts as to the WMSC's expertise, WMATA is still obligated to comply with the WMSC's Congressionally mandated audit of WMATA to ascertain the existence of safety hazards and WMATA's compliance with its PTASP.

WMATA notes specific examples concerning the WMSC's purported lack of expertise. Although these are irrelevant to the legal conclusion that WMATA must comply with the Subpoena, the WMSC responds to them here. WMATA argues that Subpoena Request 25 seeks medical monitoring results for employees performing hot work (e.g., welding) that OSHA regulations do not require. Similarly, WMATA argues that Subpoena Request 27 seeks air and surface monitoring protocols for toxic or hazardous substances even though there is no OSHA standard with surface contamination criteria for such substances. If WMATA has no responsive records to either Request 25 or 27 then it should state as such. If it does have responsive documents, it should produce them and allow the WMSC to determine if it needs additional expertise to evaluate the documents. As explained above, the presence or absence of regulations promulgated by other agencies does not diminish the WMSC's audit authority.

In any event, the Requests are strictly relevant to worker safety and the safety of the WMATA Rail System, so it is appropriate for the WMSC to make them. The WMSC's authority to audit worker safety and occupational health programs is not limited by OSHA regulations, and WMATA identifies no statutory language that could possibly contain such a limit, for the reasons discussed above. Finally, WMATA includes statements regarding an ongoing Corrective Action Plan to address an asbestos hazard that is not part of the Audit. WMATA's narrative underscores that many of its concerns are premature because the Corrective Action Plan process allows the WMSC and WMATA to collaborate to resolve conflicts between different regulations and ensure appropriate action is taken,

In sum, WMATA's objections based on the WMSC's experience and expertise are unfounded and do not provide a basis for WMATA to withhold responsive documents or to refuse to comply with the Subpoena.

### Response to General Objection 6

Finally, WMATA objects to requests that call for information not within WMATA's possession, alleging that these requests require WMATA to create new records or modify existing records. WMATA also asserts various privileges. The WMSC intended to request documents

within WMATA's possession and not to require WMATA to create or modify existing records. The WMSC believes that all of the requested documents should be in WMATA's possession, and if any documents are not in WMATA's possession, WMATA may so indicate, although the WMSC reserves the right to require corrective action if necessary. The WMSC does not understand how its requests would require WMATA to create new records or modify existing records. If WMATA's concern is that responding to some of the requests may require protecting confidential or non-responsive information, the WMSC is willing to discuss an appropriate way to handle those concerns in order for WMATA to provide responsive information to the WMSC while protecting non-responsive information.

### Response to Privilege and Confidentiality Objections

WMATA asserts a generic claim of privilege, but does not identify any specific documents or class of documents that may be protected by any specific privilege. If WMATA withholds any document or documents, or any portion thereof, based on a claim of privilege, the WMSC requires a log of all such documents indicating clearly the privilege claimed and providing enough information about the document (date, author(s), recipient(s), general topic, document type, etc.) to allow the WMSC to evaluate the claim of privilege. As the WMSC has previously stated when WMATA raises a concern about privilege or confidentiality, the WMSC will evaluate all properly presented claims.

### Response to the Suggestion of Mediation

The core of WMATA's objections is legal in nature, challenging the WMSC's authority to audit occupational safety issues. Fundamental questions of legal authority are not conducive to mediation, which is conducted by a third-party neutral without authority to bind either party to a particular outcome. The WMSC believes that once the legal issues are resolved, the WMSC and WMATA can resolve any remaining practical issues, such as inspecting documents and preserving confidential information, through the kind of cooperative efforts that have historically characterized our relationship.

---

**ATTACHMENT B**

**Common Responses to Specific Objections**

Many of WMATA's specific objections are repetitive and lack specificity. Rather than repeat our response to each common objection each time it is raised, the WMSC states its response here and incorporates its response to each specific objection as referenced below.

Response to the Objection that Documents are Available in Paper Form and Include Confidential Information

WMATA objects to Requests 9, 13, 14, 15, 26, 27, and 28 on the grounds that the requested records are not stored electronically. This objection does not justify withholding responsive documents. As to each, WMATA's responsibility for complying with the safety regulations implicated by those requests mean it cannot claim any undue burden to demonstrate compliance.[14] Further, where there is a preexisting expectation that the government might request a business's records, the business's choice to store documents in a difficult-to-use database meant that the burdens of production could not excuse its compliance with a subpoena.[15]

WMATA objects to the same Requests on the grounds that the requested records include PII or other confidential medical information and it would be an undue burden to require WMATA to review and redact PII. WMATA's concerns regarding PII and other confidential information are overstated. WMATA may make a request for confidential treatment along with a statement justifying nondisclosure. Relatedly, the WMSC does not require redaction of the requested records prior to submission.

Further, in prior audits the WMSC and WMATA have developed ways to protect personal information, by producing documents through a secure share file, but also by producing anonymized data, and/or by ensuring that the WMSC redacts any personal information before publicly posting reports that reference documents that contain PII. The information the WMSC requests in the Audit is similar in nature to those earlier requests and the WMSC sees no reason why WMATA and the WMSC cannot use similar methods of protecting confidential information here. To be clear, the WMSC will maintain the confidentiality of any PII or personal medical information and will cooperate with WMATA to protect the confidentiality of such information as required by law. The presence of confidential information does not prevent WMATA from producing the information to the WMSC.

Response to the Objection that the Requests are Overly Broad

WMATA objects to Requests 3, 12, 16, 26, 27, and 28 on the grounds that they are overly broad. The WMSC seeks only responsive documents that apply to Metrorail, which are well within the WMSC's authority to request as described above. The WMSC understands that responsive documents may also apply to Metrobus or other aspects of WMATA operations but fails to see

---

[14] The WMSC notes its concern that WMATA continues to maintain these documents only in paper form. In CAP C-0130, WMATA committed to a plan to convert these and similar records into electronic format to allow WMATA to use the information for identification, tracking, and trending issues. It also allows for the WMSC, FTA, or another agency to readily audit compliance. The administrative burdens WMATA cites as cause to avoid compliance with this audit are self-imposed and cannot justify any failure to produce responsive documents.

[15] *Capitol Supply*, 27 F. Supp. 3d at 105.

how that makes any Request overly broad. If responsive policies, procedures, or other documents apply to Metrorail, WMATA must produce them.[16] Indeed, WMATA is *required* to make Agency Safety Plan documentation and records available to the WMSC upon request.[17] Therefore, WMATA must provide any and all documentation responsive to these Request—leaving the WMSC to filter out unrelated material, thereby conserving WMATA's resources, if needed. To the extent that responsive documents contain information about training programs that do not apply to Metrorail, the WMSC will simply disregard that information. The WMSC is also willing to confer with WMATA regarding how to segregate data regarding Metrorail operations or personnel from data that may also contain information about Metrobus operations or personnel.

### Responses to Specific Objections

In addition to the WMSC's responses to WMATA's "General Objections," which are incorporated herein, the WMSC hereby addresses the "Specific Objections" set forth in WMATA's letter dated May 6, 2024.[18]

**Request 2(b)**: **All policies and procedures (Metrorail-wide, departmental, organizational unit level and all documents from policy instructions down to work instructions) related to occupational health programs.**

Request 2(b) seeks the policies and procedures WMATA and Metrorail have in place to implement the occupational safety and health risk management program, which includes compliance with OSHA and FTA standards, Agency Safety Plan § 3.2.1, so the WMSC can assess how WMATA and Metrorail are implementing and enforcing those programs. This request is clearly within the WMSC's safety oversight authority and WMATA's objections do not provide a basis to refuse to produce responsive information.

*The WMSC's Authority.* WMATA objects that Request 2(b) is "beyond the scope" of the WMSC's authority." WMATA Response at 8. However, Request 2(b) is firmly within the WMSC's safety oversight authority. First, the WMSC has the authority to "enforce Federal and relevant State laws and regulations relating to safety" that are applicable to WMATA.[19] WMATA

---

[16] *See, e.g., Am. Immigr. Lawyers Ass'n v. Exec. Office for Immigr. Rev.*, 830 F.3d 667, 677–78 (D.C. Cir. 2016).

[17] 49 C.F.R. § 673.31 ("At all times, a transit agency must maintain documents that set forth its Public Transportation Agency PTASP, including those related to the implementation of its Safety Management System (SMS), and results from SMS processes and activities. A transit agency must maintain documents that are included in whole, or by reference, that describe the programs, policies, and procedures that the agency uses to carry out its [PTASP]. These documents must be made available upon request by . . . a State Safety Oversight Agency having jurisdiction.").

[18] The WMSC notes that WMATA did not specifically object to the following Requests: 1(a), 1(b). 2(a). 4, 5, 6, 7, 8, 10, 17, 19, and 20. WMATA specifically objected to Request 18 ("The most recent drug and alcohol management information system (MIS) data report submitted to the U.S. Department of Transportation") but assured the WMSC that it "will produce . . . the 2023 and 2024 MIS reports previously submitted to the U.S. Department of Transportation" regardless.[18] Thus, the WMSC does not address the specific objection to Request 18 in detail.

[19] 49 U.S.C. § 5329(e)(3)(B); *see* WMSC Compact § 2 (By the power vested in Congress and the signatory States to the Metrorail Safety Commission Interstate Compact, the WMSC "shall have safety regulatory and enforcement authority over the WMATA Rail System and shall act as the [SSOA] for WMATA under 49 U.S.C. § 5329. WMATA shall be subject to the Commission's rules, regulations, actions, and orders.); *see also* WMSC Compact § 30 (The WMSC's Safety Oversight Powers include the authority to: "(b) [r]eview, approve, oversee, and

is subject to the federal Occupational Safety and Health Act of 1970 ("OSH Act") and the regulations promulgated thereunder,[20] as well as regulation through the Maryland Occupational Safety and Health ("MOSH") and Virginia Occupational Safety and Health ("VOSH") programs. WMATA does not dispute that the documents in Request 2(b) are required by regulations concerning safety of the rail system—in fact, WMATA confirms as much by acknowledging in the PTASP that it will comply with the relevant OSHA regulations, 29 C.F.R. Part 1910.[21]). As discussed in response to WMATA's General Objections, the WMSC has the authority to "implement and enforce" those regulations pursuant to the WMSC Compact Section 30(d).

Second, the WMSC is required to assure compliance with WMATA's Agency Safety Plan pursuant to the WMSC Compact Section 30(b) and 49 U.S.C. § 5329(e)(3)(B).[22] Occupational Health programs are expressly included in the Agency Safety Plan. Agency Safety Plan at 17, 31–32 (including "Occupational Health and Wellness," "Occupational Safety and Health Risk Management," and "Environmental Risk Management"). Those programs are not incidental. As described in the Agency Safety Plan, WMATA has established an Office of Occupational Safety and Health ("OSH") with "subject matter experts" to "oversee [WMATA's] occupational safety and health programs" and, as of December 2023, to "oversee [WMATA's] Fitness for Duty Program."[23] The OSH is situated under the umbrella of Safety Risk Management ("SRM"),[24] which is a required component of WMATA's Agency Safety Plan.[25] Because the WMSC must oversee the implementation of WMATA's Agency Safety Plan, it is responsible for ensuring that WMATA's policies and procedures related to occupational health programs are complete and adequate.[26] Accordingly, the WMSC has the authority to audit those programs to assure compliance with the Agency Safety Plan.

Third, as also discussed above, the WMSC has the authority to request this information as part of the WMSC's "exclusive safety oversight authority and responsibility."

*Regulation by Other Agencies.* WMATA objects that this request covers programs subject to regulation by other agencies, including OSHA, MOSH, and VOSH. This is not a valid basis to withhold responsive documents. As discussed above, the fact that certain programs may be regulated or required by other federal, state, or local regulatory entities in no way excuses WMATA's obligation to comply, and WMATA does not cite any provision of law to the contrary, or any other authority to suggest that the WMSC cannot audit activities regulated by other agencies. Indeed, as explained in response to WMATA's General Objections, the WMSC

---

enforce the . . . implementation of WMATA's Public Transportation Agency PTASP; (c) [r]equire, review, approve, oversee, and enforce the . . . implementation of any Corrective Action Plans that the Commission deems appropriate; (d) [i]mplement and enforce relevant federal and State laws and regulations relating to safety of the WMATA Rail System; (e) [perform triennial audits].").

[20] 29 C.F.R. Part 1910.

[21] PTASP §§ 2.4.2 and 3.2.1.

[22] 49 U.S.C. § 5329(e)(8) (the WMSC, as a certified SSOA, must "ensure the enforcement of Federal safety regulation" and "provid[e] adequate safety oversight" of WMATA consistent with this section).

[23] PTASP § 3.2.1.

[24] *Id.* § 2.4.2.

[25] 49 C.F.R. § 673.25.

[26] *Supra* note 23.

Compact makes clear that the WMSC must oversee WMATA in addition to those other agencies. The jurisdictions and Congress gave the WMSC "exclusive safety oversight authority and responsibility over the WMATA Rail System pursuant to federal law"[27] and authorized the WMSC to implement and enforce applicable safety laws also enforced by other agencies. To remove any doubt, the WMSC Compact makes clear that any limitation in other laws does not limit the WMSC's authority over WMATA.[28]

*Vagueness.* WMATA objects that the term "occupational health programs" is "vague" or "overly broad."[29] Those objections lack merit. The February 9, 2024 Audit notification letter explains the scope and objectives of the audit. Additionally, WMATA's Agency Safety Plan identifies its "occupational health programs" that apply across the whole of WMATA. The WMSC seeks copies of the policies, procedures, and instructions related to those programs that WMATA has promulgated or issued, or that otherwise apply to Metrorail. The WMSC fails to see what is vague about that request. If WMATA has questions as to whether any specific document is responsive, the WMSC is available to discuss them. Similarly, WMATA's overbreadth objection is not a basis to withhold documents. The WMSC seeks responsive documents that apply to the safety of the Metrorail. If any responsive documents apply to Metrorail as well as to Metrobus or other non-rail aspects of WMATA, WMATA should produce them, and the WMSC can disregard portions of those documents that do not apply to Metrorail. Similarly, if responsive information is included in documents that do not exclusively involve occupational health, the WMSC can disregard the non-responsive information. WMATA cites no basis for withholding documents on these grounds, and WMATA's unilateral refusal to produce responsive documents is inconsistent with the WMSC's broad authority to "[e]nter upon the WMATA Rail System . . . for the purpose of making inspections, investigations, examinations, and testing as the Commission may deem necessary to carry out the purposes of [the WMSC] Compact . . . ."[30]

*Wasteful Duplicative Audit.* WMATA objects that this request is "wasteful" because it is "duplicative" of audits by other agencies.[31] This objection fails to excuse non-compliance. First, as described above, the fact that other agencies have overlapping authority with the WMSC does not limit the WMSC's authority or WMATA's obligations to cooperate with the WMSC. Second, although the audits may be "overlapping," they are not duplicative because the scope of the WMSC's audits is broader than investigations by OSHA or the FTA. The WMSC's audits extend beyond compliance with discrete regulatory provisions to assess system-wide compliance with Metrorail safety requirements, and to address other system-wide hazards and safety issues. For example, the WMSC has the authority to order and monitor WMATA's compliance with Corrective Action Plans ("CAPs"), which are not limited by the regulations of other agencies.

Third, WMATA's argument that "a duplicative audit by the WMSC . . . could result in conflicting findings, directives, or orders given OSHA's expertise in this area"[32] is irrelevant because, as described above, the WMSC Compact expressly gives the WMSC authority to

---

[27] WMSC Compact § 3(a).

[28] *Id.* § 61.

[29] WMATA Response at 8.

[30] WMSC Compact § 31(b).

[31] WMATA Response at 8.

[32] *Id.*

implement and enforce applicable federal and state laws in addition to any other agency. Moreover, WMATA's position does not justify its refusal to produce documents for this audit. WMATA's concern that the Audit may result in conflicting directives issued by another agency is entirely conjectural and may never occur. And if it did occur, the WMSC's distinctive Corrective Action Plan process provides a mechanism to resolve any conflict at that time. The WMSC's practice is to require "minimum corrective actions:" or generally to require that WMATA develop and implement a corrective action plan and relies on WMATA to formulate the best means to correct the issue. The WMSC and WMATA typically engage in extensive dialogue over the details of each of WMATA's proposed corrective action plans, and only after WMATA's proposed or actual corrective action proves to be inadequate will the WMSC consider prescribing a particular method of compliance. If the WMSC and another agency were to issue findings on the same issue, the WMSC would work with the other agency and WMATA to develop a single, appropriate corrective action plan.

*Undue Burden.* WMATA asserts that compliance is somehow unduly burdensome because there are dual audits and proposes that the WMSC participate in an unspecified audit conducted by the Occupational Safety and Health Administration ("OSHA") to avoid "unduly burdening WMATA resources."[33] Undue burden in the context of an administrative subpoena is a difficult burden to meet. A subpoena will be enforced unless "the demand is *unduly* burdensome or *unreasonably* broad."[34] Provided that the subpoena is for a lawful purpose and meets the relevance standard, a subpoena is only overly burdensome and broad if "compliance threatens to unduly disrupt or seriously hinder normal operations of a business."[35] "Some burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest."[36] Moreover, agencies have broad rights to monitor their regulated entities to ensure their "'behavior is consistent with the law and the public interest,' even if [agency monitoring is] prompted by 'nothing more than *official curiosity*.'"[37] Further, where there is a preexisting expectation that the government might request a business's records, the business's choice to store documents in a difficult-to-use database means that the burdens of production cannot excuse its compliance with a subpoena.[38]

WMATA does not meet the undue burden standard here. WMATA makes no showing that responding to the WMSC's audit would "seriously hinder" its operations or otherwise be unduly disruptive. WMATA's past and continued cooperation with the WMSC on other audits and investigations undercuts that suggestion, as does its stated willingness to respond to audits by other agencies. Moreover, WMATA has long been on notice that it would be subject to audits by the

---

[33] *Id.*

[34] *FTC v. Texaco, Inc.*, 555 F.2d 882 (D.C. Cir. 1977) (emphases in original).

[35] *Id.*; *see also Linde Thomson Longworthy Kohn & Van Dyke, P.C. v. Resolution Tr. Corp.*, 5 F.3d 1508, 1517 (D.C. Cir. 1993); *United States CFTC v. Ekasala*, 62 F. Supp. 3d 88, 94 (D.D.C. 2014); *United States v. Capitol Supply, Inc.*, 27 F. Supp. 3d 91, 101 (D.D.C. 2014). The standard is "a difficult one to meet." *FTC v. Invention Submission Corp.*, Misc. No. 89-272, 1991 U.S. Dist. LEXIS 5523, at *8 (D.D.C. Feb. 13, 1991), *aff'd* 965 F.2d 1086 (D.C. Cir. 1992).

[36] *Texaco,* 555 F.2d at 882.

[37] *SEC v. Covington & Burling, LLP,* No. 23-mc-2, 2023 U.S. Dist. LEXIS 127205, at *25 (D.D.C. July 24, 2023) (quoting *United States v. Morton Salt,* 338 U.S. 632, 652 (1950)).

[38] *Capitol Supply,* 27 F. Supp. 3d at 105.

WMSC and other agencies, so it cannot claim an undue burden now that the WMSC is conducting an audit.

In any event, WMATA's claim of undue burden fails to survive scrutiny. If WMATA has provided responsive material to another agency, producing it to the WMSC imposes no undue burden because the material has already been compiled. If the WMSC's request is broader than that of another agency, then there is no duplication of WMATA's effort. And if WMATA has not yet responded to the audit of another agency, then responding to the WMSC's audit is not duplicative and WMATA can use the WMSC responses to respond to the later audit. In any case, there is no undue burden on WMATA.

Moreover, Requests 2(b) and 3 are not duplicative of each other because Request 3 seeks on documents "not provided in response to #2." Ultimately, WMATA does not explain how submission of its existing policies and procedures is "unduly burdensome," particularly if they have already been produced to another agency. WMATA does not show that it can meet the high hurdle of "unduly burdensome."

Finally, WMATA provides no support for its suggestion that the WMSC should participate in an OSHA inspection or investigation rather than conduct its own Audit. Although the WMSC is not aware of any ongoing or proposed investigation by OSHA, the WMSC has the independent authority to conduct the Audit, even if there is overlap with audits by other agencies, as explained above. Further, WMATA fails to show any actual burden, much less an undue burden, of providing its existing policies and procedures. The Audit is different in scope and purpose than audits and investigations that may be conducted by other agencies, and the WMSC cannot meet its statutory obligations by relying on possible audits by other agencies operating under different statutory obligations.

**Request 3(a)–(l): [If not provided in response to #2] Provide current program documents including any governing documents and procedures (Metrorail-wide, departmental, organizational unit level and all documents from policy instructions down to work instructions) for the following programs: Walking-Working Surfaces; Environmental Control; Hazardous Materials; Personal Protective Equipment; General Environmental Controls; Medical and First Aid; Materials Handling and Storage; Machinery and Machine Guarding; Hand and Portable Powered Tools/Hand-Held Equipment Guarding; Welding, Cutting, and Brazing; Electrical Safety; and Toxic and Hazardous Substances.**

Request 3 seeks existing policies and procedures for addressing specific occupational health and safety issues that are reflected in the Agency Safety Plan and/or OSHA standards. Specifically, Request 3 seeks the policies and procedures WMATA has in place to comply with OSHA regulations in 29 C.F.R. Part 1910[39] that WMATA has included in the Agency Safety Plan. The WMSC seeks this information to assess the effectiveness of WMATA's occupational health programs, with an emphasis on areas of occupational health that have been at issue in recent safety concerns. This request is clearly within the WMSC's safety oversight authority and WMATA's objections do not provide a basis to refuse to produce responsive information.

---

[39] 29 C.F.R. Part 1910, Subparts D, G, H, I, J, K, N, O, P, Q, S, Z, respectively.

*Regulation by Other Agencies.*  WMATA objects to the WMSC's "efforts to review programs already under extensive oversight from competent and cognizant agencies."[40]  As explained above, the WMSC Compact gives the WMSC the authority to implement and enforce all applicable federal and state laws, assure compliance with the Agency Safety Plan, and exercise exclusive safety oversight authority over WMATA even if WMATA is also subject to regulation by another agency.[41]  Because WMATA is subject to the requirements of 29 C.F.R. Part 1910, and has included those regulations in the Agency Safety Plan,[42] the WMSC is well within its authority to assess whether WMATA is complying with OSHA regulations, complying with the Agency Safety Plan, and generally assuring a safe workplace by reviewing WMATA's existing procedures and practices to determine compliance with WMATA's acknowledged obligations.

*Vagueness.*  WMATA objects that Request 3 is "vague as each sub-part of [Request 3] appears listed directly in OSHA's regulations at 29 C.F.R. Part 1910, without identifying any WMATA program."  The WMSC does not understand how this Request is vague.  To further clarify, the "program" is Metrorail and the WMSC requests the procedures for each category as they may apply to Metrorail operations.  If WMATA is unsure whether any specific document or group of documents is responsive, the WMSC is available to address WMATA's questions.  But as written, Request 3 is specific and relates to regulatory obligations WMATA acknowledges apply to it.  The Request is not vague.

**Request 9: All completed drug and alcohol information requests transmitted to job applicants' prior DOT employers for the period of September 1, 2023, through December 31, 2023.**

WMATA is required to request the drug and alcohol testing information of an applicant from prior DOT employers before placing that applicant in a safety-sensitive position.  40 C.F.R. § 40.25.  Request 9 seeks to obtain evidence of WMATA's compliance with this requirement.  This request is clearly within the WMSC's safety oversight authority and WMATA's objections do not provide a basis to refuse to produce responsive information.

Because WMATA has agreed to make responsive documents available for inspection, the WMSC will not respond in detail to WMATA's objections other than to incorporate its response to WMATA's Objections to Requests 2 and 3.  Because WMATA is required to comply with 40 C.F.R. § 40.25, the WMSC has clear authority to audit compliance and WMATA cannot claim any undue burden to demonstrate compliance or simply assert that it takes appropriate action based on the information it receives from past DOT employers.

---

[40] WMATA Response at 10.

[41] 49 U.S.C. § 5329(e)(3)(B); *see* WMSC Compact § 2 (By the power vested in Congress and the signatory States to the Metrorail Safety Commission Interstate Compact, the WMSC "shall have safety regulatory and enforcement authority over the WMATA Rail System and shall act as the [SSOA] for WMATA under 49 U.S.C. § 5329.  WMATA shall be subject to the Commission's rules, regulations, actions, and orders.); *see also* WMSC Compact § 30 (the WMSC's Safety Oversight Powers include the authority to: "(b) [r]eview, approve, oversee, and enforce the . . . implementation of WMATA's Public Transportation Agency PTASP; (c) [r]equire, review, approve, oversee, and enforce the . . . implementation of any Corrective Action Plans that the Commission deems appropriate; (d) [i]mplement and enforce relevant federal and State laws and regulations relating to safety of the WMATA Rail System; (e) [perform triennial audits].").

[42] PTASP §§ 2.4.2 and 3.2.1.

While reserving all of its rights in the event WMATA does not fully respond to Request 9, the WMSC looks forward to making the appropriate arrangements to inspect and copy as necessary all responsive documents.

**Request 11: All training requirements related to fitness for duty and occupational health programs.**

WMATA is subject to a regulatory array of training requirements related to fitness for duty and occupational health, as identified in the Agency Safety Plan and regulations. *E.g.*, 29 C.F.R. Part 1910. Request 11 requests information demonstrating that WMATA is aware of its training obligations, including those described in the Agency Safety Plan § 5.1.1. This request is clearly within the WMSC's safety oversight authority and WMATA's objections do not provide a basis to refuse to produce responsive information.

*Duplicative and Beyond the WMSC's Authority.* WMATA objects to Request 11 as duplicative and beyond the WMSC's authority over "rail safety" for the same reasons WMATA objected to Requests 2 and 3. WMATA Response at 11. Those objections do not justify WMATA's refusal to produce responsive documents for the same reasons the WMSC discussed in response to WMATA's General Objections and objections to Requests 2 and 3, above, which the WMSC incorporates herein by reference. Fundamentally, the WMSC Compact authorizes the WMSC to verify that WMATA properly understands Metrorail's fitness for duty and occupational health training obligations by asking WMATA to identify those requirements.

*Undue Burden.* WMATA objects that this request is "unduly burdensome, particularly in that the information requested is just as readily available to the WMSC as to WMATA."[43] WMATA fails to show how producing responsive documents meets the high bar of "undue burden," as described above. The fact that responsive documents are just as available to the WMSC as to WMATA is immaterial for two reasons. First, the purpose of the request is to verify that WMATA understands what its training obligations are; the WMSC's awareness of those requirements cannot show WMATA's knowledge. Second, WMATA suggests that it has already produced at least some responsive documents by objecting to producing documents repetitive of the "WMSC's Initial Audit Requests."[44] If WMATA has produced some responsive information, there can be no undue burden to producing the remaining responsive information. With respect to any responsive information WMATA may have already produced, WMATA may incorporate those documents in its response by referring to the date and/or number of production.

*Vague.* WMATA objects that Request 11 is "vague, as to 'All training requirements related to' and 'occupational health programs'" without providing any more explanation. The Request is not vague. WMATA is responsible for implementing training requirements published in federal regulations,[45] which are explicitly identified in the Agency Safety Plan as "training requirements," as well as developing and implementing its own training requirements.[46] Those terms are

---

[43] WMATA Response at 11.

[44] *Id.*

[45] *E.g.*, 29 C.F.R. §§ 1910.332, 1910.30.

[46] PTASP § 4.1.1 ("Departments that perform maintenance activities are required to coordinate across Metro to develop and maintain Maintenance Control Plans that include: . . . Minimum training requirements for personnel engaged in maintenance activities"); *id.* § 5.1 ("Each department has developed training systems that include in-house

commonly used in the industry and not at all vague. Moreover, WMATA's Office of Occupational Safety and Health ("OSH") is staffed with "subject matter experts" to "oversee [WMATA's] occupational safety and health programs"[47] who should be well equipped to provide any further clarification as to "occupational health programs." If WMATA is unsure whether any specific program is responsive, the WMSC is available to discuss the matter.

Moreover, the Agency Safety Plan contains significant detail about WMATA's internal development of training requirements.[48] In section 5.1.1 ("Employee Safety Training"), WMATA explicitly claims responsibility for "establishing training requirements" for "safety-related courses" such as "Hazardous Materials/Hazard Communication" and "Bloodborne Pathogens."[49] These topics are defined in relevant occupational health and safety regulations.[50] WMATA's internal Department of Safety requires training across a host of "Industrial Hygiene and Occupational Safety and Health" topics, including asbestos awareness, electrical safety, HAZWASTE management, and lead awareness.[51] WMATA further explains that "[Safety Management System] training for managers and employees will be developed by incorporating lessons learned,"[52] which is of high importance for the WMSC's safety oversight and auditing purposes in light of safety concerns that have arisen with WMATA employees over the last year. WMATA cannot claim, in good faith, that it does not comprehend what information falls within the scope of "training requirements related to . . . occupational health programs."

WMATA's reticence to comply with this request is particularly concerning because WMATA claims in its Agency Safety Plan that these requirements not only exist but are closely managed in an electronic database. The "Training Recordkeeping" provision within section "5.0: Safety Promotion" of the Agency Safety Plan states that "[t]raining records are maintained in an Enterprise Learning Management (ELM) system that is available to WMATA supervisors and employees. The [training] course owners . . . are responsible for updating and maintaining their training rosters in this database."[53] Additionally, "key [Safety Management System] documentation [is] made available to all Metrorail personnel on its intranet through the *MetroDocs site on Metroweb*."[54] Per the Agency Safety Plan, therefore, the information demanded in this and other requests contained in the April 8 Subpoena should be immediately available for submission.

Finally, the Agency Safety Plan confirms that "[a]ll the documentation referenced in the [Agency Safety Plan] is considered [Safety Management System] documentation" that shall be provided to the WMSC "when requested." WMATA is to direct its "officials, employees,

---

classroom training, on-the-job training, equipment safety training, and testing."); *id.* § 5.1.1 ("Metro continuously improves its comprehensive staff training program for operations and maintenance personnel. . .. Each department is responsible for training requirements . . ..."). See also PTASP § 3.2.1 (incorporating 29 C.F.R. Part 1910).

[47] PTASP § 3.2.1.

[48] *Supra* note 46.

[49] PTASP § 5.1.1.

[50] 29 C.F.R. §§ 1910, subpart D and subsection 1910.1030, respectively.

[51] PTASP § 5.1.2.

[52] *Id.* § 5.1.6.

[53] *Id.* § 5.1.4.

[54] *Id.* § 6.0.

consultants, and contractors . . . to cooperate and respond immediately to requests made by the WMSC personnel and to promptly provide any requested information directly to WMSC."[55]  That obligation to produce information is also contained in the WMSC's Program Standard[56] and federal regulation.[57]

**Request 12: All training curricula, trainings, class schedules, and exams related to fitness for duty and occupational health programs.**

Request 12 seeks documents that demonstrate how WMATA implements the training requirements referenced in Request 11 so that the WMSC can assess the scope, relevancy, and compliance of WMATA's training programs.  This request is clearly within the WMSC's safety oversight authority and WMATA's objections do not provide a basis to refuse to produce responsive information.

*Duplicative and Beyond the WMSC's Authority.*  WMATA objects to Request 12 as duplicative and beyond the WMSC's authority over "rail safety" for the same reasons WMATA objected to Requests 2 and 3.  WMATA Response at 11.  Those objections do not justify WMATA's refusal to produce responsive documents for the same reasons the WMSC discussed in response to WMATA's General Objections and objections to Requests 2 and 3, above, which the WMSC incorporates herein by reference.  Fundamentally, the WMSC Compact authorizes the WMSC to verify that WMATA is providing adequate, accurate, and current training to meet its fitness for duty and occupational health training obligations.

Finally, the WMSC is pleased that WMATA will produce documents related to reasonable suspicion training, which is part of WMATA's fitness for duty program.  That limited production does not excuse refusing to produce documents relating to other fitness for duty and occupational health training programs.  Similarly, the fact that only some of the OSHA Part 1910 programs have "exam requirements," as WMATA states, does not excuse non-production.  If WMATA does not have responsive documents, it may say so in response to the request.

**Request 13: All completed forms for all random drug/alcohol tests conducted from October 1, 2023, through December 31, 2023.**

WMATA is required to implement FTA rules regarding the prevention of alcohol misuse and use of prohibited drugs pursuant to 49 C.F.R. Part 655.  Request 13 seeks documents generated by WMATA pursuant to FTA's rules to assess the adequacy and the compliance with Metrorail's procedures and requirements of WMATA's drug and alcohol testing procedures.  This request is clearly within the WMSC's safety oversight authority and WMATA's objections do not provide a basis to refuse to produce responsive information.

---

[55] *Id.*

[56] Program Standard § 4(A)(1)(d) ("WMATA's [PTASP] must include the elements required by 49 U.S.C. § 5329 and 49 C.F.R. Part 673 . . . including . . . [a] comprehensive staff training program for the operations personnel directly responsible for the safety of Metrorail."

[57] 49 C.F.R. § 673.31 ("documents . . . related to the implementation of [the transit agency's Safety Management System] . . . must be made available upon request by . . . a State Safety Oversight Agency having jurisdiction.").

Because WMATA has agreed to make responsive documents available for inspection, the WMSC will not respond in detail to WMATA's objections other than to incorporate its response to WMATA's Objections to Requests 2 and 3. Because WMATA is required to comply with 49 C.F.R. § 655, which is also part of the Agency Safety Plan, the WMSC has clear authority to audit compliance and WMATA cannot claim any undue burden to demonstrate compliance.

While reserving all of its rights in the event WMATA does not fully respond to Request 13, the WMSC looks forward to making the appropriate arrangements to inspect and copy as necessary responsive documents.

**Request 14**: Log or tracker for follow-up drug/alcohol tests scheduled to be completed from September 1, 2023, through December 31, 2023.

Request 14 requests information relating to WMATA's compliance with its obligations under 49 C.F.R. § 655.47 to conduct follow-up testing after an employee returns to duty. Under the Agency Safety Plan, WMATA's Office of Occupational Health and Wellness (OHAW) administers these procedures. Agency Safety Plan § 2.4.2.

Because WMATA has agreed to make responsive documents available for inspection, the WMSC will not respond in detail to WMATA's objections other than to incorporate its response to WMATA's Objections to Requests 2, 3, 9, and 13. Because WMATA is required to comply with 49 C.F.R. § 655.47, the WMSC has clear authority to audit compliance and WMATA cannot claim any undue burden to demonstrate compliance with its follow-up testing obligations.

While reserving all of its rights in the event WMATA does not fully respond to Request 14, the WMSC looks forward to making the appropriate arrangements to inspect and copy as necessary responsive documents.

**Request 15**: All completed testing/decision forms of all post-accident and reasonable suspicion tests conducted from July 1, 2023, through December 31, 2023.

Request 15 requests information relating to WMATA's compliance with its obligations under 49 C.F.R. § 655.43 to conduct post-accident and reasonable suspicion tests when WMATA management has cause to believe that an employee has used a prohibited drug and/or engaged in alcohol misuse. Request 15 seeks a copy of testing and decision forms so that the WMSC can assess WMATA's compliance with those requirements and ability to assure that employees are fit for duty.

Because WMATA has agreed to make responsive documents available for inspection,[58] the WMSC will not respond in detail to WMATA's objections other than to incorporate its response to WMATA's Objections to Requests 2, 3, 9, 13, and 14. Because WMATA is required to comply with 49 C.F.R. § 655.43, the WMSC has clear authority to audit compliance and WMATA cannot claim any undue burden to demonstrate compliance with its post-accident and reasonable suspicion obligations.

---

[58] WMATA Response at 13.

While reserving all of its rights in the event WMATA does not fully respond to Request 15, the WMSC looks forward to making the appropriate arrangements to inspect and copy as necessary responsive documents.

**Request 16: All existing data reports/trend data related to drug and alcohol testing program for the period January 1, 2021, through December 31, 2023.**

The Agency Safety Plan references WMATA's Drug and Alcohol Policy and Testing Program and WMATA's related development of corrective and preventative action plans. Agency Safety Plan § 4.1.3. Request 16 seeks the data reports and trend data upon which WMATA may rely in executing and tracking its testing program so that the WMSC can evaluate the effectiveness of these programs. This request is clearly within the WMSC's safety oversight authority and WMATA's objections do not provide a basis to refuse to produce responsive information.

*Vagueness.* WMATA objects to Request 16 as "vague and ambiguous" as to "all existing data reports/trend data."[59] The request is neither vague nor ambiguous. WMATA is subject to extensive record retention requirements for its anti-drug and alcohol misuse program.[60] WMATA must disclose those records to the WMSC upon request.[61] WMATA confirms that it understands the request when it states that it "maintains" "drug and alcohol testing program trend data" across its departments.[62]

**Request 18: The most recent drug and alcohol management information system (MIS) data report submitted to the U.S. Department of Transportation.**

As part of its audit of the adequacy of WMATA's drug and alcohol testing programs, the WMSC seeks Metrorail's most recent MIS data report.

The WMSC received the 2022 and 2023 MIS reports WMATA submitted to the U.S. Department of Transportation. The WMSC has not received the 2024 MIS report WMATA states it submitted to the U.S. Department of Transportation. The WMSC reserves all of its rights to compel further production pending review of those reports.[63]

**Request 21: All internal occupational health program audits, internal reviews, internal safety reviews, or similar assessments conducted from January 1, 2021, through December 31, 2023.**

The Agency Safety Plan outlines WMATA's occupational health and wellness programs. Agency Safety Plan § 2.4.2. Request 21 seeks WMATA's self-evaluation of that structure to assist the WMSC's evaluation of WMATA's occupational health programs and the implementation and effectiveness of Metrorail's continuous safety improvement processes associated with these areas.

---

[59] WMATA Response at 13–14.

[60] 49 C.F.R. § 655.71.

[61] *Id.* § 655.73(d).

[62] WMATA Response at 14.

[63] *Id.*

This request is clearly within the WMSC's safety oversight authority and WMATA's objections do not provide a basis to refuse to produce responsive information.

*Beyond the WMSC's Authority.* WMATA objects to Request 21 as beyond the WMSC's authority over "rail safety" for the same reasons WMATA objected to Requests 2 and 3. WMATA Response at 14. Those objections do not justify WMATA's refusal to produce responsive documents for the same reasons the WMSC discussed in response to WMATA's General Objections and objections to Requests 2 and 3, above, which the WMSC incorporates herein by reference. Fundamentally, the WMSC Compact authorizes the WMSC to evaluate whether WMATA's occupational health programs comply with its PTSAP and other occupational health laws to which WMATA is subject, as discussed above.

*Vague and Ambiguous.* WMATA objects to Request 21 as "vague and ambiguous" as to "occupational health program" and "similar assessments." WMATA Response at 14. As detailed above, the February 9, 2024 Audit notification letter explains the scope and objectives of the audit. Further, WMATA has described its occupations health programs in its Agency Safety Plan. The WMSC seeks WMATA's evaluations of those programs. There is nothing ambiguous about that. Indeed, WMATA acknowledges producing some reports in response to this request. Further, the WMSC is not asking WMATA to create documents or data that do not exist, only to produce what it does have.

The WMSC appreciates that WMATA has produced two reports in response to Request 21 and expects WMATA to produce all other responsive documents in its possession.

**Request 22: All existing data reports/trend data related to dosimetry testing, indoor air quality, toxic and hazardous substances, Job hazard analyses, PPE usage, training overdue for health and safety programs, employee safety concerns for the period January 1, 2021, through December 31, 2023.**

Request 22 seeks data regarding specific categories of occupational health and safety concern to assist the WMSC's evaluation of the effectiveness of WMATA's occupational health programs.

WMATA states that it has no responsive documents in its possession.[64] The WMSC does not accept WMATA's representation that it has no responsive documents. For example, WMATA has produced job hazard analyses in the past in connection with investigations into specific incidents. In April 2022, a roofing contractor at Metrorail's Queenstown Road Storage Facility fell through the roof, which was under construction as part of a replacement project. The contractor fell 28 feet to the ground. WMATA's statement of probable cause stated there was, "an inadequate process to update and refine the Job Hazard Analysis for tasks as new hazards are identified…," and the corrective actions included revising the Job Hazard Analysis.[65] Similarly, to address a finding in the WMSC's 2022 Audit of Metrorail Station Maintenance, Elevators and Escalators, Actionable Item 1 in a corrective action plan (C-22-C0203) was the creation of a Job Hazard Analysis. In response, WMATA submitted three documents, including a December 2022 policy

---

[64] *Id.* at 15.

[65] WMSC Commissioner Brief W-0176, Queenstown Road Repair and Maintenance Supply Storage Facility, April 25, 2022 and WMATA SAFE Final Report of Investigation A&I E22257. Available at WMSC.gov.

document 4210-2-01/00 Job Hazard Analysis Program. Request 22 seeks all such hazard analyses and related reports and data to holistically assess how WMATA addresses employee safety and occupational health and safety risks.

Further, WMATA's objections do not justify withholding responsive documents for the reasons discussed in response to WMATA's General Objections and Requests 2 and 3, which the WMSC incorporates by reference. -

**Request 23: List all fitness for duty and occupational health reporting requirements required by the federal government, the District of Columbia, Maryland, and Virginia.**

Request 23 asks Metrorail to identify all fitness for duty and occupational health reporting requirements to which it is subject in order to allow the WMSC to assess if WMATA is aware of the applicable reporting requirements. This request is clearly within the WMSC's safety oversight authority and WMATA's objections do not provide a basis to refuse to produce responsive information.

*Duplicative and Beyond the WMSC's Authority.* WMATA objects to Request 23 as duplicative and beyond the WMSC's authority over "rail safety" for the same reasons WMATA objected to Requests 2 and 3. WMATA Response at 15. Those objections do not justify WMATA's refusal to produce responsive documents for the same reasons the WMSC discussed in response to WMATA's General Objections and objections to Requests 2 and 3, above, which the WMSC incorporates herein by reference. Fundamentally, the WMSC Compact authorizes the WMSC to verify that WMATA properly understands Metrorail's fitness for duty and occupational health reporting obligations by asking WMATA to identify those requirements.

*Vague.* WMATA objects to Request 23 as vague as to "all . . . reporting requirements" and "occupational health," WMATA Response at 15, without providing any more explanation. The Request is not vague. WMATA is responsible for complying with reporting requirements regarding fitness for duty and occupational health. The Agency Safety Plan describes those programs and the applicable reporting requirements should be well known to WMATA. Moreover, WMATA's Office of Occupational Safety and Health ("OSH") is staffed with "subject matter experts" to oversee WMATA's occupational safety and health and fitness for duty programs"[66] who should be well equipped to provide any further clarification as to "occupational health programs." If WMATA is unsure whether any specific program is relevant to its response, the WMSC is available to discuss the matter.

*Undue Burden.* Similar to Request 11, the aim of Request 27 is to ensure that WMATA *itself* is aware of what reporting requirements·are applicable to the agency by law. WMATA's objection to this request on the basis that these requirements can be independently ascertained by the WMSC misunderstands the nature of the request and the WMSC's enforcement role. WMATA's refusal to recite the reporting requirements it is subject to, or its ignorance of the same (suggested by the use of, "if any exist" in WMATA's objection), is alarming. WMATA has a publicly funded department strictly dedicated to these two areas of safety compliance.[67] The

---

[66] PTASP § 3.2.1.

[67] *Id.* ("The Office of Occupational Safety and Health subject matter experts (SME . . . oversee Metro's occupational safety and health programs . . . *determine the applicable regulatory requirements* [emphasis added] . . . and will oversee *Metro's Fitness for Duty Program*.").

WMSC did not request this information in a specific format, allowing WMATA to confirm its knowledge of each applicable reporting requirement as efficiently as possible. Continued refusal to provide this information may result in a higher level of scrutiny or intervention as permitted by the WMSC Compact and Program Standard. Providing that information is not an undue burden, particularly for a regulated entity such as WMATA.

**Request 24**: **All occupational health inspection reports that relate to the WMATA Rail System from the federal Occupational Safety and Health Administration, the occupational health agencies from the District of Columbia, Maryland, and Virginia for the period January 1, 2022, through January 31, 2024.**

Request 24 seeks any reports from OSHA, VOSH, or MOSH regarding Metrorail so that the WMSC can assess WMATA's regulatory compliance with applicable occupational health standards and identify and determine, if needed, methods to improve compliance and safety. This request is clearly within the WMSC's safety oversight authority and authority to implement and enforce applicable state and federal laws. WMATA's objections do not provide a basis to refuse to produce responsive information.

*Duplicative and Beyond the WMSC's Authority.* WMATA objects to Request 23 as duplicative and beyond the WMSC's authority over "rail safety" for the same reasons WMATA objected to Requests 2 and 3. WMATA Response at 16. Those objections do not justify WMATA's refusal to produce responsive documents for the same reasons the WMSC discussed in response to WMATA's General Objections and objections to Requests 2 and 3, above, which the WMSC incorporates herein by reference. Fundamentally, the WMSC Compact authorizes the WMSC to implement and enforce applicable state and federal laws regarding occupational health and safety, and the WMSC is authorized to review the occupational health inspection reports from the relevant federal and state occupational health agencies.

*Vagueness.* WMATA objects to Request 24 as "vague and ambiguous" as to "occupational health inspection reports." WMATA Response at 16. There is nothing vague about this request. To clarify further, the WMSC requests a copy of any inspection reports, audits, or investigation reports regarding Metrorail that OSHA, MOSH, VOSH, and/or DCOSH have provided to WMATA within the specified two-year period that are in the possession of WMATA. WMATA's subject matter experts on occupational health should be able to readily identify and produce any such documents. The WMSC is available to provide any further clarification if necessary.

**Request 25**: **All medical monitoring results for welders and other employees who engage in hot work from January 1, 2021, through December 31, 2023.**

29 C.F.R. Part 119 imposes a number of requirements on employers such as WMATA who perform welding and other "hot work," including measures to address employee exposure to hazardous materials used in such work. Request 25 seeks any medical monitoring results for those employees to allow the WMSC to evaluate the effectiveness of WMATA's safety procedures for those employees. This request is clearly within the WMSC's safety oversight authority and authority to implement and enforce applicable state and federal laws. WMATA's objections do not provide a basis to refuse to produce responsive information.

*Beyond the WMSC's Authority.* WMATA objects to Request 25 as beyond the WMSC's authority over "rail safety" for the same reasons WMATA objected to Requests 2 and 3. WMATA Response at 16. Those objections do not justify WMATA's refusal to produce responsive documents for the same reasons the WMSC discussed in response to WMATA's General Objections and objections to Requests 2 and 3, above, which the WMSC incorporates herein by reference. Fundamentally, the WMSC Compact gives the WMSC exclusive safety oversight authority and the authority to implement and enforce applicable state and federal laws regarding occupational health and safety. Reviewing any medical monitoring results for welders and other employees who perform "hot work," which necessarily involves a risk of exposure to hazardous substances as recognized in 29 C.F.R. Part 119, falls within the WMSC's authority.

WMATA also objects that there are no federal or state medical monitoring requirements for these workers. However, the WMSC's authority is not limited by federal or state requirements promulgated by other agencies. The WMSC has the authority to evaluate whether welders and other employees engaged in hot work are exposed to health hazards as a result of their work on Metrorail and whether additional safety measures are necessary to protect their health and promote the overall safety of Metrorail. Thus, Request 25 requests documents to allow the WMSC to assess whether WMATA has adequate medical monitoring programs for workers and whether WMATA has implemented the necessary safety measures of those programs to protect Metrorail workers.

*Vagueness.* WMATA objects to Request 25 as "vague and ambiguous" as to "medical monitoring results." WMATA Response at 16. The WMSC believes the terms of the request are clear and unambiguous. To further clarify, by "medical monitoring results" the WMSC seeks the results of any health or medical tests or evaluations WMATA performs on, or requests from, employees engaged in welding or other hot work, other than fitness for duty tests that are sought through other requests. To the extent WMATA's objection is that such monitoring is not required by federal or state law, that objection is without merit for the reasons explained above. If WMATA did not conduct medical monitoring of welders or other employees who engage in hot work within the three-year span provided, it may state as such.

**Request 26(a)–(b): All noise and dosimetry test schedules and results from January 1, 2021, through December 31, 2023; (a) All documents confirming that audible or hearing tests are undertaken for personnel working in areas above WMATA's time-weighted average for noise levels; (b) All medical monitoring results for employees exposed to an 8-hour time-weighted average (TWA) noise level of 85 decibels (dBs) or above or per the thresholds in WMATA's hearing conservation program.**

WMATA is subject to OSHA's regulations concerning Occupational Noise Exposure. 49 C.F.R. § 1910.95. Request 26 seeks documentation of WMATA's related testing and monitoring activities so that the WMSC can assess the adequacy of WMATA's compliance with these regulations. This request is clearly within the WMSC's safety oversight authority and authority to implement and enforce applicable state and federal laws. WMATA's objections do not provide a basis to refuse to produce responsive information.

*Duplicative and Beyond the WMSC's Authority.* WMATA objects to Request 26 as duplicative and beyond the WMSC's authority over "rail safety" for the same reasons WMATA objected to Requests 2 and 3. WMATA Response at 17. Those objections do not justify WMATA's refusal to produce responsive documents for the same reasons the WMSC discussed