**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

WASHINGTON METRORAIL SAFETY
COMMISSION,

          Petitioner,                  Case No. 1:24-mc-00144-LLA

v.                                 Judge Loren L. AliKhan

WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,

          Respondent.

---

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY'S**
**OPPOSITION TO PETITION FOR SUMMARY ENFORCEMENT OF**
**<u>ADMINISTRATIVE SUBPOENA</u>**

Attison L. Barnes, III (DC Bar No. 427754)
George E. Petel (DC Bar No. 1028877)
William K. Lane III (DC Bar No. 1034955)
Wiley Rein LLP
2050 M Street, NW
Washington, DC  20006
Phone: (202) 719-7000
Fax: (202) 719-7049
abarnes@wiley.law
gpetel@wiley.law
wlane@wiley.law

*Counsel for the Washington Metropolitan Area
Transit Authority*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

I.    FACTUAL BACKGROUND.......................................................................................... 3

   A.    WMATA Is an Interstate Compact Agency with Broad Responsibilities .......................... 3

   B.    The WMSC Is Also an Interstate Compact Agency with Limited Oversight Authority

   for Metrorail System Safety, Not Occupational Health ............................................. 4

   C.    The Subpoena Requests at Issue Exceed the WMSC's Limited Authority for Oversight

   of Safety on the WMATA Rail System ................................................................... 6

      1.    The WMSC's Unsupported Expansive Interpretation of its Authority............................ 6

      2.    The WMSC Subpoena and WMATA's Objections ................................................. 9

II.    LEGAL STANDARD....................................................................................... 12

III.    ARGUMENT .............................................................................................. 12

   A.    The Plain Text of the WMSC Compact Limits the WMSC's Regulatory Authority to

   WMATA's Rail System ................................................................................. 13

   B.    Federal Law Precludes the WMSC From Exercising Plenary Safety Oversight

   Authority. ............................................................................................ 17

      1.    Federal Transportation Administration (FTA). ................................................ 17

      2.    Occupational Health & Safety Administration (OSHA)............................................. 18

IV.    CONCLUSION............................................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama v. North Carolina*,
  560 U.S. 330 (2010)............................................................................................13

*Bayou Lawn & Landscape Servs. v. Sec'y of Lab.*,
  713 F.3d 1080 (11th Cir. 2013) ........................................................................16

*Burdon Cent. Sugar Ref. Co. v. Payne*,
  167 U.S. 127 (1897)............................................................................................15

*Corley v. United States*,
  556 U.S. 303 (2009)............................................................................................20

*Est. of Cowart v. Nicklos Drilling Co.*,
  505 U.S. 469 (1992)............................................................................................13

*F.T.C. v. Ken Roberts Co.*,
  276 F.3d 583 (D.C. Cir. 2001)...........................................................................20

*FEC v. Machinists Non-Partisan Pol. League*,
  655 F.2d 380 (D.C. Cir. 1981)...........................................................................12

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
  505 U.S. 88 (1992)........................................................................................18, 20

*Lowe v. S.E.C.*,
  472 U.S. 181 (1985)............................................................................................15

*Metro-N. Commuter R. Co. v. Buckley*,
  521 U.S. 424 (1997)............................................................................................19

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
  595 U.S. 109 (2022)............................................................................................14

*Union Pac. R.R. Co. v. Surface Transp. Bd.*,
  863 F.3d 816 (8th Cir. 2017) .............................................................................16

*United States v. Butler*,
  297 U.S. 1 (1936)................................................................................................15

*United States v. Inst. for Coll. Access & Success*,
  27 F. Supp. 3d 106 (D.D.C. 2014).....................................................................12

*United States v. Newport News Shipbuilding & Dry Dock Co.*,
    837 F.2d 162 (4th Cir. 1988) ................................................................12

*United States v. Philip Morris Inc.*,
    263 F. Supp. 2d 72 (D.D.C. 2003) ........................................................20

**Statutes**

29 U.S.C. § 667 ............................................................................................18

49 U.S.C. § 5329 ..........................................................................................17

D.C. Code § 9-1107.01 ..................................................................................3

Md. Code Ann., Transp.§ 10-204 ..................................................................3

Pub. L. No. 89-774, 80 Stat. 1324 (1966) .....................................................3

Pub. L. No. 115-54, 131 Stat. 1093 (2017) ...............................4, 5, 6, 12, 13, 14, 19

Va. Code Ann. § 33.2-3100 ...........................................................................3

**Other Authorities**

29 C.F.R. § 1910.1001 .................................................................................19

49 C.F.R. § 673.11 .......................................................................................16

Rail Transit Roadway Worker Protection, 89 Fed. Reg. 20605 (proposed Mar. 25,
    2024) ........................................................................................................17

Washington Metrorail Saftey Commission, https://wmsc.gov/ (last visited Nov.
    20, 2024) ....................................................................................................4

Washington Metrorail Saftey Commission, Program Standard § 11.D .........8

Respondent, the Washington Metropolitan Area Transit Authority ("WMATA" or "Metro"), by counsel, submits this Opposition to the Petition of the Washington Metrorail Safety Commission (the "WMSC") for summary enforcement of an administrative subpoena (the "Petition") *duces tecum* issued on April 8, 2024 (the "Subpoena").

## PRELIMINARY STATEMENT

WMATA provides safe and reliable transit service for the Washington Metropolitan Area, and this Opposition does not seek to change WMATA's dedication to safety and reliability. WMATA is also committed to transparency and accountability in Metro's operations, including, but not limited to, safety and service standards. WMATA further acknowledges that, depending on the context, it is subject to regulatory oversight from multiple federal agencies, including the National Transportation Safety Board ("NTSB"), the Federal Transit Administration ("FTA"), the U.S. Department of Labor, Occupational Safety and Health Administration ("OSHA"), the Environmental Protection Agency ("EPA"), and the WMSC. Thus, there is no shortage of nor gap in oversight of WMATA.

In its Petition, the WMSC seeks to enforce a broad Subpoena for occupational health program information—information that is outside the jurisdiction of the WMSC and, instead, within the jurisdiction of OSHA. The WMSC does not claim there is a gap in the oversight of regulations issued and overseen by OSHA. Similarly, the WMSC does not assert that oversight of OSHA's rules is not ably handled by OSHA audits of WMATA. Even if the WMSC were to make such contentions, the WMSC does not dispute that it only possesses limited authority under its Compact approved by Congress, and that such authority is limited to oversight "***relating to safety of the WMATA Rail System***" ("Metrorail"). As this Court may be aware, Metrorail is only a portion of WMATA's comprehensive mass transit system, consisting not only of Metrorail, but

1

also a fixed-route bus service ("Metrobus"), paratransit services ("MetroAccess"), and its own police force, the Metro Transit Police Department ("MTPD"). By objecting to the WMSC Subpoena and opposing the Petition, WMATA is not seeking to prevent access to relevant information within the WMSC's limited, rail safety oversight role.

In its Petition, the WMSC also does not deny that WMATA has tried in good faith to reach compromises with the WMSC both informally and through the administrative process set forth in the WMSC's Program Standard. The WMSC does not deny that WMATA has urged the WMSC to coordinate with agencies with actual authority such as the FTA and OSHA to avoid subjecting WMATA to conflicting regulatory orders or directives and duplication of efforts, to no avail. The WMSC responded by filing this Petition.

WMATA welcomed the WMSC as a partner to ensure the safety of the Metrorail system and accommodated the relatively new WMSC—created only seven years ago—as it establishes itself, its programs, and its protocols. But WMATA's accommodation has been increasingly weaponized by the WMSC, not in the service of safety of the rail system, but as an end unto itself, far exceeding the bounds of the limited authority granted by Congress and the signatory jurisdictions. Unfortunately, the WMSC's attempts to reach beyond the plain language of the WMSC Compact and to exceed the limits on its oversight authority have interfered with WMATA's relationships with its other oversight agencies and interfered with WMATA's operations. All of this has exponentially burdened WMATA's staff with duplicative audit demands within the competent jurisdiction of other agencies. Worse still, WMATA has serious safety concerns that compliance with directives from the WMSC beyond its authority and expertise

conflict with guidelines of agencies with jurisdiction over the specific subject matter at issue.[1]
Such directives beyond its authority do not foster safety; rather they <u>increase</u> safety risks.
WMATA believes that the parties should cooperate to enhance the safety of the WMATA rail
system, not create an unduly adversarial relationship by filing this legal action.

For the reasons set forth more fully below, WMATA requests that this Court deny the
Petition and, thereby, hold the WMSC to its limited oversight authority.

## I.    FACTUAL BACKGROUND

### A.    WMATA Is an Interstate Compact Agency with Broad Responsibilities

WMATA, created by the District of Columbia, State of Maryland, and Commonwealth of
Virginia (the "Signatories"), with the consent of Congress, effective February 20, 1967, is an
interstate compact agency and, by the terms of its enabling legislation, an agency and
instrumentality of each of the Signatories. *See* WMATA Compact, Pub. L. No. 89-774, 80 Stat.
1324 (1966), as amended, D.C. Code § 9-1107.01; Md. Code Ann., Transp.§ 10-204; Va. Code
Ann. § 33.2-3100 *et seq.*  WMATA was created by the Signatories to plan, develop, finance, and
cause to be operated a comprehensive mass transit system for the Washington Metropolitan Area,
including the following modes: Metrorail, Metrobus, and MetroAccess.  WMATA is governed by
a Board of Directors, consisting of two voting representatives from each Signatory and the federal
government.

As part of WMATA's responsibilities, it manages programs and policies that range from
procurement to union negotiations to workplace safety.  It has specific programs that apply only

---

[1]    For example, in one instance more fully described below, although the WMSC lacked the
authority and technical expertise, the WMSC directed WMATA to break up and remove tiles and
mastic in an equipment room that may contain asbestos, thereby potentially releasing asbestos
particles.  However, following EPA guidelines and OSHA regulations, WMATA instructed safety
professionals to avoid sweeping particles into the air and laid a floor on top.

to Metrorail, such as its Roadway Worker Protection (RWP) program for protection of workers on the tracks. Most of WMATA's programs operate holistically across the mass transit system without regard to a specific mode. For example, WMATA is subject to FTA rules that apply across the system, and those rules are implemented and overseen by the FTA across all modes. WMATA also has systemwide programs to ensure compliance with regulations such as applicable regulations issued by OSHA. OSHA workplace safety regulations are not specific to rail transit.

**B.    The WMSC Is Also an Interstate Compact Agency with Limited Oversight Authority for Metrorail System Safety, Not Occupational Health**

The WMSC was created in 2017 through an Interstate Compact executed by the same Signatories with the consent of Congress to act as the state safety oversight authority for WMATA's rail system under 49 U.S.C. § 5329. Pub. L. No. 115-54, 131 Stat. 1093 (2017) (the "WMSC Compact"). In 2019, the WMSC assumed safety oversight of Metrorail from the FTA. The WMSC Compact states that the WMSC's "Purpose and Function" is limited to safety oversight related to "hazards, incidents, and accidents *on the WMATA Rail System.*" WMSC Compact Art. II § 3 (emphasis added).[2] The WMSC Compact does not mention, much less grant authority over, occupational or workplace safety. *See generally* WMSC Compact. The WMSC Compact grants the WMSC only the following specific and limited[3] powers to:

(a) Adopt, revise, and distribute a written State Safety Oversight Program;

(b) Review, approve, oversee, and enforce the adoption and implementation of WMATA's Public Transportation Agency Safety Plan;

---

[2]     "WMATA Rail System" or "Metrorail" is defined in the WMSC Compact to mean the rail fixed guideway public transportation system and all other real and personal property owned, leased, operated, or otherwise used by WMATA rail services.

[3]     Even the WMSC's own website acknowledges its limited authority to safety practices "on the DC region's Metrorail system." *See* WMSC, https://wmsc.gov/ (last visited Nov. 20, 2024).

(c) Require, review, approve, oversee, and enforce the adoption and implementation of any Corrective Action Plans that the Commission deems appropriate;

(d) Implement and enforce relevant federal and State laws and regulations relating to safety *of the WMATA Rail System*; and

(e) Audit every 3 years the compliance of WMATA with WMATA's Public Transportation Agency Safety Plan or conduct such an audit on an ongoing basis over a 3-year time frame.

WMSC Compact Art. IV § 30 (emphasis added).  To exercise those Powers, the WMSC may only:

(a) Conduct, or cause to be conducted, inspections, investigations, examinations, and testing of WMATA personnel and contractors, property, equipment, facilities, rolling stock, and operations *of the WMATA Rail System*, including, without limitation, electronic information and databases through reasonable means, which may include issuance of subpoenas;

(b) Enter *upon the WMATA Rail System* and, upon reasonable notice and a finding by the chief executive officer that a need exists, upon any lands, waters, and premises adjacent to the WMATA Rail System, including, without limitation, property owned or occupied by the federal government, for the purpose of making inspections, investigations, examinations, and testing as the Commission may deem necessary to carry out the purposes of this MSC Compact, and such entry shall not be deemed a trespass. The Commission shall make reasonable reimbursement for any actual damage resulting to any such adjacent lands, waters, and premises as a result of such activities;

(c) Compel WMATA's compliance with any Corrective Action Plan or order of the Commission by such means as the Commission deems appropriate, including, without limitation, by:

(1) Taking legal action in a court of competent jurisdiction;

(2) Issuing citations or fines with funds going into an escrow account for spending by WMATA on Commission-directed safety measures;

(3) Directing WMATA to prioritize spending on safety-critical items;

(4) Removing a specific vehicle, infrastructure element, or hazard from the WMATA Rail System; and

(5) Compelling WMATA to restrict, suspend, or prohibit rail service on all or part of the WMATA Rail System with an appropriate notice period dictated by the circumstances;

(d) Direct WMATA to suspend or disqualify from performing in any Safety Sensitive Position an individual who is alleged to or has violated safety rules, regulations, policies, or laws;

5

    (e) Compel WMATA's Office of the Inspector General, created under WMATA Board Resolution 2006–18, or any successor WMATA office or organization having similar duties, to conduct safety-related audits or investigations and to provide its findings to the Commission; and

    (f) Take such other actions as the Commission may deem appropriate consistent with its purpose and powers.

WMSC Compact Art. IV § 31 (emphases added).

### C. The Subpoena Requests at Issue Exceed the WMSC's Limited Authority for Oversight of Safety on the WMATA Rail System

#### 1. The WMSC's Unsupported Expansive Interpretation of its Authority

By objecting to this Petition, WMATA is not seeking to prevent access to relevant information within the WMSC's limited, rail safety oversight role.  Since the certification of the WMSC by the FTA in 2019, WMATA has responded to over 92 audit requests for documents from the WMSC across approximately 23 audits (not including the Fitness for Duty and Occupational Health Programs audit for which the Subpoena was issued (the "Audit")).  Ex. A, Decl. of Theresa M. Impastato ("Impastato Decl.") ¶ 6.  WMATA, at its own expense, has produced around 40,000 documents consisting of over 550,000 pages and over 118 Gigabytes of data uploaded to the WMSC.  *Id.*  During the COVID-19 pandemic, WMATA spent over 1,200 hours responding to just one request from the WMSC.  Pet. Ex. 9, WMATA Subpoena Obj. at 12.[4] At times, WMATA has objected to the WMSC's requests that, like the Subpoena here, were unduly burdensome, duplicative, and exceeded the WMSC's authority, but only where responding to those demands unnecessarily diverted critical resources away from continued improvements to Metrorail safety.  But given the increasing rate, and frankly overwhelming volume, of the WMSC's

---

[4]     Only after it issued the Subpoena did the WMSC relent to conducting an in-person document inspection for its recent requests for similar records.  *See* Pet. ¶ 34 (acknowledging that WMATA provided acceptable responses to the fitness for duty requests in the audit); *see also, e.g.*, Pet. Ex. 9 at 12 ("Without waiver of and subject to WMATA's objections, WMATA will make available for in-person inspection, at its office and at a mutually convenient time, the records relevant to this Subpoena Request.").

demands, WMATA estimates that just responding to the current pace of the WMSC's requests, if upheld by this Court, would require WMATA to expand its safety staff.  Impastato Decl. ¶ 10.

WMATA has often expressed its concern to the WMSC that, in addition to the undue burden, the WMSC's usurpation of the oversight authority of other agencies can result in conflicts and confusion about which agency's directive applies or is prioritized.  *See, e.g.*, Pet. Ex. 9 at 2. This is especially salient where the WMSC has issued no regulations at all covering the subject matter.  Such conflicts and confusion caused by the WMSC risk the safety of WMATA's customers and workforce.  The Petition's references to "potential asbestos exposure," is an instructive example of an alleged "hazard" "on the WMATA Rail System" that the WMSC claims is within its authority but instead highlights WMATA's concern.  *See* Pet. ¶ 19.  Over the last year or so, the WMSC has repeatedly issued a request and orders for an environmental remediation issue that, if WMATA were to comply, could create an environmental hazard where none exists.[5] WMATA followed Environmental Protection Agency ("EPA") guidelines and OSHA regulations as part of WMATA's holistic Asbestos Program to address the issue, but the WMSC has persistently intruded upon that subject while refusing to coordinate with those agencies.

WMATA has tried to reach compromises with the WMSC both informally and through the administrative process set forth in the WMSC's Program Standard.  *See* Pet. at 6 n.1.  WMATA has urged the WMSC to coordinate with agencies such as the FTA and OSHA to conduct oversight

---

[5]     Despite its disagreement with the WMSC over its authority over an issue expressly within OSHA's authority and regulations—and not the WMSC Compact or any WMSC regulation— WMATA cooperated in good faith to address the WMSC's concerns about this asbestos mitigation issue.  WMATA has been following EPA guidelines consistent with OSHA regulations to remediate this issue as part of WMATA's holistic Asbestos Program.  But the WMSC refused to coordinate its activities with agencies with competent jurisdiction and instead sought to insert itself into areas beyond its authority, duplicating efforts, wasting WMATA resources, and issuing conflicting directives.

activities to avoid conflicts and duplication.  Pet. Ex. 9 at 2.[6]  The process has proven futile and actively prejudices WMATA because the WMSC Program Standard requires compliance with the WMSC's requests pending a dispute unless a stay is granted—but the WMSC has rarely granted a stay.  WMSC, Program Standard § 11.D; Impastato Decl. ¶ 13.  The WMSC has then used WMATA's accommodation during that administrative process to claim that WMATA's compliance with the underlying WMSC order while a stay request was pending mooted WMATA's objection.[7]  If the WMSC does not act on a stay request and simultaneously requires timely compliance absent a stay, there is no fair process for WMATA.

The Petition references a similar instance where the WMSC sought to usurp occupational health oversight from OSHA and used WMATA's good faith notification against it.  *See* Pet. ¶¶ 17-19.  When inspecting emergency medical equipment cabinets on station platforms, dust was discovered in cabinets at certain rail stations.  Impastato Decl. ¶ 12.  The WMSC directed WMATA to start replacing the items in the cabinets that were covered in dust.  *Id.*  However, WMATA took the initiative to test the dust first following industry best practices, discovered that it contained lead, and, although the accumulated dust posed minimal risk, out of an abundance of caution WMATA retained a lead-abatement professional to abate the lead and clean the cabinets.  *Id.*; *see also* Pet. Ex. 9 at 7.  Had WMATA done what the WMSC directed, it could have created a lead

---

[6]    To avoid duplication of effort and potentially inconsistent, regulatory orders or directives, OSHA has executed Memoranda of Understanding ("MOU") and Memoranda of Agreement ("MOA") with various agencies to enable shared application and oversight of the OSHA regulations at issue in the Subpoena.  *See* Ex. B, OSHA/FRA MOA; Ex. C, OSHA/FAA MOU.  As noted, the WMSC has not issued any occupational health regulations of its own and seeks instead to usurp OSHA's oversight authority based on OSHA's regulations.

[7]    Even while WMATA pursues those avenues of communication, the WMSC circumvents the process by confronting WMATA safety staff with demands for information without engaging the appropriate managers and WMATA stakeholders.  Impastato Decl. ¶ 8; *see also* Pet. Ex. 9 at 8.

exposure risk where none previously existed. WMATA notified the WMSC of its progress as a courtesy and has communicated transparently with the WMSC. Impastato Decl. ¶ 12. Yet throughout these exchanges, the WMSC has sought information, analyses, and actions that are outside the requirements of OSHA's regulations and contrary to best practices, despite an absence of confirmed employee airborne concentration exposure at or above the OSHA action level. *See* Pet. ¶ 19.

WMATA's good faith cooperation with the WMSC's inquiries, despite being outside its authority, only encouraged the WMSC to press further. Pet. ¶ 19 ("WMATA was largely responsive to the WMSC's informal information requests related to the lead dust issue for the initial months following WMATA's [voluntary] disclosure to the WMSC."). The Subpoena's demands for information related to these occupational health issues is merely another step in the WMSC's attempt to intrude upon OSHA's oversight authority to unlawfully expand the WMSC's powers over WMATA. Pet. Ex. 9 at 17 (Request No. 27 seeking WMATA's air or surface monitoring protocols for various substances listed in OSHA regulation 29 C.F.R. part 1910 subpart Z, including lead, but without mentioning OSHA or citing the regulation).

2.    The WMSC Subpoena and WMATA's Objections

The WMSC began its "safety audit of WMATA's fitness for duty and occupational health programs" in February 2024 (the "Audit") with a notice and request for documents. Pet. Ex 4, WMSC February 9, 2024 letter to WMATA; Pet. Ex. 5, WMSC Initial Request for Documents.[8]

---

[8]    As the WMSC admits, some of those requests demanded WMATA create records that did not exist and were not kept by WMATA in the normal course of business. *See* Pet. at 22. One request demanded that WMATA create a list of "all fitness for duty and occupational health reporting requirements required by the federal government, the District of Columbia, Maryland, and Virginia," which serves to demonstrate the WMSC's lack of knowledge in these areas. Pet. Ex. 9 at 15.

WMATA sought clarification because many of the WMSC's requests had never been raised in prior audits, appeared to exceed the WMSC's limited authority, and, as written, unnecessarily requested voluminous responsive documents that would require hundreds of WMATA personnel hours to produce. Pet. Ex. 9 at 1. Even so, and contrary to the Petition's unsupported contention that "WMATA refused to produce any documents or information in response to the Initial Document Request," WMATA provided the WMSC with documents responsive to items related to the fitness for duty portion of the Audit.[9] *See* Pet. ¶ 26; Petition Ex. 9 at 2. That is why the Subpoena does not include Requests Nos. 1, 4, 5, 6, 7, 8, 10, 17, 19, and 20 from the Initial Document Request. *Compare* Pet. Ex. 9 at 8-17 *with* Pet. Ex. 5.

WMATA has, however, maintained its objections to the WMSC's demand for occupational health program information and records from the start, including that the WMSC lacked the authority to audit this area. *See, e.g.*, Pet. Ex. 6, March 8, 2024 letter from WMATA at 2-3 (requesting the WMSC to refrain from conducting the Audit because it exceeded the scope of the WMSC's "rail safety oversight authority, as limited by the WMSC Compact," "is duplicative of existing oversight efforts by jurisdictional agencies that have the expertise to monitor workplace safety conditions," and unnecessarily subjects WMATA to "potentially inconsistent regulatory

---

[9]     Despite reaching a compromise and producing those documents on March 11, and making other documents available for inspection after responding to the Subpoena, WMATA maintained its objection that the fitness for duty portion of the document requests was unnecessarily duplicative, burdensome, costly, reached beyond the WMSC's authority over the WMATA Rail System, and was lacking in proper audit practices. Pet. Ex. 9 at 5-6. WMATA is already subject to audit by the FTA of the drug and alcohol screening records the WMSC was seeking through its Audit. The FTA conducts those audits holistically across all of WMATA's modes while the WMSC's audit required the inefficient sorting of Metrorail-related records, and the WMSC improperly sought records related to MTPD. *Id.* As with the occupational health records sought in the Subpoena, WMATA encouraged the WMSC to instead participate in the oversight activities of the agency that promulgated the regulations but the WMSC refused, opting instead to force WMATA and its staff to expend additional taxpayer resources and to consume WMATA resources better-served to address WMATA's mission of providing safe and reliable service.

scrutiny").  Initially, WMATA sought clarification from the WMSC because its reference to "occupational health programs" was vague and undefined in the Initial Document Requests.  Pet. Ex. 9 at 8.  Although the WMSC did not update the Initial Document Requests or the Subpoena to clarify, it informed WMATA that "occupational health programs" referred to the 12 listed "programs" in the WMSC's Document Request 3.  *Id.* at 8-10.  Notwithstanding the WMSC's ambiguous answer, WMATA discovered that the 12 "programs" listed in the Subpoena are in fact ***taken directly from various sections of OSHA's regulations at 29 C.F.R. subpart 1910***.  *See id.* WMATA expressed concern that the WMSC's requests were duplicative to existing oversight from OSHA, which could lead to conflicting directives.  Impastato Decl. ¶ 11; Pet. Ex. 9 at 6-7. WMATA also noted the WMSC had not issued any occupational health regulations and was instead trying to audit WMATA's OSHA compliance, and that based on the questions asked by WMSC staff they seemingly lacked the qualifications to understand the regulations for which the WMSC was requesting records.  Pet. Ex. 9 at 6-7.  As had occurred previously, the WMSC's lack of expertise in this area would substantially increase the burden on WMATA to educate the WMSC on how to interpret any produced records, or whether such documents were even available or relevant to the WMSC's actual concerns—concerns which the WMSC refused to document in advance, contrary to best audit practices and procedures.  *See id.* at 8.

In the midst of attempting to resolve WMATA's concerns with the scope of the Audit informally, the WMSC abruptly issued the Subpoena on April 8, 2024.  WMATA sent its objections on May 6, 2024, although WMATA continued to communicate with the WMSC in an effort to resolve the Audit requests.  In good faith, WMATA made an offer—without waiving its other objections—for the WMSC to conduct an in-person inspection of certain records if the WMSC was insistent upon duplicating the FTA's audits.  Pet. Ex. 9 at 8-17.  WMATA continues

to object to the WMSC's intrusion on occupational health programs as beyond the WMSC's limited authority under the WMSC Compact.

## II.    LEGAL STANDARD

A court reviewing the enforceability of an administrative subpoena considers "whether the 'inquiry is within the authority of the agency, the demand is not too indefinite, and the information sought is reasonably relevant.'" *United States v. Inst. for Coll. Access & Success*, 27 F. Supp. 3d 106, 111 (D.D.C. 2014) (quoting *Resol. Tr. Corp. v. Thornton*, 41 F.3d 1539, 1544 (D.C. Cir. 1994)). Subpoenas that exceed regulatory authority are unlawful and may not be enforced. *See, e.g.*, *United States v. Newport News Shipbuilding & Dry Dock Co.*, 837 F.2d 162, 168 (4th Cir. 1988) ("Because the materials sought by [the agency] are not within the scope of its statutory authority, we affirm the order of the district court denying enforcement of the subpoena in this case."); *FEC v. Machinists Non-Partisan Pol. League*, 655 F.2d 380, 396 (D.C. Cir. 1981) ("Since the FEC lacked jurisdiction to control 'draft' group contributions, the subpoena should not have been enforced."). At issue here are the limits of the WMSC's express authority under the WMSC Compact to investigate, inspect, and audit "safety" and "hazards" "on the WMATA Rail System." Pet. ¶ 7; WMSC Compact Art. II § 3; *id.* Art. IV §§ 30-31. Although the WMSC Compact permits the WMSC to issue subpoenas to WMATA as part of its "inspections, investigations, examinations, and testing," that authority is limited solely to those powers granted by the Compact, which the WMSC's Subpoena exceeds. *See* WMSC Compact Art. IV § 31(a). The Subpoena, therefore, is unlawful and cannot be enforced against WMATA.

## III.    ARGUMENT

In attempting to regulate all aspects of WMATA employee health and safety, the WMSC far exceeds its legal authority, which is limited to oversight of the safety of WMATA's rail system. The text of the WMSC Compact, as well as all the federal statutes governing workplace safety

(OSHA) and transit safety (FTA), confirm as much, and therefore preclude the WMSC from enforcing its Subpoena. Therefore, the Petition should be denied.

### A. The Plain Text of the WMSC Compact Limits the WMSC's Regulatory Authority to WMATA's Rail System

As stated above, while the WMSC Compact grants the WMSC "safety regulatory and enforcement authority," that competence is limited to "the WMATA **Rail System**." WMSC Compact § 1 (emphasis added). "WMATA Rail System," in turn, is defined as "the rail fixed guideway public transportation system and all other real and personal property owned, leased, operated, or otherwise used by WMATA rail services." *Id.* § 1(m). The WMSC insists that such language "does not limit the reach of the terms 'safety' or 'hazards.'" In other words, the WMSC's position is that the Compact places *no limitations* on the WMSC's authority to regulate the health and wellbeing of WMATA employees. Pet. at 3. The WMSC's interpretation cannot withstand scrutiny. This Court need not look beyond the four corners of the WMSC Compact to confirm that the agency lacks the authority to enforce its expansive Subpoena. *See Alabama v. North Carolina*, 560 U.S. 330, 339 (2010) ("The terms of the Compact" did not expressly authorize interstate agency to impose monetary sanctions on member state "and we are not free to rewrite it.") (quoting *Texas v. New Mexico*, 462 U.S. 554, 565 (1983)); *id.* at 352 ("We are especially reluctant to read absent terms into an interstate compact given the federalism and separation-of-powers concerns that would arise were we to rewrite an agreement among sovereign States, to which the political branches consented."); *see also Est. of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992) ("In a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished.").

*First*, the WMSC's authority is limited to rail-system safety.[10] Article II of the WMSC Compact lists specific "functions" that the WMSC may perform pursuant to its charge "to review, approve, oversee, and enforce the safety of the WMATA Rail System."  WMSC Compact § 3. These include "the power to restrict, suspend, or prohibit rail service," "[d]evelop and adopt a written state safety oversight program," "[r]eview and approve the WMATA Public Transportation Agency Safety Plan," and "[i]nvestigate hazards, incidents, and accidents on the WMATA Rail System."  *Id.*  These powers illustrate the limited purposes of the WMSC: to regulate aspects of safety that are unique to operating a rail system—not workplace health and safety more generally. Indeed, even the regulatory authority of OSHA, an agency with a significantly broader mandate than the WMSC—including specified power to regulate workplace health and safety—is far less expansive than the plenary safety oversight authority the WMSC now claims.  *See Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 118 (2022) ("Although COVID–19 is a risk that occurs in many workplaces, it is not an *occupational* hazard in most. . . .  Permitting OSHA to regulate the hazards of daily life—simply because most Americans have jobs and face those same risks while on the clock—would significantly expand OSHA's regulatory authority without clear congressional authorization.").  Simply put, the WMSC Compact's grant of authority to regulate the safety of the "WMATA Rail System" is limited to regulating dangers inherent in the operation of a <u>rail system</u>.  The WMSC cannot regulate safety across the entire WMATA organization more generally, let alone workplace safety and health.

*Second*, contrary to the WMSC's suggestion, the WMSC Compact's assignment of "*exclusive* safety oversight authority over the WMATA Rail System," WMSC Compact § 3(a)

---

[10] WMATA has never argued that the WMSC's authority is "limited to the physical rail line," as the WMSC now suggests, Pet. at 3, but rather WMATA's position—confirmed by the WMSC Compact—is that the WMSC's mandate is to provide safety oversight of the "rail system."

(emphasis added), *restricts* rather than expands the agency's powers.  The WMSC claims that the term "exclusive" signifies an intent to "preempt any applicable *state* laws."  Pet. at 10 (emphasis added).  Conspicuously absent from the WMSC's Petition, however, is any explanation on how this language affects *federal* law.  Resolving that question confirms that the WMSC's safety authority is not plenary.

Consider asbestos mitigation.  The WMSC's position is that *both* OSHA and the WMSC have authority over asbestos exposure mitigation and remediation.  *See, e.g.*, Pet. Ex. 10, WMSC June 6, 2024 letter to WMATA at 12.  But that position is implausible.  If the WMSC Compact truly granted the WMSC "exclusive" authority to regulate asbestos exposure, as the WMSC claims in its Petition, then OSHA could not also possess such authority.  Yet there is no question that OSHA can regulate asbestos exposure, and the WMSC does not attempt to argue otherwise.

In reality, the WMSC's limited "safety oversight authority" under its Compact is much narrower than the plenary authority the WMSC now claims.  Where the federal government regulates, the WMSC necessarily cannot.  The WMSC Compact does not permit concurrent authority because it expressly provides for *exclusive* authority; to conclude otherwise would impermissibly strip the word "exclusive," as used in the WMSC Compact, of any meaning.  *See Lowe v. S.E.C.*, 472 U.S. 181, 208 n.53 (1985) ("[W]e must give effect to every word that Congress used in the statute."); *United States v. Butler*, 297 U.S. 1, 65 (1936) ("These words cannot be meaningless, else they would not have been used."); *Burdon Cent. Sugar Ref. Co. v. Payne*, 167 U.S. 127, 142 (1897) ("We should remember that the contract must be so construed as to give

meaning to all its provisions, and that that interpretation would be incorrect which would obliterate one portion of the contract in order to enforce another part thereof").[11]

Moreover, given that Congress authorized the WMSC Compact, it must be assumed that its purpose was not to duplicate pre-existing, regulatory oversight authority specifically entrusted to another agency. Here, an agency like OSHA has authority over certain aspects of the WMATA transit system, much of which do not directly concern the operation of the rail system. Absent indication to the contrary—which the WMSC Compact does not include—it must be assumed that the WMSC lacks authority to duplicate the oversight efforts of state and federal agencies with competent jurisdiction. *See Bayou Lawn & Landscape Servs. v. Sec'y of Lab.*, 713 F.3d 1080, 1084 (11th Cir. 2013) ("[W]e would be hard-pressed to locate [the] power [to regulate particular subject matter] in one agency where it had been specifically and expressly delegated by Congress to a different agency"); *Union Pac. R.R. Co. v. Surface Transp. Bd.*, 863 F.3d 816, 823 (8th Cir. 2017) ("Congress's express delegation to the FRA and Amtrak in § 207(a) overcomes any implied situational authority claimed by the Board under § 213(a).").

---

[11]    While the WMSC would have this Court make a sweeping conclusion that every word in WMATA's Agency Safety Plan falls within the WMSC's admittedly limited authority, such a conclusion could not be reconciled with OSHA's authority over occupational health and safety. Moreover, the WMSC seeks to exploit the fact that WMATA, for purposes of efficiency and conservation of taxpayer funds, prepares a single Agency Safety Plan, as opposed to separate plans for each mode or agency authority, but such a theory improperly places form over substance. Indeed, FTA regulations expressly contemplate this structure, consistent with industry best practices. *See* 49 C.F.R. § 673.11(b) ("A transit agency may develop one Public Transportation Agency Safety Plan for all modes of service or may develop a Public Transportation Agency Safety Plan for each mode of service not subject to safety regulation by another Federal entity."). Yet the WMSC continues to use the fact that WMATA combines all modes into a single aspirational Agency Safety Plan as a sword against WMATA. *See* Pet. Ex. 2, Public Transportation Agency Safety Plan at 2 ("This document is a plan, which, by definition, is aspirational in parts as Metro moves towards full implementation of its SMS.").

**B.      Federal Law Precludes the WMSC From Exercising Plenary Safety Oversight Authority.**

This Court's inquiry into the WMSC's authority should begin and end with the WMSC Compact's text, which precludes the WMSC from exercising the virtually unlimited "safety" oversight authority it now unilaterally claims for itself.  Were there any remaining doubt, however, federal law further weighs in favor of WMATA.  Statutes governing the FTA and OSHA make clear that their oversight powers, absent express authorization to the contrary, were intended to be exclusive.

### 1.      Federal Transportation Administration (FTA).

The WMSC's expansive Subpoena exceeds the limited regulatory powers Congress, through the FTA, chose to delegate to state safety oversight agencies ("SSOA"), like the WMSC. As the WMSC Compact makes clear, the WMSC was created specifically to act as the SSOA for WMATA under 49 U.S.C. § 5329.  The State Safety Oversight program, administered by the FTA, provides funding for, and regulates, state agencies that "oversee[] rail fixed guideway public transportation safety." 49 U.S.C. § 5329(e)(3)(A).  The statute funds such agencies for the specific purpose of "adopt[ing] and enforce[ing] Federal and relevant State laws *on rail fixed guideway public transportation safety*." *Id.* § 5329(e)(3)(B) (emphasis added).  Just like the language of the WMSC's Compact, the statute shows that the agency's purpose is to address dangers inherent in the operation of a commuter rail system, not the general regulation of workplace health and safety. *See, e.g.*, *id.* § 5329(e)(4)(A)(v) (providing SSOAs with "investigative, inspection, and enforcement authority with respect to the *safety of rail fixed guideway public transportation systems* of the eligible State." (emphasis added)).  And that is precisely what federal regulations governing SSOAs address—rail safety.  *See, e.g.*, Rail Transit Roadway Worker Protection, 89 Fed. Reg. 20605 (proposed Mar. 25, 2024) (to be codified at 49 C.F.R. pt. 671) (proposed rule "to

17

ensure the safe operation of public transportation systems and to prevent accidents, incidents, fatalities, and injuries to transit workers who may access the roadway in the performance of work.").  In seeking to enforce its Subpoena, the WMSC vastly exceeds its mandate as an SSOA.

2. <u>Occupational Health & Safety Administration (OSHA).</u>

Just as SSOAs may operate under authority expressly delegated to them from the FTA, state agencies may also oversee federal occupational health and safety standards—but only where OSHA has expressly authorized them to do so.  State regulation of such issues, which has not been approved by the Secretary of Labor, and for which there already is a federal standard in effect, is impliedly preempted as in conflict with the full purposes and objectives of the Occupational Safety and Health Act.  *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 99 (1992).  As the Supreme Court explained in its plurality opinion in *Gade*, "[t]he design of the statute persuades us that Congress intended to subject employers and employees to only one set of regulations, be it federal or state, and that *the only way a State may regulate an OSHA-regulated occupational safety and health issue is pursuant to an approved state plan* that displaces the federal standards."  *Id.* at 99 (emphasis added); *see* 29 U.S.C. § 667(b) ("Any State which, at any time, desires to assume responsibility for development and enforcement therein of occupational safety and health standards relating to any occupational safety or health issue with respect to which a Federal standard has been promulgated under section 655 of this title shall submit a State plan for the development of such standards and their enforcement.").

The WMSC has not submitted to OSHA—much less received approval for—a "State plan" for regulating general occupational health and safety.  And yet the WMSC, through its Subpoena, seeks to assume such authority.  The WMSC's attempt to regulate, for example, asbestos and lead exposure provides more than a compelling reason for this Court to decline to enforce the Subpoena. After observing tiles potentially containing asbestos in certain areas, the WMSC admits that it

"required WMATA to mitigate the issue" because of "the potential exposure to asbestos in a place where WMATA employees walked." *See* Pet. Ex. 10 at 3 n.4. But OSHA (and EPA) unquestionably have explicit and expansive regulatory authority over asbestos exposure mitigation and remediation. *See generally Metro-N. Commuter R. Co. v. Buckley*, 521 U.S. 424 (1997); 29 C.F.R. § 1910.1001. For that reason, WMATA implemented industry best practices, consistent with OSHA regulations and EPA guidelines, to mitigate any potential asbestos exposure. *See* Pet. Ex. 9 at 7. The danger of the WMSC's unlawful attempt to involve itself where OSHA already regulates is readily apparent. As WMATA explained in response to the WMSC's demand that asbestos be removed, "if WMATA were to comply with the WMSCs request, [it] would potentially create an environmental hazard where none exists":

> WMSC auditors noted that WMATA had placed a warning notice on cracked floor tiles so as not to disturb the tiles due to asbestos. Pursuant to Environmental Protection Agency ("EPA") guidance (see EPA letter dated July 13, 1990), the cracked tiles and mastic are considered "nonfriable" (i.e., not an asbestos exposure risk) if left undisturbed, and WMATA personnel are not performing any activities prohibited under the OSHA program for asbestos safety. *See* 29 C.F.R. § 1910.1001. The WMSC, however, directed WMATA to implement a program to remove the tiles on an accelerated basis rather than in accordance with WMATA's asbestos program (part of WMATA's holistic set of health and safety initiatives includes assessments in advance of any work which may disturb such materials). Removing the tiles on the WMSC's schedule would risk creating a workplace safety and health hazard through the release of asbestos particles that cause the very harm the EPA seeks to avoid.

*Id.* It was precisely this sort of regulatory chaos that Congress sought to avoid when it chose to vest exclusive authority in agencies with competent jurisdiction.

In seeking to enforce its Subpoena, the WMSC offers no support for its claim that it can unilaterally assume the oversight powers of an agency like OSHA. Although the WMSC Compact suggests overlap between FTA and WMSC authority, it is completely silent as to OSHA. *See, e.g.*, WMSC Compact Art. II § 2. The WMSC relies on a number of inapposite cases to support

its Petition. It cites *United States v. Philip Morris Inc.*, 263 F. Supp. 2d 72 (D.D.C. 2003), but the question at issue in that case was whether one federal statute had impliedly repealed another—something not implicated at all by the WMSC's Subpoena. As the WMSC itself acknowledges, the court concluded nothing more than "[w]hen two federal statutes overlap, courts must give effect to both, if at all possible." Pet. at 10 (citing *Philip Morris*, 263 F. Supp. 2d at 76). The Supreme Court's decision in *Corley v. United States*, 556 U.S. 303 (2009), likewise dealt with nothing more than harmonizing potentially overlapping federal statutes. And the same was true in *F.T.C. v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2001), *see* Pet. at 10, where the D.C. Circuit was asked to resolve arguably overlapping enforcement authority asserted by the Federal Trade Commission and the Commodity Futures Trading Commission. The question in that case, once again, concerned the harmonization of two federal statutes—not a state agency attempting to duplicate pre-existing, regulatory enforcement efforts already exercised by a federal agency.

Here, the WMSC, an interstate compact agency, is attempting to assume oversight powers of federal agencies with competent jurisdiction, like OSHA. Tellingly, the standards the WMSC seeks to enforce through its Subpoena are carbon copies of those issued by OSHA. But again, Congress chose to imbue agencies like OSHA, which possess unique regulatory expertise, with *exclusive* authority to oversee their relevant federal standards to "avoid subjecting workers and employers to duplicative regulation." *Gade*, 505 U.S. at 100. While at times Congress allows OSHA, the FTA, and other agencies to delegate oversight authority to state-level analogues—they may do so only when certain criteria had been satisfied. Here, FTA has delegated limited authority to the WMSC through the State Safety Oversight Program; OSHA has delegated nothing whatsoever to the WMSC. The WMSC's attempt to mimic oversight over federal standards for which it has neither the legal authority nor competence should be rejected.

## IV.    CONCLUSION

For these reasons, WMATA respectfully urges this Court to hold that the Subpoena is unenforceable and exceeds the WMSC's statutory authority, and that the Subpoena requests are therefore overly broad and unduly burdensome.  The Court should deny the WMSC's Petition and grant such further relief as this Court deems proper.

Dated: November 27, 2024                    Respectfully submitted,

                                            */s/ Attison L. Barnes, III*
                                            Attison L. Barnes, III (DC Bar No. 427754)
                                            George E. Petel (DC Bar No. 1088877)
                                            William K. Lane III (DC Bar No. 1034955)
                                            Wiley Rein LLP
                                            2050 M Street NW
                                            Washington, DC  20006
                                            Phone: (202) 719-7000
                                            Fax: (202) 719-7049
                                            abarnes@wiley.law
                                            gpetel@wiley.law
                                            wlane@wiley.law

                                            *Counsel for Respondent*

**CERTIFICATE OF SERVICE**

I certified that a copy of the foregoing has been served via the Court's Electronic Filing system upon all registered counsel this 27th day of November 2024.

*/s/ Attison L. Barnes, III*
Attison L. Barnes, III