UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| WASHINGTON METRORAIL SAFETY COMMISSION, | |
| Petitioner, | No. 1:24-mc-00144-LLA |
| v. | |
| THE WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, | Hon. Loren L. AliKhan |
| Respondent. | |

**REPLY IN SUPPORT OF THE WASHINGTON METRORAIL SAFETY COMMISSION'S PETITION FOR SUMMARY ENFORCEMENT OF ADMINISTRATIVE SUBPOENA**

**INTRODUCTION**

As part of a mandatory triennial audit, the Washington Metrorail Safety Commission (the "WMSC") requested certain documents and information from Washington Metropolitan Transit Authority ("WMATA") regarding occupational health and safety issues within the WMATA Rail System ("Metrorail"). In order to avoid complying with those requests, WMATA argues that the language of the Interstate Compact forming the WMSC (the "WMSC Compact") and other provisions of federal law somehow deprive the WMSC of the authority to investigate occupational health and safety issues. But each provision of the WMSC Compact to which WMATA points confirms that the WMSC is responsible for providing safety oversight related to "the safety of the WMATA Rail System." Similarly, the WMSC Compact gives the WMSC the authority to implement and enforce other state and federal laws. Nothing in the language of the WMSC Compact or other law excludes occupational health and safety from the WMSC's broad safety

1

oversight authority over all aspects of safety on the WMATA Rail System. To the contrary, the plain language of the WMSC Compact confirms that the District of Columbia, the Commonwealth of Virginia, the State of Maryland, and Congress intended to give the WMSC the authority to audit WMATA's occupational health and safety programs and practices as part of its authority to assure safety on the WMATA Rail System.

WMATA's objections to the audit boil down to little more than its desire not to be subject to the WMSC's oversight. To justify its bald effort to avoid that oversight, WMATA offers textually implausible readings of the WMSC Compact and ignores portions of the relevant statutes in order to conjure a cramped and narrow understanding of the WMSC's authority. As demonstrated in the Petition, and further shown below, none of WMATA's arguments have merit because the three states, with the consent of Congress, granted the WMSC the authority to audit WMATA's compliance with regulations and programs governing safety on the WMATA Rail System, without regard for the type of regulation or program, including WMATA's occupational safety and health ("OSH") programs. Because the language of the WMSC Compact is clear, this Court should grant the WMSC's petition and issue the requested order enforcing the Subpoena.

## ARGUMENT

Courts reviewing administrative subpoenas see their roles as "strictly limited," and will inquire only into "whether 'the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant' to the agency's investigation." *United States v. Hill*, 319 F. Supp. 3d 44, 47 (D.D.C 2018) (first quoting *FTC v. Texaco, Inc.*, 555 F.2d 862, 872 (D.C. Cir. 1977), and then quoting *United States Int'l Trade Comm'n v. ASAT, Inc.*, 411 F.3d 245, 253 (D.C. Cir. 2005)). WMATA disputes only the first prong, namely whether the Subpoena is within the WMSC's authority.

**I.    THE WMSC COMPACT PERMITS THE WMSC TO OVERSEE THE OCCUPATIONAL SAFETY AND HEALTH OF METRORAIL EMPLOYEES.**

As the WMSC showed in its Petition, the WMSC has broad authority over all aspects of safety within the Metrorail system, including occupational health and safety. That authority flows clearly from Section 3 of the WMSC Compact, which provides that the WMSC is:

> empowered . . . to review, approve, oversee, and enforce the safety of the WMATA Rail System, including, without limitation, to:
>
> (a) Have exclusive safety oversight authority and responsibility over the WMATA Rail System pursuant to federal law, including, without limitation, the power to restrict, suspend, or prohibit rail service on all or part of the WMATA Rail System as set forth in this WMSC Compact; . . . [and]
>
> (d) Investigate hazards, incidents, and accidents on the WMATA Rail System.

WMSC Compact § 3. That authority is reinforced by Section 30(d), which gives the WMSC authority to "[i]mplement and enforce relevant federal and State laws and regulations relating to safety of the WMATA Rail System."

Each of these provisions grants the WMSC authority over "safety" in all of its forms within Metrorail. Occupational safety is a type of "safety." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 368 (2018) ("Adjectives modify nouns—they pick out a subset of a category that possesses a certain quality."). Accordingly, the WMSC Compact gives the WMSC the authority to review WMATA's occupational health and safety programs as part of its safety oversight authority.

Further, the WMSC Compact grants the WMSC authority to audit and ensure WMATA's compliance with its Public Transportation Agency Safety Plan ("PTASP"), in which WMATA commits to implementing programs relating to occupational health and safety. WMSC Compact § 30(b), (e). Not only does the WMSC Compact give the WMSC authority to monitor WMATA's

compliance with its PTASP, including the occupational health and safety provisions, but WMATA's inclusion of occupational health and safety in the PTASP is an admission that occupational health and safety is an integral aspect of safety on the WMATA Rail System.

## II. WMATA'S ARGUMENTS IGNORE AND MISREAD THE PLAIN TEXT OF THE WMSC COMPACT AND OTHER FEDERAL LAWS.

### A. The WMSC's Oversight Authority Is Not Limited to "Operational Dangers."

WMATA argues that the powers in Section 3 somehow show that WMSC's authority over the WMATA Rail System is limited to "dangers inherent in the operation of a rail system." Opposition at 14. WMATA suggests that the WMSC's powers only make sense in the context of "aspects of safety that are unique to operating a rail system." *Id.* That interpretation is inconsistent with the plain language of the WMSC Compact.

The scope of the WMSC's authority is "safety" on the "WMATA Rail System," a term that the WMSC Compact defines to mean "the rail fixed guideway public transportation system and all other real and personal property owned, leased, operated, or otherwise used by WMATA rail services and shall include WMATA rail projects under design or construction by owners other than WMATA." WMSC Compact § 1(m). That definition is broad and includes the entire Metrorail "public transportation system" *and* all of the real and personal property used in that system. Thus, the scope of the WMSC's authority extends to all places where WMATA conducts rail operations *and* every aspect of WMATA's rail system. The WMSC's power to "oversee[] and enforce the safety of the WMATA Rail System" therefore encompasses the power to oversee all aspects of safety related to the operation of the rail system, including all aspects of safety that occur on property that WMATA uses for rail services. That clearly encompasses occupational health and safety.

4

Just as the WMSC Compact describes the WMSC's jurisdictional bounds broadly, the WMSC Compact defines the WMSC's substantive ambit broadly. The WMSC Compact empowers the WMSC to conduct investigations of "hazards, incidents, and accidents on the WMATA Rail System," *id.* § 3(d) (emphasis added). "Hazards" is an expansive term, meaning "any real or potential condition that can cause injury, illness, or death; damage to or loss of the facilities, equipment, rolling stock, or infrastructure of a rail fixed guideway public transportation system; or damage to the environment." 49 C.F.R. § 674.7. OSH hazards, such as asbestos and lead, are hazards because they are conditions that can cause injury or illness. The WMSC Compact does not limit the types of hazards that the WMSC must focus on. Moreover, because the WMSC Compact directs the WMSC to investigate hazards "on real property owned, leased, operated, or otherwise used by WMATA rail services," the WMSC is tasked with investigating OSH hazards that may be found on real property used by Metrorail and is given oversight authority over WMATA's response to Metrorail-related OSH hazards. There is nothing in the language of the WMSC Compact that limits that authority to somehow exclude operational hazards, incidents, or accidents.

**B.     WMATA's Reading of the WMSC Compact and Section 5329 is Incorrect and Unworkable.**

WMATA makes a similar argument regarding the statute governing state safety oversight programs, and that argument fails for the same reasons. WMATA argues that the phrase "rail fixed guideway public transportation safety" "shows that the [WMSC's] purpose is to address dangers inherent in the operation of a commuter rail system." Opposition at 17. WMATA's proposed limit repeats the error WMATA made regarding the WMSC Compact. Aside from erroneously describing WMATA's service and FTA's jurisdiction—WMATA does not run

commuter rail (*see* 49 U.S.C. § 24102(3))—WMATA's proposed limit repeats the error WMATA made regarding the WMSC Compact.

As a State Safety Oversight Agency ("SSOA"), *see* WMSC Compact § 2, the WMSC is responsible for "enforc[ing] Federal and relevant State laws on rail fixed guideway public transportation safety." 49 U.S.C. § 5329(e)(3)(B). Further, SSOAs have "investigative, inspection, and enforcement authority with respect to the safety of rail fixed guideway public transportation systems." *Id.* § 5329(e)(4)(A)(v). Through these provisions, Section 5329 authorizes SSOAs to oversee and address "safety" in all its forms.

The "safety" of a "public transportation system[]" like Metrorail can be affected by many dangers and hazards, only some of which are inherent to rail operations. Passengers, workers, and other stakeholders care about all of them. Accordingly, Congress directed SSOAs to enforce laws related to "public transportation safety," broadly and without limitation. To clarify the jurisdictional limits of the SSOA's authority, Congress used the phrase "rail fixed guideway public transportation." That phrase means federal law only authorizes SSOAs to oversee the safety of public transportation *rail* systems and not non-rail public transportation, such as buses or ferries. The phrase does not limit the types of "safety" that SSOAs must oversee, because the safety of a public transportation system includes all aspects of safety, whether inherent to rail or not.[1] Had

---

[1] Indeed, WMATA's reading of the SSOA statute is at odds with how FTA understands it. A recent FTA directive relating to assaults on transit employees instructs transit agencies to assess the risks posed by assaults on their workforce and report the results to FTA. *General Directive 24-1: Required Actions Regarding Assaults on Transit Workers*, 89 Fed. Reg. 78431, 78431 (Sep. 25, 2024). FTA issued that order based on its statutory authority to "issue directives with respect to the safety of the public transportation system of a recipient or the public transportation industry generally." *Id.* at 78433, 78447 (citing 49 U.S.C. § 5329(f)(2)). FTA was granted authority over the safety of public transportation, and FTA understood that authority to encompass both risks inherent to a public transportation system and risks within a public transportation system that are also applicable to other industries, such as assaults. FTA, like Congress, recognized that it does

6

Congress wished to limit SSOAs' authority, it would have done so much more plainly, such as by directing SSOAs to oversee "the safety of rail components of public transportation systems." It did not.

Additionally, the distinction that WMATA attempts to draw between hazards that are exclusive to a rail system and hazards that are not is incoherent, as WMATA's own example demonstrates. WMATA cites the Federal Transit Administration's regulations governing Roadway Worker Protection, which involves safety risks to workers who enter onto train tracks, as an appropriate subject of the WMSC's investigative authority. Opposition at 17. A roadway worker faces several different occupational hazards. Some of these are unique to a rail environment, such as collisions with trains. Others, however, are merely distinctive forms of commonly found hazards: slips and falls while walking along the tracks, electrocution from the third rail (which supplies power to Metrorail trains) or other sources, or injuries from dropping heavy construction materials on a worker's foot. *See, e.g.*, 49 C.F.R. §§ 671.21(b)(1) (requiring workers to have safety shoes), 671.33(b)(3) (requiring job safety briefings to discuss "hazards explicitly related to the electrified system"), 671.41(c)(8) (requiring that training for roadway workers discuss the hazards of traction power). Falls, electrocutions, and construction are risks found in many industrial settings. Hazards to roadway workers are just particular types of occupational hazards.

WMATA does not and cannot explain why a fall or electrocution on a public transportation system should be treated differently from lead or asbestos exposure, or any other occupational safety issue, on a public transportation system. All are common occupational hazards that can take

---

not matter to workers and employees whether they are injured because of a train derailment or because of a violent assault. The statutes empowering FTA, SSOAs, and the WMSC reflect that recognition.

distinct forms within Metrorail or other railroads. Accordingly, if, as WMATA concedes, the WMSC has the power to oversee WMATA's compliance with roadway worker protection obligations, it must have the power to oversee WMATA's compliance with OSH obligations. There is no principled way to draw the line WMATA would like to draw, confirming that WMSC has the authority to investigate occupational health and safety issues.

### C.     WMATA's Reading of the Word "Exclusive" is Implausible.

WMATA's other textual argument centers on the WMSC Compact's grant of "*exclusive* safety oversight authority," which, WMATA claims, means that any subject of regulation by the Occupational Safety and Health Administration ("OSHA") is not a proper subject of the WMSC's audit authority. Opposition at 14–15. In WMATA's view, the word "exclusive" must restrict the WMSC's authority, because it would otherwise displace the authority over other agencies that set safety regulations, such as the OSHA.

On its face, WMATA's argument proves too much. If the WMSC Compact gave WMATA the "exclusive" authority WMATA asserts, then the WMSC, not OSHA or any other agency, would have sole enforcement authority, in which case the WMSC would have the authority to audit occupational health and safety practices. As the Supreme Court directs, "a more specific statute will be given precedence over a more general one," *Corley v. United States*, 556 U.S. 303, 316 (2009) (quoting *Busic v. United States*, 446 U.S. 398, 406 (1980)), so the WMSC Compact—a federal law that applies specifically to the WMSC and WMATA—must be given precedence over the Occupational Safety and Health Act ("OSH Act"), which applies generally to all employers in all industries.

Conversely, if the word "exclusive" somehow displaced the WMSC's authority, then WMATA's reading would make sections of the WMSC Compact meaningless because the WMSC would lack the authority to "[i]mplement and enforce relevant federal and State laws and

8

regulations relating to safety of the WMATA Rail System," WMSC Compact § 30(d), and "meet other requirements of federal and State law relating to safety oversight of the WMATA Rail System," *id.* § 3(f). The word "exclusively" must be read within this broader context of overlapping jurisdiction that the WMSC Compact establishes. WMATA's argument is textually unsupportable.[2]

The language and legislative context of the WMSC Compact provide a simpler and more logical explanation. Pursuant to 49 U.S.C. § 5329(e)(4)(A), WMATA would be subject to oversight by three different State Safety Oversight Agencies ("SSOAs"): Maryland's, Virginia's, and the District of Columbia's.[3] The three jurisdictions, with Congress's consent, sought to avoid that result by directing that the WMSC would have "exclusive safety oversight authority" rather than overlapping oversight from three SSOAs. The decision to give the WMSC "exclusive safety oversight authority" was intended to prevent conflicts between SSOAs in three jurisdictions, not to somehow limit the WMSC's authority.

WMATA argues that that reading does not explain how the word "exclusive" "affects *federal* law." Opposition at 15 (emphasis in original). But the WMSC Compact *is* federal law. *See Cuyler v. Adams*, 449 U.S. 433, 440 (1981) ("[W]here Congress has authorized the States to enter into a cooperative agreement, and where the subject matter of that agreement is an appropriate subject for congressional legislation, the consent of Congress transforms the States'

---

[2] WMATA argues that this reading must mean that OSHA's authority to regulate OSH hazards, such as asbestos, is displaced. Opposition at 15. But the WMSC has "exclusive safety oversight authority"—not the exclusive authority to set regulatory standards.

[3] The term "State" in Section 5329 includes the District of Columbia. 49 U.S.C. § 5302(20). Section 5329(e)(4)(A) gives SSOAs "investigative, inspection, and enforcement authority with respect to the safety of rail fixed guideway public transportation systems of the eligible State," and shall "audit[] . . . the compliance of the rail fixed guideway public transportation systems in the eligible State . . . with the" applicable safety plan."

agreement into federal law under the Compact Clause."). WMATA does not explain why it is necessary for "exclusive" to affect federal law when the WMSC Compact elsewhere states that the WMSC's *safety oversight* authority is intended to operate in tandem with the *regulatory* authority of other federal agencies. *Infra*, 11-12.

> **D.  The WMSC's Authority to Audit WMATA's Compliance with its Public Transportation Agency Safety Plan Does Not Exclude Occupational Health And Safety.**

The WMSC Compact directs the WMSC to "oversee[] and enforce the adoption and implementation of WMATA's Public Transportation Agency Safety Plan," and "[a]udit every 3 years the compliance of WMATA with WMATA's Public Transportation Agency Safety Plan." WMSC Compact § 30(b). The SSOA statute, too, directs SSOAs to "audit[], at least once triennially, the compliance of the rail fixed guideway public transportation systems in the [subject] State . . . with the public transportation agency safety plan" for those systems, and "enforce the implementation" of the PTASP. 49 U.S.C § 5329(e)(4)(A)(iv), (vi). WMATA's Public Transportation Agency Safety Plan ("PTASP") includes OSH programs, so the WMSC has the authority to oversee WMATA's OSH programs. Nonetheless, WMATA argues that the WMSC must ignore the discussion of OSH programs in the PTASP because of OSHA's authority and because the discussion of OSH is merely included for "efficiency." Opposition at 16 n.11.

WMATA is incorrect: neither the WMSC Compact nor Section 5329 limits the portions of the PTASP that the WMSC should review. Instead, both direct the WMSC to audit Metrorail's compliance with WMATA's PTASP as a whole, thereby requiring the WMSC to oversee WMATA's OSH programs. True, the WMSC is exclusively focused on Metrorail pursuant to the WMSC Compact and as an SSOA, so the WMSC does not review the compliance of WMATA's bus or paratransit services with the PTASP. Indeed, the portions of the PTASP that do not apply to Metrorail, such as a section concerning vehicular and pedestrian accidents involving buses, are

clearly labeled as such. *See* WMATA, PUBLIC TRANSPORTATION AGENCY SAFETY PLAN § 1.5.1.[4] Otherwise, the PTASP is not organized by transit mode. Instead, it contains various policies and processes that mostly apply to all WMATA employees. The sections of the PTASP detailing OSH programs contain no limits relating to the modes to which they apply. *See, e.g., id.* § 3.2.1. It is the WMSC's responsibility to ensure that Metrorail complies with the PTASP. The PTASP details OSH programs and strategies that are applicable to Metrorail. Therefore, the WMSC must audit WMATA's compliance with the OSH portions of the PTASP. WMATA's claim otherwise lacks any textual basis, and WMATA identifies no distinction, coherent or otherwise, between the OSH sections of the PTASP and other sections.

### E. WMATA Does Not Need to Follow the Procedures for State Agencies Set Forth in the Occupational Safety and Health Act.

Faced with the plain text of the WMSC Compact, WMATA attempts to find some limit to the WMSC's powers to audit WMATA's compliance with OSH regulations in the OSH Act. Specifically, WMATA argues that the WMSC has not received the requisite permission from OSHA to set occupational health and safety standards. Opposition at 18–19. WMATA's argument is inconsistent with its prior public statements regarding OSHA's jurisdiction over WMATA.[5] But regardless of the scope of OSHA's jurisdiction, there are three problems with such an argument.

First, the OSH Act and the WMSC Compact can be easily harmonized without displacing either agency's authority. WMATA acknowledges that "[w]hen two federal statutes overlap, courts must give effect to both, if at all possible." Opposition at 20. Because Congress's consent

---

[4] The PTASP is available at https://www.wmata.com/rider-guide/safety/upload/2024-WMATA-ASP-Fully-Approved.pdf.

[5] In its 2019 System Safety Program Plan—the predecessor document to the PTASP—WMATA stated that OSHA "does not consider WMATA as being under its jurisdiction because it is a public agency." Exhibit 1.

11

to the WMSC Compact "transformed [the Compact] into federal law," *Cuyler*, 449 U.S. at 440, the task of the Court is to give both statutes effect. Doing so is easy: OSHA is empowered to set and enforce federal OSH standards, and the WMSC is empowered to audit WMATA's compliance with them and issue orders when WMATA is not in compliance. That is how the WMSC has operated for its entire existence, as WMATA is well aware. There is therefore no reason that the plain text of the WMSC Compact should not apply to WMATA.

Second, even if the possibility of conflicting orders meant that the OSH Act displaced the WMSC's authority to enforce OSH standards, that would be irrelevant here because the WMSC is merely seeking to subpoena documents in connection with its audit authority. The WMSC is not exercising its authority to compel WMATA to take any particular action within the Metrorail system. Instead, the WMSC is seeking to audit WMATA's OSH programs. There are no conflicting orders yet because the WMSC is still gathering information. Any disputes about actual conflicting orders are premature and not ripe and can be resolved collaboratively if they arise.

Third, the WMSC is not a state agency. The WMSC is, as WMATA acknowledges, an interstate compact agency. Accordingly, the WMSC is a creature of federal law, just like OSHA. *See Cuyler*, 449 U.S. at 440 ("[W]here Congress has authorized the States to enter into a cooperative agreement, and where the subject matter of that agreement is an appropriate subject for congressional legislation, the consent of Congress transforms the States' agreement into federal law under the Compact Clause."). WMATA describes the process for states to assume responsibility for the development and enforcement of OSH standards, but the WMSC need not go through that process because it has already been granted the requisite authority by a higher authority: Congress.

12

WMATA attempts to add substance to its speculation by pointing to a dispute regarding a prior action of the WMSC's related to asbestos. However, that dispute does not undercut the WMSC's authority to audit occupational health and safety issues. Additionally, WMATA's mischaracterizes the issue. As the WMSC previously explained to WMATA, the WMSC directed WMATA to mitigate an asbestos hazard caused by disturbed or damaged tiles and gave WMATA the discretion to select the best way to do so. WMATA initially cooperated with the WMSC in this process but abruptly stopped. Pet. Ex. 10 at 3 n.4. Moreover, the WMSC understands that the Virginia Occupational Safety and Health Program ultimately *agreed* with the WMSC and issued a proposed citation to WMATA directing WMATA to remediate and remove the floor tiles, just as the WMSC chose to do.[6]

## III. WMATA FAILS TO SHOW THAT COMPLIANCE WITH THE SUBPOENA WOULD CAUSE AN UNDUE BURDEN.

In the introduction to its opposition and in the Impastato Affidavit, WMATA argues that the WMSC's audit requests place an undue burden on it. However, WMATA's arguments regarding burden are generalized and miss the mark. WMATA does not point to any individually burdensome request, but instead only addresses the burden of the WMSC's audit requests in the aggregate. The WMSC's general practices are not before the Court—the only question is whether the specific document requests in the Subpoena are enforceable. In the absence of any specific argument that the burden of the Subpoena justifies nonenforcement, WMATA has either waived the argument or failed to make a persuasive argument, and the court should therefore not consider burdensomeness in its resolution of the Petition.

---

[6] The WMSC understands that WMATA has objected to this citation. However, regardless of the outcome of WMATA's objection, the fact that an expert state agency reached the same conclusion as the WMSC belies WMATA's claim that there was anything inappropriate about how the WMSC's handled of this issue.

Moreover, WMATA mischaracterizes the WMSC's audit procedures in order to create the appearance of a generalized burden. The WMSC and WMATA have productively collaborated for the six years that the WMSC has existed. WMATA now claims that there is an "increasing rate" or "overwhelming volume" of audit requests. Opposition at 6. But the WMSC's audit requests have been consistent across the WMSC's existence. Each audit has included a similar number of requests. Many of these requests ask WMATA to provide its programs, policies, and trainings related to the audit, and the remainder consist of requests unique to the particular program being audited. That approach has not changed. WMATA has complied with the WMSC's requests for six years without serious objection, and the WMSC has not taken any action that would make that compliance more difficult.

Moreover, the WMSC designs its audit process to provide ample opportunity for discussions between the WMSC and WMATA staff. Those discussions refine the scope of the audit and allow WMATA to address any concerns that particular requests are overly burdensome. The WMSC staff have frequently addressed WMATA's questions and concerns relating to the burden of particular requests. In fact, the WMSC and WMATA have taken exactly that approach during the audit now at issue. WMATA was concerned that the portions of the audit not in dispute—namely, those relating to fitness for duty and drug and alcohol safety[7]—would require WMATA to create documents not in existence or spend countless hours combing through paper records. Notwithstanding the WMSC's prior direction to WMATA to improve its recordkeeping practices to prevent such issues from arising, the WMSC accommodated WMATA's concern by narrowing certain document requests and reviewing documents in person. But with respect to the

---

[7] WMATA has complied with these portions of the WMSC's Request for Documents notwithstanding that the dangers presented by employees' use of drugs and alcohol are not inherent to railroads, but are instead present in a variety of industrial contexts.

14

portions of this audit that are the subject of the WMSC's Petition, WMATA has outright refused to engage with the WMSC.

Finally, any burden on WMATA is because Congress recognized the need for strong safety oversight of public transportation systems like WMATA. Congress gave SSOAs a broad mandate, and the District of Columbia, Virginia, and Maryland, as ratified by Congress, gave the WMSC a similarly broad mandate when it enacted the WMSC Compact in 2017. If WMATA now needs to expand its safety staff, that is because of the system the jurisdictions have established. The WMSC is merely carrying out its mandate and responding to known safety hazards.

## **CONCLUSION**

For the foregoing reasons, this Court should issue the requested order enforcing WMSC's April 8, 2024 subpoena.

KAPLAN KIRSCH LLP

Dated:  December 13, 2024    By:   /S/
　　　　　　　　　　　　　　　　　W. Eric Pilsk  (DC Bar No. 419901)
　　　　　　　　　　　　　　　　　Charles A. Spitulnik
　　　　　　　　　　　　　　　　　1634 I (Eye) Street, NW, Suite 300
　　　　　　　　　　　　　　　　　Washington, DC  20006
　　　　　　　　　　　　　　　　　(202) 955-5600 Phone
　　　　　　　　　　　　　　　　　(202) 955-5616 Facsimile

　　　　　　　　　　　　　　　　　M. Riley Scott
　　　　　　　　　　　　　　　　　1675 Broadway, Suite 2300
　　　　　　　　　　　　　　　　　Denver, CO 80202
　　　　　　　　　　　　　　　　　(303) 825-7000 Phone

　　　　　　　　　　　　　　　　　Grant M. Glovin
　　　　　　　　　　　　　　　　　1500 Broadway, Suite 1605
　　　　　　　　　　　　　　　　　New York, NY 10036
　　　　　　　　　　　　　　　　　(646) 883-5110 Phone

　　　　　　　　　　　　　　　　　ATTORNEYS FOR WASHINGTON METRORAIL SAFETY COMMISSION

**CERTIFICATE OF SERVICE**

    I hereby certify that I have on the 13th of December 2024, caused a copy of the foregoing REPLY IN SUPPORT OF THE WASHINGTON METRORAIL SAFETY COMMISSION'S PETITION FOR SUMMARY ENFORCEMENT OF ADMINISTRATIVE SUBPOENA to be served upon all parties of record in this proceeding by the Court's electronic filing system.

_____
W. Eric Pilsk

Dated: December 13, 2024

# EXHIBIT 1

# Washington Metropolitan Area Transit Authority



# SYSTEM SAFETY PROGRAM PLAN

**January 2019**

Department of Labor and Industry, Occupational Safety and Health (VOSH) and to the Occupational Safety and Health Administration (OSH), U.S. Department of Labor.

SAFE is responsible for reporting the in-patient hospitalization of one or more employees or an employee's amputation or an employee's loss of an eye, as a result of a work-related incident that occurs at a WMATA facility in Virginia, within twenty-four (24) hours, to the Virginia Department of Labor and Industry, Occupational Safety and Health (VOSH) and to the Occupational Safety and Health Administration (OSH), U.S. Department of Labor.

SAFE is to be notified immediately of the arrival of VOSH inspectors at any Authority facility for the purposes of conducting inspections or investigations.

SAFE is the Authority's primary point of contact with VOSH. Copies of all VOSH citations received at a facility are to be immediately provided to SAFE.

SAFE is responsible for submitting the Authority's response to VOSH citations and for requesting hearings or contesting citations in conjunction with COUN.

WMATA contractors working in Virginia are required to comply with VOSH standards including reporting requirements.

Therefore, the Authority must establish contract requirements that require contractors comply with VOSH standards and monitor the effectiveness of such compliance.

## 5.18 Occupational Safety and Health Administration

The Occupational Safety and Health Administration (OSHA) does not consider WMATA as being under its jurisdiction because it is a public agency.

However, OSHA will notify SAFE if it receives an employee complaint, request that it be investigated and request that the Authority provide a written response.

Alternatively, OSHA will notify the District of Columbia OSH, which is a consulting agency, to investigate the complaint.

WMATA contractors working in the District of Columbia are required to comply with Federal OSHA standards including reporting requirements.

Therefore, the Authority must establish contract requirements that require contractors comply with OSHA standards and monitor the effectiveness of such compliance.

## 5.19 Safety Responsibilities and Task Matrix

The Safety Responsibilities and Task Matrix (see exhibit 5-1) includes safety related responsibilities and tasks performed by SAFE and other responsible departments.