UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WASHINGTON METRORAIL SAFETY COMMISSION,**<br><br>Petitioner,<br><br>v.<br><br>**WASHINGTON METROPOLITAN TRANSIT AUTHORITY,**<br><br>Respondent. | No. 24-mc-00144-LLA |

**ORDER**

Pending before the Court is the Washington Metrorail Safety Commission's ("WMSC") petition to enforce an administrative subpoena against the Washington Metropolitan Area Transit Authority ("WMATA"). For the reasons set forth herein, the undersigned orders that WMSC's motion be GRANTED.

**I.   BACKGROUND**

On February 9, 2024, WMSC notified WMATA about an audit of "WMATA's fitness for and occupational health programs." *See* WMSC Pet., ECF No. 1 at ¶ 20. The audit stems in part from a July 14, 2023, report that detailed the presence of lead dust in an emergency medical cabinet at a train station platform. *See id.* at ¶¶ 17–19. As part of this audit, WMSC served an initial request on WMATA for documents requesting information related to "employee fitness, occupational health, training, various bodily and environmental safety programs, drug and alcohol testing, and exposure to hazardous substances." *See id.* at ¶¶ 22–23.

1

WMATA objected to the scope of WMSC's requests and asked WMSC to abstain from conducting the occupational safety and health ("OSH") portion of the audit. *See id.* at ¶ 24. WMSC refused this request and eventually issued a subpoena to compel the production of documents and information. *See id.* at ¶¶ 26–27. WMATA objected to WMSC's subpoena. *See id.* at ¶ 31. WMATA argued the requests were outside of WMSC's authority, duplicative to regulations by the Occupational Safety and Health Administration ("OSHA"), and unduly burdensome. *See id.*

Attempts to resolve the dispute informally failed. *See id.* at ¶ 34. On October 31, 2024, WMSC filed the instant petition to enforce the subpoena. *See generally*, WMSC Pet.

## II. DISCUSSION

This Court has original jurisdiction to enforce subpoenas under the Washington Metrorail Safety Commission Interstate Compact (the "Compact"). *See* D.C. Code § 9-1109.11 ¶ 48. But "[t]he court's role in a proceeding to enforce an administrative subpoena is a strictly limited one." *United States v. Hill*, 319 F. Supp. 3d 44, 47 (D.D.C. 2018) (quoting *F.T.C. v. Texaco, Inc.*, 555 F.2d 862, 871–72 (D.C. Cir. 1977)). Courts must consider whether "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *Texaco Inc.*, 555 F.2d at 872 (citing *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)). Here, WMATA argues only that WMSC's subpoena is outside of the scope of WMSC's authority. *See generally* WMATA Opp. Pet., ECF No. 6. Therefore, the Court will not consider whether the subpoena has an indefinite demand or whether it is reasonably relevant. *See Clark v. Sweeney*, No. 25–52, 2025 WL 3260170, at *1 (U.S. Nov. 24, 2025) (explaining that "the parties frame the issues for decision," not the Court).

A.      The Inquiry Is Within WMSC's Authority

1.      *WMSC's Safety Oversight Authority Over WMATA*

In 2017, the Compact established WMSC. *See generally* § 9-1109.11. The Compact granted WMSC "exclusive safety oversight authority and responsibility over the WMATA Rail System[,]" *id.* at ¶ 3(a), and the ability to "[i]nvestigate hazards, incidents, and accidents on the WMATA rail system[.]"[1] *Id.* at ¶ 3(d). As part of the WMSC's "Safety Oversight Powers," the Compact permits WMSC to conduct "inspections, investigations, examinations, and testing of WMATA personnel and contractors, property, equipment, facilities, rolling stock, and operations of the WMATA Rail System, including, without limitation, electronic information and databases through reasonable means, which may include issuance of subpoenas." *Id.* at ¶ 31(a).

As well as the general safety oversight described above, the Compact requires WMSC to "review, approve, oversee, and enforce the adoption and implementation of WMATA's Public Transportation Agency Safety Plan ("Safety Plan")." *Id.* at ¶ 30 (b). In addition, as WMATA's certified State Safey Oversight Agency (SSOA),[2] *see id.* at ¶ 2, WMSC has "investigative, inspection, and enforcement authority" and "authority to review, approve, oversee, and enforce the implementation" of WMATA's Safety Plan. 49 U.S.C. § 5329(e)(4)(A)(iv)–(v). As WMATA's SSOA, WMSC must also report on the safety of WMATA's Rail System annually and audit WMATA's compliance with their Safety Plan triennially. *See id*. at (vi)–(vii).

---

[1] The "WMATA Rail System" is "the rail fixed guideway public transportation system and all other real and personal property owned, leased, operated, or otherwise used by WMATA rail services." § 9-1109.11 ¶ 1(m).
[2] A State Safey Oversight Agency (SSOA) is an agency certified by the Federal Transit Administration to oversee safety at rail transit systems. *See* Federal Transit Administration, *State Safety Oversight (SSO) Program*, https://perma.cc/665K-R9R9 (last visited Dec. 17, 2025).

2.     *WMSC's Authority over OSH*

OSH refers to the general discipline of maintaining safe and healthy workplaces for workers. *See* Occupational Safety and Health Act of 1970, § 2. As discussed above, WMSC has broad authority over all aspects of safety within the Metro Rail System. WMSC contends that OSH falls within this broad authority. WMATA argues otherwise.

When interpreting a statute, "if the words are plain, they give meaning to the act, and it is neither the duty nor the privilege of the courts to enter speculative fields in search of a different meaning." *Caminetti v. United States*, 242 U.S. 470, 490 (1917). The words of the Compact are plain. They provide that WMSC has "exclusive safety oversight authority and responsibility over the WMATA Rail System." § 9-1109.11 at ¶ 3(a). This authority is "without limitation." *Id.* The Compact further empowers WMSC to "[i]mplement and enforce relevant federal and State laws and regulations relating to safety of the WMATA Rail System." *Id.* at ¶ 30(d). Accordingly, the Compact grants WMSC authority over "safety" in all its forms within the WMATA Rail System.

OSH falls under the umbrella of "safety." First, grammar dictates this to be true. "Adjectives modify nouns—they pick out a subset of a category that possesses a certain quality." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 19 (2018) (finding that the designation of "critical habitat" by the Fish and Wildlife Services was necessarily a type of "habitat" under the Endangered Species Act). Thus, "[a]ccording to the ordinary understanding of how adjectives work, "[occupational safety]" must also be "[safety]." *Id.*

Second, that the Compact empowers WMSC to investigate "hazards," § 9-1109.11 ¶ 3(d), further highlights that OSH is within WMSC's purview. The Federal Transit Administration defines "hazard" to include "any real or potential condition that can cause injury, illness, or death." *See* 49 U.S.C § 674.7. Conditions that cause injury or illness are classic examples of workplace safety concerns. Indeed, the Bureau of Labor Statistics' OSH definitions state: "[a]n injury or

4

illness is considered by [OSHA] to be work-related if an event or exposure in the work environment either caused or contributed to the resulting condition or significantly aggravated a pre-existing condition." *See* U.S. Bureau of Labor Statistics, *BLS OSH Definitions*, https://perma.cc/QKE2-CY6E (last visited Dec. 17, 2025); *see also* Dept. of Labor, *OSHA Definitions*, https://perma.cc/8YYM-823H (last visited Dec. 17, 2025).

WMATA argues WMSC cannot investigate hazards related to OSH because WMSC's authority is limited to "aspects of safety that are unique to operating a rail system." *See* WMATA Opp. Pet., 13–14. This argument falls flat. The Compact does not limit the definition of hazard to exclude OSH. There is no textual basis to exclude conditions that would harm employees of the Metro Rail System from the definition of hazards. In fact, the Compact explicitly empowers WMSC to conduct safety investigations related to "WMATA personnel and contractors" and any "equipment [and] facilities" § 9-1109.11 ¶ 31(a). This indicates that WMSC's investigative authority includes conditions that impact WMATA's employees.

Finally, WMATA's Safety Plan includes a section on OSH programs and contains policies related to employee safety, occupational health, and hazard-related guidance. *See* Department of Safety, Washington Metropolitan Area Transit Authority, *Public Transportation Agency Safety Plan*, 31–32 (4th ed. 2023), https://perma.cc/BHU7-B6AP (last visited Dec. 17, 2025). The Compact mandates WMSC to audit WMATA's compliance with this Safety Plan, including the OSH provisions. *See* § 9–1109.11 ¶ (30)(e). This further cements that OSH oversight is squarely within WMSC's responsibilities.

### 3. *WMSC's Authority in Concurrence with OSHA*

The fact that OSHA also has the authority to regulate WMATA's OSH does not preclude WMSC from having concurrent authority. Indeed, "a court must proceed with the utmost caution

5

before concluding that one agency may not regulate merely because another may." *F.T.C. v. Ken Roberts Co.*, 276 F.3d 583, 593 (D.C. Cir. 2001).

"When there are two [federal] acts upon the same subject, the rule is to give effect to both if possible." *United States v. Borden Co.*, 308 U.S. 188, 198 (1939). Congress established OSHA through federal law. *See* 29 U.S.C. §§ 651–678. Although the D.C. Code created the Compact, it was "transform[ed] . . . into federal law" because of Congress's consent to it. *See Cuyler v. Adams*, 449 U.S. 433, 440 (1981). Here, the Compact and the OSHA readily coexist: OSHA retains authority to set and enforce federal OSH standards, and the WMSC is empowered to audit WMATA's compliance with those standards.

WMATA argues that WMSC's power to audit OSH is limited because WMSC is not an OSHA-approved workplace safety and health program. *See* WMATA Opp. Pet., 18–19. But this argument is misplaced. OSHA covers most private sector employers and workers in all 50 states. *See* U.S. Dep't of Labor, FAQ, *What is an OSHA-Approved State Plan?*, https://perma.cc/RG3L-N2AL (last visited Dec. 17, 2025). A state can create its own workplace safety and health program in place of OSHA. *See id.* When this happens, federal law requires that OSHA approve and monitor that program. *See id.* WMSC, however, is not such a program. It is an interstate compact agency created by the District of Columbia, Virginia, and Maryland, and ratified by Congress. WMSC does not need to be authorized by OSHA to audit OSH because Congress directly authorized WMSC to do so. *See supra*.

6

B.  Undue Burden

"The subpoenaed party bears the burden of showing that the administrative subpoena is unreasonable." *Hill*, 319 F. Supp. 3d at 47 (quoting *Texaco, Inc.*, 555 F.2d at 882). "In the administrative subpoena context, however, a much stronger showing of 'undue burden' is required." *F.T.C. v. Boehringer Ingelheim Pharms., Inc.*, 898 F. Supp. 2d 171, 174 (D.D.C. 2012) (quoting *Texaco, Inc.*, 555 F.2d at 882). "When evaluating an administrative subpoena enforcement petition, the court should enforce the subpoena 'if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant.'" *Id.* (quoting *Texaco, Inc.*, 555 F.2d at 872). "To that end, to reject a petition to enforce an administrative subpoena, this Circuit requires a showing that compliance with the subpoena 'threatens to unduly disrupt or seriously hinder normal operations of a business.'" *Id.* (quoting *Texaco, Inc.*, 555 F.2d at 882).

As discussed above, WMSC may investigate OSH on the WMATA Rail System. WMSC's subpoena was well within this authority: it requested documents related to occupational health-related programs, fitness for duty-related programs, audits, and general information about facility safety, hazards and conditions in the workplace. *See e.g.*, WMATA Obj. to Subpoena, ECF No. 1-9 at Requests No. 2, 3, 11, 12, 15, 21, 22, 23, 24, 25, 26, 27, 28.[3]

Affidavits used to demonstrate undue burden must be appropriately detailed given the high bar that petitioners must clear. *See United States Equal Emp. Opportunity Comm'n v. AAM Holding Corp.*, 736 F. Supp. 3d 186, 192 (S.D.N.Y. 2024). WMATA submitted a declaration from

---

[3] The subpoena also contained requests related to drug and alcohol screening of employees. *See id.* at Requests No. 9, 13, 14, 18. WMATA complied with these requests. *See* WMSC Reply at 14, n.7.

7

Ms. Theresa M. Impastato, WMATA's Executive Vice President and Chief Safety and Readiness Officer. *See* WMATA Opp. Pet., Ex. A, Declaration, ECF No. 6-1.

While Ms. Impastato's declaration is lengthy and details a seemingly tense relationship between WMATA and WMSC, it fails to sufficiently explain why WMSC's current subpoena is burdensome. For example, her declaration states that "[d]uring the COVID-19 pandemic, WMATA spent over 1,200 hours responding to just one of the numerous requests from WMSC." *Id.* at ¶ 6. WMATA's response to a subpoena from several years ago does not bear on the burden of the present-day subpoena. As to present-day burden, her declaration only states that she "estimate[s] that just responding to the requests, providing instruction in order for WMSC staff to understand the complex and specialized data sets and sampling methods, and implementing corrective actions and other WMSC directives, will require WMATA to greatly expand its safety staff." *Id.* at ¶ 10. Whether WMSC's corrective actions or directives are burdensome has no bearing whether WMSC's request for documents is burdensome. Without particularized information about the burden that the subpoena imposes—*i.e.*, estimated hours to find documents, difficulty in producing large volumes of data, etc., *see In re Non-Party Subpoena to Ctr. for Study of Soc. Pol'y*, 659 F. Supp. 3d 54, 58 (D.D.C. 2023)—the Court cannot adequately consider WMATA's claim of burden.

Next, the Court is not convinced by Ms. Impastato's claim that WMSC's requests are so complex that they will require WMATA to hire additional staff. *See* WMATA Opp. Pet., Ex. A, Declaration ¶ 10. First, many of the requests in WMSC's subpoena ask for records of existing policies, procedures, governing documents, training curriculums, and prior audits. *See e.g.*, WMATA Obj. to Subpoena, ECF No. 1-9 at Requests No. 2, 3, 11, 12, 15, 21, 22, 23, 24, 25, 26, 27, 28. While these types of records may be voluminous, it is difficult to imagine that they would

be particularly complex to identify. Moreover, the subpoena "require[s] collection and production of [] data of the type routinely collected and maintained by businesses pursuant to their legal reporting obligations to governmental agencies [such as OSHA] . . . Compiling this standard data to respond to the Subpoena[] should not be overly burdensome, as it is exactly the type of data that Respondents are otherwise periodically required to compile and report." *AAM Holding Corp.*, 736 F. Supp. 3d at 191. Indeed, WMATA states in its brief that WMSC's requests were duplicative of requests from OSHA. *See* WMATA Opp. Pet. at 11. Thus, "in light of the nature of the information sought in the Subpoena[]" WMATA's argument is "unpersuasive." *AAM Holding Corp.*, 736 F. Supp. 3d at 191.

Finally, Ms. Impastato's declaration fails to explain how the complexity of these requests would disrupt the usual course of business. In *AAM Holding Corp.*, the court found that the subpoenaed party's affidavit was inadequate because it failed to provide a detailed explanation of how compliance would lead to long work hours and because it provided no evidence to support the conclusion that it would be too costly to hire additional support to comply with the subpoena. *See* 736 F. Supp. at 186, 192. Like the affidavit in *AAM Holding Corp.*, Ms. Impastato's declaration is vague—it states only that it will take time to explain the "complex" requests to WMATA staff but provides no specific details on how long that will take and how that would disrupt business activity. *See* WMATA Opp. Pet., Ex. A, Declaration ¶ 10.

The Court will not fill in the gaps in Ms. Impastato's declaration. And without an adequate declaration or other evidence, WMATA failed to carry its burden of demonstrating that the subpoena is unreasonable.

### III. CONCLUSION[4]

WMATA shall respond to WMSC's April 8, 2024, subpoena within 30 days.

Date: December 17, 2025

　　　　　　　　　　　　　　　　　　　　　　ZIA M. FARUQUI
　　　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE

---

[4] A magistrate judge resolves a district judge's referral of a "non-dispositive matter – such as discovery generally or, more specifically, a motion to compel" via an opinion or order. *United States v. All Assets Held at Bank Julius*, No. 004-CV-00798, 2016 WL 11609892, at *2 (D.D.C. Jan. 12, 2016) (citing Loc. Civ. R. 72.2). As such, this is a final order issued pursuant to Local Rule 72.2. The parties are hereby advised that, under the provisions of Local Rule 72.2(b), any party who objects to this Order must file a written objection thereto with the Clerk of this Court within fourteen days of the party's receipt of this Order. When considering an objection, the district judge will determine whether this Order is clearly erroneous or contrary to law. *See* Loc. Civ. R. 72.2(c).