# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

WASHINGTON METRORAIL SAFETY
COMMISSION,

      Petitioner,

v.

WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,

      Respondent.

_____

Case No. 1:24-mc-00144-LLA-ZMF

Judge Loren L. AliKhan

Magistrate Judge Zia M. Faruqui

**ORAL HEARING REQUESTED**

---

## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY'S OBJECTIONS TO THE MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDATIONS, STYLED AN ORDER, GRANTING PETITION FOR ENFORCEMENT OF ADMINISTRATIVE SUBPOENA

Attison L. Barnes, III (DC Bar No. 427754)
George E. Petel (DC Bar No. 1028877)
Joel S. Nolette (DC Bar No. 1781062)
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20006
Phone: (202) 719-7000
Fax: (202) 719-7049
abarnes@wiley.law
gpetel@wiley.law
jnolette@wiley.law

*Counsel for the Washington Metropolitan Area Transit Authority*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT .................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................................... 2

    I.     WMATA, Its Regulatory Oversight, and the WMSC Compact ............................ 2

    II.    The WMSC's Mission Creep ............................................................................... 5

    III.   The WMSC's Subpoena ...................................................................................... 8

    IV.   The "Final Order" ................................................................................................. 9

LEGAL STANDARD............................................................................................................... 10

ARGUMENT .......................................................................................................................... 12

    I.     The Magistrate Judge Erred by Concluding That the WMSC Has Authority Over

          OSH Issues.......................................................................................................... 12

          A.    Interpretation of the WMSC Compact Requires Considering Its Text in

                 Context. ................................................................................................. 13

          B.    "Safety," in Context, Does Not Give the WMSC OSH-Related

                 Authority. .............................................................................................. 14

          C.    "Hazards," in Context, Does Not Give the WMSC OSH-Related

                 Authority. .............................................................................................. 20

          D.    The WMSC's Audit Authority, in Context, Does Not Give the WMSC

                 OSH-Related Authority. ........................................................................ 23

    II.    The Magistrate Judge Erred by Concluding That the Subpoena Does Not

          Threaten to Impose an Undue Burden on WMATA............................................. 24

CONCLUSION........................................................................................................................ 27

REQUEST FOR ORAL HEARING ......................................................................................... 28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abuelhawa v. United States*,
    556 U.S. 816 (2009).................................................................................................14

*Acosta v. Shingal*,
    No. 17-mc-80119-HRL, 2017 WL 9772873 (N.D. Cal. Nov. 17, 2017)................................11

*In re Admin. Subpoena Blue Cross Blue Shield of Mass., Inc.*,
    400 F. Supp. 2d 386 (D. Mass. 2005) ......................................................................11

*In re: All Assets Held in Acct. JW3083094 in the Name of Carinalli, S.A. at Jefferies, LLC*,
    No. 25-mc-TSC-MJS, 2025 WL 3650324 (D.D.C. Dec. 17, 2025) ........................................11

*Am. Energy Corp. v. Rockies Express Pipeline LLC*,
    622 F.3d 602 (6th Cir. 2010) .................................................................................16

*\*Am. Hosp. Ass'n v. NLRB*,
    499 U.S. 606 (1991)............................................................................................17–18

*\*Bell Atl. Tel. Cos. v. FCC*,
    131 F.3d 1044 (D.C. Cir. 1997)..............................................................................13

*Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*,
    519 U.S. 316 (1997)............................................................................................26

*Clark v. Martinez*,
    543 U.S. 371 (2005)............................................................................................23

*Dolan v. U.S. Postal Serv.*,
    546 U.S. 481 (2006)............................................................................................14

*Dubin v. United States*,
    599 U.S. 110 (2023)............................................................................................21

*EEOC v. Nestle Prepared Foods*,
    No. 5:11-mc-358-JMH-REW, 2012 WL 1888130 (E.D. Ky. May 23, 2012) ........................11

*EEOC v. Schwan's Home Serv.*,
    707 F. Supp. 2d 980 (D. Minn. 2010)........................................................................11

*FEC v. Machinists Non-Partisan Pol. League*,
    655 F.2d 380 (D.C. Cir. 1981)................................................................................12

*Fed. Open Mkt. Comm. of Fed. Rsrv. Sys. v. Merrill*,
    443 U.S. 340 (1979) ................................................................................................23

*Fischer v. United States*,
    603 U.S. 480 (2024) .........................................................................................19, 22

*FTC v. Texaco, Inc.*,
    555 F.2d 862 (D.C. Cir. 1977) ........................................................................12, 25

*Hammontree v. NLRB*,
    925 F.2d 1486 (D.C. Cir. 1991) .............................................................................18

*Herrmann v. Cencom Cable Assocs.*,
    978 F.2d 978 (7th Cir. 1992) ...........................................................................13, 18

*Lewis v. McDonough*,
    No. 5:06cv111/RS-MD, 2007 WL 2729670 (N.D. Fla. Sept. 18, 2007) ................11

*Monsalvo v. Bondi*,
    604 U.S. 712 (2025) .........................................................................................17, 21

*Nardone v. United States*,
    308 U.S. 338 (1939) ...............................................................................................24

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
    595 U.S. 109 (2022) ...............................................................................................22

*NLRB v. Federbush Co.*,
    121 F.2d 954 (2d Cir. 1941) .............................................................................13, 18

*NLRB v. Frazier*,
    966 F.2d 812 (3d Cir. 1992) ...................................................................................11

*In re Oral Testimony of a Witness Subpoenaed Pursuant to Civ. Investigative
    Demand No. 98-19*,
    182 F.R.D. 196 (E.D. Va. 1998) .............................................................................11

*Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess*,
    297 F.3d 310 (3d Cir. 2002) ...................................................................................16

*Panama R.R. Co. v. Johnson*,
    264 U.S. 375 (1924) ...............................................................................................17

*Pension Benefit Guar. Corp. v. Micfo, LLC*,
    No. 20-mc-114, 2021 WL 6849084 (D.D.C. Mar. 2, 2021) ...................................10

*Roell v. Withrow*,
    538 U.S. 580 (2003) ...............................................................................................27

*Schur v. L.A. Weight Loss Ctrs., Inc.*,
  577 F.3d 752 (7th Cir. 2009) ...........................................................11

*Sturgeon v. Frost*,
  587 U.S. 28 (2019)...........................................................................18

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)..........................................................................19

*Tunica-Biloxi Tribe of La. v. United States*,
  577 F. Supp. 2d 382 (D.D.C. 2008)...................................................20

*Turkiye Halk Bankasi A.S. v. United States*,
  598 U.S. 264 (2023).........................................................................14

*U.S. EEOC v. Dolgencorp.*,
  No. 07 C 6672, 2008 WL 4542973 (N.D. Ill. Apr. 15, 2008).................11

*\*U.S. Nat. Bank of Or. v. Indep. Ins. Agents of Am., Inc.*,
  508 U.S. 439 (1993)...........................................................................13

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*,
  595 U.S. 178 (2022)...........................................................................19

*\*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*,
  484 U.S. 365 (1988)...........................................................................13

*United States v. Apicella*,
  148 F. Supp. 457 (D.N.J. 1957) .........................................................16

*United States v. Hansen*,
  599 U.S. 762 (2023)..........................................................................14

*United States v. Howell*,
  78 U.S. (11 Wall.) 432 (1870) ............................................................19

*United States v. Inst. for Coll. Access & Success*,
  27 F. Supp. 3d 106 (D.D.C. 2014).....................................................12

*United States v. Newport News Shipbuilding & Dry Dock Co.*,
  837 F.2d 162 (4th Cir. 1988) .............................................................12

*\*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014)......................................................................14, 16

*Virginia v. Maryland*,
  540 U.S. 56 (2003)............................................................................13

*W. Va. Univ. Hosps., Inc. v. Casey*,
    499 U.S. 83 (1991) ................................................................................................18

*Weyerhauser Co. v. U.S. Fish & Wildlife Serv.*,
    586 U.S. 9 (2018) ................................................................................................15

*Yates v. United States*,
    574 U.S. 528 (2015) ............................................................................................22

**Statutes**

28 U.S.C. § 636 ......................................................................................................11

49 U.S.C. § 5329 ......................................................................................4, 5, 15, 19

D.C. Code § 1-1518.01 ............................................................................................3

D.C. Code § 9-1107.01 .........................................................................................2, 3

D.C. Code § 32-1101 ...............................................................................................3

Md. Code, Transp. § 10-204 .................................................................................2, 3

Pub. L. No. 89-774, 80 Stat. 1324 (1966) ...............................................................2

Pub. L. No. 112-141, 126 Stat. 405 (2012) ..........................................................3, 4

Pub. L. No. 115-54, 131 Stat. 1093 (2017) ..............................1, 4–5, 10, 15–18, 21–24

Va. Code § 33.2-3100 ...........................................................................................2–3

**Other Authorities**

29 C.F.R. § 1952.9 ...................................................................................................3

29 C.F.R. § 1952.21 .................................................................................................3

49 C.F.R. § 673.11 .................................................................................................23

163 Cong. Rec. H5894 (daily ed. July 17, 2017) ..............................................19, 21

Callimachus, *Hymn VI to Demeter* (Theoi Project ed.),
    https://tinyurl.com/zyryupte (last visited Dec. 30, 2025) ........................................6

*Exclusive*, Black's Law Dictionary (12th ed. 2024) ................................................16

Fed. R. Civ. P. 72 ...................................................................................................27

H.R. Rep. No. 115-227 (2017) ............................................................................5, 19

State Safety Oversight, 89 Fed. Reg. 83956 (Oct. 18, 2024)............................................................5

WMSC, https://wmsc.gov/ (last visited Dec. 30, 2025) ..................................................................4

Respondent Washington Metropolitan Area Transit Authority ("WMATA" or "Metro"), by counsel, submits these Objections to Magistrate Judge Zia M. Faruqui's December 17, 2025 Order ("Order"), ECF No. 9, purporting to grant the petition (the "Petition") of the Washington Metrorail Safety Commission (the "WMSC") for summary enforcement of an administrative subpoena *duces tecum* issued on April 8, 2024 (the "Subpoena").

## PRELIMINARY STATEMENT

WMATA provides transit service for the Washington metropolitan area, and while it welcomes the oversight of regulators to support WMATA's dedication to safety and reliability, such oversight must remain consistent with the comprehensive regulatory scheme governing the entities. The Subpoena, however, seeks to expand the WMSC's authority. The WMSC, created in 2017 by a congressionally approved compact, Pub. L. No. 115-54, 131 Stat. 1093 (2017) (the "WMSC Compact"), between the District of Columbia, the State of Maryland, and the Commonwealth of Virginia, possesses only *limited* authority to provide "safety oversight" of WMATA's "rail services." *See id.* §§ 1(m), 3.

In recent years, the scope creep in WMSC's numerous requests for documents and information has become an issue. In response to new demands exceeding the WMSC's authority, WMATA has tried to work with the WMSC in a spirit of good faith and cooperation as WMATA delivers safe and reliable rail-transit service. Rather than conduct oversight within its lane, the WMSC is engaged in ever-expanding overreach that poses a risk to WMATA's ability to efficiently and safely manage its operations. The Subpoena is a case in point, facially requiring WMATA to dedicate thousands of hours to respond to requests for documents and other records about occupational safety and health ("OSH") topics that other WMATA regulators with the requisite expertise have long overseen. The magistrate judge's Order threatens WMATA's

operations by improperly expanding the WMSC's authority and by forcing WMATA to try to reconcile conflicting directives from multiple oversight agencies.

To be clear, WMATA does not oppose transparency and accountability by regulators with proper oversight authority for the substantive area within that regulator's expertise. WMATA simply opposes bureaucratic overreach that threatens the very safety and reliability that that oversight is intended to support.[1] Because the demands at issue in the Subpoena pose such a threat, WMATA objects to the magistrate judge's Order.[2]

## FACTUAL BACKGROUND

## I.    WMATA, Its Regulatory Oversight, and the WMSC Compact

WMATA, created by the District of Columbia, the State of Maryland, and the Commonwealth of Virginia (the "Signatories"), with the consent of Congress, effective February 20, 1967, is an interstate compact agency and, by the terms of its enabling legislation, an agency and instrumentality of each of the Signatories. *See* Pub. L. No. 89-774, 80 Stat. 1324 (1966) (the "WMATA Compact") (codified as amended at D.C. Code § 9-1107.01; Md. Code, Transp. § 10-204; Va. Code § 33.2-3100). WMATA was created by the Signatories to plan, develop, finance, and operate a comprehensive mass transit system for the Washington metropolitan area, including not only Metrorail, but also Metrobus, MetroAccess, and the Metro Transit Police.

---

[1]    As more fully set forth below, WMATA does not seek to curtail the WMSC's ability to audit WMATA, as long as such audit requests are within the scope of the WMSC's authority. In the last five years, WMATA has responded to more than ninety-two WMSC audit requests. *See* ECF No. 6-1 ¶ 6. In other words, WMATA's objections to the demands at issue in the Subpoena are the exception, not the rule.

[2]    WMATA incorporates by reference its prior submissions. *See* ECF No. 6; ECF No. 6-1; ECF No. 6-2; ECF No. 6-3; ECF No. 6-4.

WMATA is subject to extensive regulatory oversight at both the federal and state levels wholly apart from the WMSC. As relevant here, OSH at WMATA is regulated primarily by the federal Occupational Safety and Health Administration ("OSHA"), particularly through its state-level partners the Virginia Occupational Safety and Health ("VOSH") Program, the Maryland Occupational Safety and Health ("MOSH") State Plan, and the District of Columbia Office of Risk Management. *See, e.g.*, ECF No. 1-9 at 17 (reciting the Subpoena's demand for "occupational health inspection reports that relate to the WMATA Rail System" from OSHA and from "the occupational health agencies from the District of Columbia, Maryland, and Virginia").[3] In accordance with this multi-faceted OSH regulatory scheme, WMATA has systemwide programs in place to ensure its compliance, generally under the auspices of its Office of Health and Wellness. *See, e.g.*, ECF No. 1-2 at 23.

WMATA is separately subject to regulatory oversight specifically focused on ***fixed-rail transit***. In particular, in 2012, Congress enacted the Moving Ahead for Progress in the 21st Century Act, Pub. L. No. 112-141, 126 Stat. 405 (2012). Section 20021 of the law amended 49 U.S.C. § 5329 to (among other things) encourages states through funding incentives to assume

---

[3]    The WMATA Compact confirms that "laws, rules, regulations and orders" of the Signatories and of the United States "relating to inspection of equipment and facilities, safety and testing shall remain in force and effect" over WMATA, including "regulations for the safety of . . . employees." WMATA Compact § 77 (codified at D.C. Code § 9-1107.01(77); Va. Code § 33.2-3100(77); Md. Code, Transp. § 10-204(77)); *see also* 29 C.F.R. § 1952.21(d) (noting that the VOSH Program covers public employers and employees in Virginia); *id.* § 1952.9(d) (noting that the MOSH State Plan covers public employers and employees in Maryland); D.C. Code § 32-1101(6) (defining "employer" for purposes of the District of Columbia's OSH laws to "include a District government or quasi-governmental agency and an entity established pursuant to interstate compact"); *id.* § 1-1518.01(6)(k)(1), 8(a) (explaining that the Office of Risk Management exercises "[a]ll of the powers, duties, and functions concerning the District of Columbia Public Sector Occupational Safety and Health Management Program authorized and required by the Occupational Safety and Health Act of 1970").

responsibility for "overseeing rail fixed guideway public transportation safety" of such rail systems within their respective jurisdictions and to establish state-level safety oversight agencies to do so. *See generally id.* § 20021 ("Public Transportation Safety"), 126 Stat. at 709–17; *see also id.*, 126 Stat. at 712 (codified at 49 U.S.C. § 5329(e)(5)) (extending these provisions to states that jointly operate a multi-state system, like WMATA). Accordingly, the Signatories negotiated and submitted for congressional approval in 2017 the WMSC Compact, which created the WMSC to provide "safety oversight of the [WMATA] Metrorail system." WMSC Compact § 1. That same year, Congress approved the WMSC Compact, *see generally* Pub. L. No. 115-54, and in 2019 the WMSC officially assumed that role, *see, e.g.*, ECF No. 1-9 at 3.

As the WMSC itself summarizes on its website, its regulatory ambit under the WMSC Compact is limited to overseeing "safety practices on the DC region's Metrorail system." *See* WMSC, https://wmsc.gov/ (last visited Dec. 30, 2025). The terms of the WMSC Compact confirm the limited authority of the WMSC. The WMSC Compact's article on "Purpose and Functions" states that the WMSC Compact was negotiated and agreed upon "to create a state safety oversight authority for the WMATA Rail System." WMSC Compact § 3. To that end, the WMSC Compact created the WMSC and delegated to it "safety regulatory and enforcement authority over the WMATA Rail System." *Id.* § 2. The "WMATA Rail System" over which the WMSC is delegated authority consists only of WMATA's "rail services" system. *Id.* § 1(m).

Under the WMSC Compact, the WMSC's "safety oversight authority and responsibility over the WMATA Rail System" is "exclusive" but not unbounded. *Id.* § 3(a). For instance, the WMSC has authority to investigate "hazards, incidents, and accidents," but only those that are "on the WMATA Rail System." *Id.* § 3(d). It can act to ensure that WMATA meets "other requirements of federal and State law," but again, only as "relating to safety oversight of the WMATA Rail

4

System." *Id.* § 3(f). And it can review, approve, and audit WMATA's "Public Transportation Agency Safety Plan," *id.* §§ 3(c), 30(b), 30(e) (the "Safety Plan"), as it pertains to "the WMATA Rail System," *id.* § 3, to which the WMSC's authority is limited, *see id.* § 2.

The WMSC's limited safety-oversight authority over ***rail*** safety under the WMSC Compact explains why, for example, the WMSC Compact calls for the Members constituting the WMSC to have "backgrounds in transit safety, transportation, [or] relevant engineering disciplines." *Id.* § 9. The specification of these backgrounds is consistent with the stated purpose of the WMSC to provide oversight of issues specific to fixed-rail safety, *see id.* § 9, not, for example, lead-exposure issues within OSHA's regulatory domain. By its terms, the WMSC Compact does not vest authority in the WMSC over general OSH issues. And that makes sense, particularly considering WMATA's longstanding OSH regulatory oversight from other agencies with relevant expertise. To this point, in assessing the scope of the WMSC Compact, the House of Representatives noted that the WMSC Compact was not "known to be duplicative" of other programs, agencies, offices, or initiatives with redundant goals and activities. *See* H.R. Rep. No. 115-227, at 12 (2017), *as reprinted in* 2017 U.S.C.C.A.N. 90, 94, 2017 WL 3113984 (citing Pub. L. No. 111-139, § 21, 124 Stat 8, 29 (2010)). And in a similar vein, in implementing 49 U.S.C. § 5329, the Federal Transit Administration (the "FTA") has been mindful to avoid adopting rules that would "cause conflict with State occupational safety regulators." State Safety Oversight, 89 Fed. Reg. 83956, 83960 (Oct. 18, 2024) (codified at 49 C.F.R. pt. 674).

## II.    The WMSC's Mission Creep

Despite the WMSC's limited role over fixed-rail safety issues, the WMSC has more recently sought to exceed not only the scope of its authority, but also the scope of its expertise, to control and direct WMATA operations beyond fixed-rail safety issues. *See generally* Supplemental Declaration of Theresa M. Impastato, **Exhibit 1** (the "Supplemental Declaration").

WMATA has responded to over ninety-two WMSC audit requests (not including the audit in connection with which the Subpoena was issued (the "Audit")). *See* ECF No. 6-1 ¶ 6. Since 2019, WMATA has produced to the WMSC approximately 40,000 documents consisting of over 550,000 pages of material, plus more than 100 gigabytes of data shared electronically. *Id.*; *see also* ECF No. 1 ¶ 19 (acknowledging WMATA's responsiveness). And WMATA has done so in good faith even though the WMSC's requests have proved extraordinarily burdensome—for example, WMATA devoted the better part of one employee's working year during the COVID-19 pandemic responding to just one of the WMSC's numerous requests. *See* ECF No. 6-1 ¶ 6. To date, solely to avoid a needlessly adversarial relationship with the WMSC, WMATA has objected to the WMSC's directives only when such directives actively threatened the safety of WMATA's employees and customers. *Id.* ¶ 9.

But like Erysichthon of Thessaly,[4] the more WMATA accommodates and complies with the WMSC's improper requests, the more the WMSC demands. *See* Supplemental Declaration ¶¶ 11–15. The problem has gotten so out of hand that the former Chief Safety and Readiness Officer of WMATA—whose role ordinarily is to manage and oversee WMATA's safety programs across the entire WMATA transit system and who supervises approximately 1,000 staff members—estimated that she and her staff were spending more than two-thirds of their working days addressing the WMSC's onerous demands. ECF No. 6-1 ¶¶ 1–2, 4, 7.[5] And these demands

---

[4]    "Wretched man, as much as he ate, so much did he desire again." Callimachus, *Hymn VI to Demeter* (Theoi Project ed.), https://tinyurl.com/zyryupte (last visited Dec. 30, 2025).

[5]    Until June 2025, Ms. Theresa M. Impastato was the Chief Safety and Readiness Officer of WMATA. *See* ECF No. 6-1 ¶¶ 1–2. In June 2025, she became WMATA's Chief Infrastructure Officer. *See* Supplemental Declaration ¶ 3.

are increasingly outside both the WMSC's supervisory authority and its substantive competence, further threatening the efficient use of taxpayer funds. *See id.* ¶ 7.

Contrary to the central purpose of the WMSC Compact to focus on the rail system, the WMSC's overreach threatens rather than fosters safety. Two recent examples illustrate.

First, during an inspection in 2023, the WMSC noted dust on materials in storage cabinets (not on the fixed-rail system). *Id.* ¶ 12. Contrary to industrial-hygiene best practices, the WMSC ordered WMATA to remove those materials (without proper precautions to identify or remediate potentially harmful airborne particles in the dust) and restock the cabinets with new materials. *Id.* Beyond its audit authority, the WMSC exhibited its lack of substantive competence by recklessly directing WMATA to disturb potentially harmful dust and to cause potential harm to WMATA personnel. Before doing so, however, WMATA wisely took the initiative to first test the dust in accordance with what it knew to be OSH best practices. *Id.* WMATA discovered lead in the dust (which, left undisturbed, posed a minimal safety risk) and, working with VOSH and MOSH, retained a lead-abatement professional to clean the cabinets before restocking them. *Id.*; ECF No. 1-9 at 8. Had WMATA followed the WMSC's ill-advised dictates, WMATA would have created a lead-exposure safety risk rather than abating one. ECF No. 6-1 ¶ 12.

Second, on another occasion, the WMSC directed WMATA to remediate a supposed "potential asbestos exposure" by removing cracked floor tiles in an equipment room (also not on the fixed-rail system). *See* ECF No. 1 ¶ 19; ECF No. 1-9 at 8. If undisturbed until properly removed by asbestos experts, those tiles were not an asbestos exposure risk. ECF No. 1-9 at 8. Without sufficient (or any) expertise in this OSH area, the WMSC again recklessly directed WMATA to take out the broken tiles. Again, following proper safety procedures, WMATA wisely laid a floor on top of the tiles to prevent a potential harmful exposure until proper asbestos remediation could

be accomplished. Had WMATA followed the WMSC's unsafe mandate, WMATA would have risked creating a workplace safety and health hazard through the release of asbestos particles that could have caused the very harm the WMSC ostensibly claimed to mitigate. *Id.* at 7.

It is with this backdrop that WMATA seeks to ***protect*** its personnel and other third parties from the unsafe WMSC directives demonstrably beyond its competence and authority.

## III.    The WMSC's Subpoena

In February 2024, the WMSC set in motion the present dispute by issuing WMATA an "Initial Request for Documents" (the "Request") as part of the Audit for "Fitness for Duty and Occupational Health Programs." ECF No. 1-5 at 2. As relevant here, the Request demanded a broad swath of information, including materials that were self-evidently within the ambit of other regulatory agencies—such as "[a]ll occupational health inspection reports" from OSHA and "the occupational health agencies from the District of Columbia, Maryland, and Virginia." ECF No. 1-5 ¶ 24; *see also, e.g.*, *id.* ¶ 3 (asking for "current program documents" pertaining to twelve topics that correspond directly to topics regulated by OSHA in provisions of 29 C.F.R. subpart 1910). WMATA sought clarification because many of the WMSC's requests had not been made in prior audits, appeared to exceed the WMSC's limited authority, and facially would require WMATA to waste extensive personnel hours (at taxpayer expense) to produce the documents as demanded. *See* ECF No. 1-9 at 2.

In this action, the WMSC has falsely claimed that WMATA "refused to produce any documents or information in response" to the Request, *see* ECF No. 1 ¶ 26, but in fact WMATA cooperated in good faith and produced those documents responsive to the fitness-for-duty aspects of the Request. *See* ECF No. 1-9 at 3. WMATA only stood on its objections to the WMSC's demand for OSH information based on the WMSC's lack of authority over such issues, the gratuitous duplication represented by this demand given existing oversight by OSH agencies with

the requisite expertise concerning such issues, and the risk that the WMSC's assertion of authority in this domain threatened to subject WMATA to "potentially inconsistent regulatory scrutiny." *See* ECF No. 1-6 at 3–4.

Instead of working collaboratively with WMATA to resolve its concerns or with other agencies possessing the requisite authority and expertise over occupational health, the WMSC chose to issue the Subpoena to force WMATA to produce the demanded materials. *See* ECF No. 1-9. WMATA timely served objections, reiterating its concerns about the WMSC's *ultra vires* demands and the undue burdens they would impose on WMATA. *See generally id.* Even so, still seeking to cooperate to the extent reasonably possible, WMATA proposed a viable compromise that the WMSC could work with other agencies with authority in this area and conduct an in-person inspection of certain records it had demanded. *See id.* at 9–18.

## IV.    The "Final Order"

Undeterred by WMATA's efforts to discuss a mutually agreed resolution, the WMSC commenced this proceeding by filing the Petition. WMATA timely opposed. ECF No. 6. The Court then *sua sponte* referred "this action . . . to a magistrate judge for full case management." ECF No. 8. A year later, without the required consent of both parties but rather ostensibly pursuant to his authority to "resolve[] a district judge's referral of a 'non-dispositive matter,'" the magistrate judge issued a purportedly "final order" under Local Rule 72.2 granting the WMSC's "motion" and purporting to require WMATA to "respond to" the Subpoena "within 30 days." ECF No. 9 at 1, 10 & n.4.

As set forth in the Order, the magistrate judge erroneously concluded that the Subpoena's demands for OSH information were within the WMSC's authority for three reasons. First, the magistrate judge reasoned that the WMSC Compact's grant to the WMSC of "authority over 'safety'"—particularly, the WMSC Compact's provisions giving the WMSC "exclusive safety

oversight authority and responsibility over the WMATA Rail System" and the power to "implement and enforce relevant federal and State laws and regulations relating to safety of the WMATA Rail System"—encompassed OSH issues because those issues "fall[] under the umbrella of 'safety.'" ECF No. 9 at 4. Second, the magistrate judge found that the WMSC Compact's grant of authority to the WMSC "to investigate 'hazards'" encompassed OSH issues because of the breadth of that term and because the WMSC "Compact does not limit the definition of hazard to exclude OSH." *Id.* at 4–5. Third, the magistrate judge held that the WMSC's authority extended to OSH issues because "WMATA's Safety Plan includes" general OSH programs and policies and the WMSC Compact delegates authority to the WMSC to "audit" WMATA's compliance with its Safety Plan. *Id.* at 5. And even though the WMSC Compact gives the WMSC "exclusive safety oversight authority" over the matters within its purview, WMSC Compact § 3(a), while federal and state OSH regulators still exercise regulatory authority in those areas over WMATA, *see, e.g.*, ECF No. 9 at 5 (noting the "fact that OSHA also has the authority to regulate WMATA's OSH"), the magistrate judge inconsistently concluded that the WMSC (with its "exclusive" authority) could nevertheless exercise "concurrent authority" over those issues under the WMSC Compact, *id.* at 5–6. The magistrate judge also rejected the argument that the Subpoena threatened to impose an undue burden on WMATA. *See id.* at 7–9.

In this action where the parties ***did not consent*** to a referral to the magistrate judge for a final disposition, the magistrate judge's decision purports to have disposed of all issues in the case.

## **LEGAL STANDARD**

Where, as here, the magistrate judge rules on a "case-dispositive matter" referred *sua sponte* by the Court, the magistrate judge's decision is functionally a report and recommendation, however it is styled. *See Pension Benefit Guar. Corp. v. Micfo, LLC*, No. 20-mc-114 (JEB/GMH), 2021 WL 6849084, at *1 & n.1 (D.D.C. Mar. 2, 2021), *report and recommendation adopted*, 2021

10

WL 6849088 (D.D.C. Mar. 17, 2021); *see also Acosta v. Shingal*, No. 17-mc-80119-HRL, 2017

WL 9772873, at *1 (N.D. Cal. Nov. 17, 2017) ("A petition to enforce an administrative subpoena

is dispositive."); *accord EEOC v. Nestle Prepared Foods*, No. 5:11-mc-358-JMH-REW, 2012 WL

1888130, at *2 (E.D. Ky. May 23, 2012); *EEOC v. Schwan's Home Serv.*, 707 F. Supp. 2d 980,

987–90 (D. Minn. 2010); *U.S. EEOC v. Dolgencorp.*, No. 07 C 6672, 2008 WL 4542973, at *2

(N.D. Ill. Apr. 15, 2008); *In re Admin. Subpoena Blue Cross Blue Shield of Mass., Inc.*, 400 F.

Supp. 2d 386, 388–89 (D. Mass. 2005); *In re Oral Testimony of a Witness Subpoenaed Pursuant

to Civ. Investigative Demand No. 98-19*, 182 F.R.D. 196, 200–02 (E.D. Va. 1998).[6]

As such, the Court must "make a de novo determination" of the magistrate judge's

decision. 28 U.S.C. § 636(b)(1); *see also In re: All Assets Held in Acct. JW3083094 in the Name

of Carinalli, S.A. at Jefferies, LLC*, No. 25-mc-TSC-MJS, 2025 WL 3650324, at *1 (D.D.C. Dec.

17, 2025) ("District courts must apply a *de novo* standard of review when considering objections

to . . . a magistrate judge's Report and Recommendation." (quoting *Means v. District of Columbia*,

999 F. Supp. 2d 128, 132 (D.D.C. 2013))); *NLRB v. Frazier*, 966 F.2d 812, 815–18 (3d Cir. 1992)

(holding that the district court had to review *de novo* under 28 U.S.C. § 636(b)(1)(C) the magistrate

judge's "Order and Opinion" resolving a petition to enforce an administrative subpoena because

that decision "disposed entirely of the [agency's] business before the court" in the matter).

---

[6]     For this reason, the Order is not operative as such. *See, e.g.*, *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 760 (7th Cir. 2009) ("[A] magistrate judge's recommendation on a dispositive matter is not a final order, and the district judge makes the ultimate decision to adopt, reject, or modify it."); *Lewis v. McDonough*, No. 5:06cv111/RS-MD, 2007 WL 2729670, at *1 (N.D. Fla. Sept. 18, 2007) ("The Report and Recommendation is not a final order from which an appeal may be taken. The Report and Recommendation is just that, a recommendation, by the Magistrate Judge to the District Judge."). In an abundance of caution, however, WMATA is simultaneously moving for a stay of the Order.

A court reviewing the enforceability of an administrative subpoena considers "whether 'the inquiry is within the authority of the agency, the demand is not too indefinite, and the information sought is reasonably relevant.'" *United States v. Inst. for Coll. Access & Success*, 27 F. Supp. 3d 106, 111 (D.D.C. 2014) (quoting *Resol. Tr. Corp. v. Thornton*, 41 F.3d 1539, 1544 (D.C. Cir. 1994)). Subpoenas that exceed regulatory authority are unlawful and may not be enforced. *See, e.g.*, *United States v. Newport News Shipbuilding & Dry Dock Co.*, 837 F.2d 162, 164 (4th Cir. 1988) ("Because the materials sought by [the agency] are not within the scope of its statutory authority, we affirm the order of the district court denying enforcement of the subpoena in this case."); *FEC v. Machinists Non-Partisan Pol. League*, 655 F.2d 380, 396 (D.C. Cir. 1981) ("Since the FEC lacked jurisdiction to control 'draft' group contributions, the subpoena should not have been enforced."). Likewise, subpoenas that are "unreasonable," such as those that "threaten[] to unduly disrupt or seriously hinder normal operations of a business," do not pass muster. *See FTC v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C. Cir. 1977).

## **ARGUMENT**

### I. **The Magistrate Judge Erred by Concluding That the WMSC Has Authority Over OSH Issues.**

The magistrate judge erred by holding that the WMSC's authority under the WMSC Compact extended to OSH issues, ostensibly under the "plain . . . meaning" of the WMSC Compact, such that the Subpoena's demands were within its authority.[7] ECF No. 9 at 4 (cleaned up). Specifically, the magistrate judge erroneously read key terms of the WMSC Compact myopically rather than in light of the entire WMSC Compact and its relevant context. Properly

---

[7]    It is undisputed that the demands at issue in the Subpoena are OSH-related. *See* ECF No. 1 ¶¶ 34–35.

interpreting the WMSC Compact's text in context compels the conclusion that the Subpoena is beyond the WMSC's limited authority.

### A.    Interpretation of the WMSC Compact Requires Considering Its Text in Context.

"[T]extual analysis is a language game played on a field known as 'context,'" and a word does not have "meaning without context to illuminate its use"—that is, "the meaning of statutory language, plain or not, depends on context." *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997) (cleaned up).[8] Thus, legal interpretation is a "holistic endeavor," *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988), that "must account for a statute's full text" and "subject matter," *U.S. Nat. Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993); *see also Herrmann v. Cencom Cable Assocs.*, 978 F.2d 978, 982 (7th Cir. 1992) (Easterbrook, J.) ("Language in general, and legislation in particular, is a social enterprise . . . drawing on background understandings and the structure and circumstances of the utterance. Slicing a statute into phrases while ignoring their contexts—the surrounding words, the setting of the enactment, the function a phrase serves in the statutory structure—is a formula for disaster."); *NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941) (Hand, L., J.) ("Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used . . . .").

For this reason, it is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."

---

[8]    A congressionally approved interstate compact like the WMSC Compact is interpreted "'as if [it] were . . . a federal statute.'" *Virginia v. Maryland*, 540 U.S. 56, 66 (2003).

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) ("*UARG*") (cleaned up). The interpretation of a particular word or phrase necessarily "depends upon reading the whole statutory text" and "considering the purpose and context of the statute," which dictate the specific meaning of terms among their "definitional possibilities" in the abstract. *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). Repeatedly in recent years, the Supreme Court has driven this point home. *See, e.g.*, *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275–77 (2023) (recognizing that a statutory phrase in the Foreign Sovereign Immunities Act was "amenable" to a certain reading in "complete isolation" but explaining why that interpretation "misse[d] the forest for the trees"); *UARG*, 573 U.S. at 315–20 (reading the phrase "any air pollutant" throughout the Clean Air Act not to denote "every conceivable airborne substance" but "only those that may sensibly be encompassed within the particular regulatory program" in the relevant provisions of the statute because of "the design and structure of the statute as a whole" (cleaned up)); *Abuelhawa v. United States*, 556 U.S. 816, 819–20 (2009) (declining to give a statutory term its full, "literal sweep" in light of its context and because "statutes are not read as a collection of isolated phrases"); *see also United States v. Hansen*, 599 U.S. 762, 775 (2023) ("When words have several plausible definitions, context differentiates among them.").

**B.    "Safety," in Context, Does Not Give the WMSC OSH-Related Authority.**

The magistrate judge's analysis mistakenly "misse[d] the forest for the trees" in contravention of these principles. *See Turkiye Halk Bankasi*, 598 U.S. at 277. First, consider the conclusion that the WMSC possesses authority over OSH issues because the WMSC Compact gives the WMSC "authority over 'safety'" and OSH issues "fall[] under the umbrella of 'safety.'" ECF No. 9 at 4. Context, however, demonstrates that the WMSC does not possess authority over everything that could conceivably come within the definitional scope of "safety" in isolation, including OSH issues. For one, the WMSC is delegated safety-regulatory authority "over the

WMATA Rail System," WMSC Compact § 3(a), defined to encompass only the "rail fixed guideway public transportation system" operated by WMATA along with related property "used by WMATA rail services," *id.* § 1(m). Thus, out of the gate the WMSC's safety authority is inherently confined to issues pertaining to the Metrorail—hence why the WMSC is called the Washington "Metrorail Safety" Commission in the first place. *Id.* § 1(c). At no time was the WMSC granted plenary authority over all aspects of WMATA operations.

This limitation is confirmed by the very statute under which the WMSC was created. 49 U.S.C. § 5329(e) creates a cooperative-federalist regime for states to take responsibility for ensuring the safety of the "rail fixed guideway public transportation system[s]" within their respective jurisdictions. *See* 49 U.S.C. § 5329(e)(2)(A)–(B); *see also, e.g., id.* § 5329(e)(3)(A)–(B), (D)–(E) (speaking repeatedly of the focus on "rail fixed guideway public transportation safety"). "Adjectives modify nouns—they pick out a subset of a category that possesses a certain quality." *Weyerhauser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 19 (2018). Thus, entities like the WMSC are created not to regulate safety generally in whatever form it is implicated. They are created to regulate a particular "subset" of safety matters, *id.* at 19–20, namely, "rail fixed guideway public transportation" safety, *see* WMSC Compact § 1(m). As the WMSC Compact's Preamble notes, the role of entities like the WMSC is to exercise "safety oversight of . . . fixed rail transit facilities," WMSC Compact pmbl., not to wield regulatory authority over anything and everything that plausibly "falls under the umbrella of 'safety,'" such as general OSH issues in the workplace, ECF No. 9 at 4.

Other provisions in the WMSC Compact reinforce this limitation that does not permit the WMSC to exert regulatory oversight over general OSH issues. For instance, Members of the Commission are required to have backgrounds in "transit safety, transportation, [or] relevant

engineering disciplines." WMSC Compact § 9. Having as a prerequisite such rail-focused expertise for WMSC Members illustrates that the "safety" regulatory authority wielded by those Members is also rail-focused, not an open-ended grant encompassing OSH issues. *See, e.g.*, *UARG*, 573 U.S. at 319 (reading a statutory phrase to include within its otherwise "conceivable" reach only those matters "that may sensibly be encompassed within the particular regulatory program" enacted). It therefore makes the WMSC's attempted assumption of OSH authority more troubling when its own WMSC Compact did not envision anything other than rail-focused expertise.

Moreover, the WMSC Compact's grant of "***exclusive*** safety oversight authority and responsibility over the WMATA Rail System" to the WMSC further confirms the limited scope of this grant. WMSC Compact § 3(a) (emphasis added). "Exclusive," after all, generally means "[l]imited to a particular person, group, entity, or thing." *Exclusive*, Black's Law Dictionary (12th ed. 2024); *see also, e.g.*, *Am. Energy Corp. v. Rockies Express Pipeline LLC*, 622 F.3d 602, 605 (6th Cir. 2010) (Sutton, J.) ("Exclusive means exclusive"); *Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 318 (3d Cir. 2002) (recognizing that a statute granting "exclusive" regulatory authority "does not provide for shared regulation" because "[e]xclusive . . . means just that—'exclusive,'" not "'parallel' or 'concurrent'"); *United States v. Apicella*, 148 F. Supp. 457, 458 (D.N.J. 1957) ("The word exclusive means 'shut out,' 'debarring from participation.' Black's Law Dictionary notes, 'These words preclude the idea of co-existence, and mean possessed to the exclusion of others.'"). The only way for the WMSC to wield "concurrent authority" with OSH safety regulators—as the magistrate judge mistakenly concluded the WMSC does about OSH-related issues, *see* ECF No. 9 at 5–6, and as the WMSC itself has argued, *see* ECF No. 1-10 at 10–

11, 13—is if the WMSC and those OSH safety regulators oversee different kinds of "safety" matters; OSH regulators over OSH issues, the WMSC over rail-related safety issues.

Corroborating that point, under the WMSC Compact the WMSC's authority is not limited to conducting audits, as the magistrate judge seemed to think. *See* ECF No. 9 at 6 (explaining that the WMSC "Compact and the OSHA readily coexist" because "OSHA retains authority to set and enforce federal OSH standards, and the WMSC is empowered to audit WMATA's compliance with those standards"). Instead, under the WMSC Compact the WMSC is empowered to "[a]dopt, amend, and repeal rules and regulations respecting the exercise of the powers conferred" on the WMSC by the WMSC Compact and to "promulgate rules and regulations to carry out the purpose" of the WMSC Compact. WMSC Compact §§ 33(b), 34. Thus, if the WMSC truly had general OSH authority of the sort needed to support the Subpoena's demands at issue, the WMSC could issue OSH-related rules that would govern in lieu of the regulations and policies prescribed by OSHA, VOSH, MOSH, and the District of Columbia Office of Risk Management.

But had the WMSC Compact intended to displace these OSH-expert agencies' longstanding OSH-related authority over WMATA, "language expressly" doing so was needed. *See Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 613 (1991); *see also Panama R.R. Co. v. Johnson*, 264 U.S. 375, 384 (1924) ("An intention to depart from a course or policy thus deliberately settled is not lightly to be assumed."); *cf. Monsalvo v. Bondi*, 604 U.S. 712, 725 (2025) ("When Congress adopts a new law against the backdrop of a 'longstanding administrative construction,' this Court generally presumes the new provision should be understood to work in harmony with what has come before."). The WMSC Compact does not contain such language.[9] Particularly where the

_____

[9]    The WMSC Compact contains general clauses specifying that the WMSC Compact prevails in cases of "conflict" or "inconsisten[cy]" with "other general or special laws" or

WMSC lacks that expertise by virtue of its prescribed composition, reading the WMSC Compact to effectuate such a change—as logic dictates if the magistrate judge's reading of the WMSC Compact were correct—simply fails to account for its text in context. *See W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 100–01 (1991) (explaining that, absent "clearly expressed" meaning to the contrary, statutory language is construed "to contain that permissible meaning which fits most logically and comfortably into the body of both previously and subsequently enacted law" in order to "make sense rather than nonsense out of the *corpus juris*").

The broader "setting" of the WMSC Compact further confirms the WMSC's limited, rail-focused safety authority. *See Herrmann*, 978 F.2d at 982; *Federbush Co.*, 121 F.2d at 957. WMATA's "Rail System" is just a portion of its operations—WMATA manages a comprehensive transit system, including a fixed-route bus service, paratransit services, and its own police force. *See, e.g.*, ECF No. 1-2 at 29–30 (listing out the various "Department Safety Committees" at WMATA, including committees within the "Rail Transportation," "Bus Transportation," "Access Services," and "Metro Transit Police" departments). The WMSC's regulatory ambit over WMATA's "rail services" by definition does not extend to these distinct, non-rail operations of WMATA. *See* WMSC Compact §§ 1(m), 3.

Further, for "those who consider it," the "legislative history . . . confirms" what the text and context themselves demonstrate. *Sturgeon v. Frost*, 587 U.S. 28, 54 (2019). For example, the

---

provisions of the WMATA Compact. Setting aside that, for all the reasons discussed herein, there is no such conflict or inconsistency when the WMSC Compact is read correctly and in context, these generic clauses are not the sort of "express[]" and "specific[]" alterations of WMATA's existing OSH-related regulatory scheme that is to be "expected" if that was the intent. *See Am. Hosp. Ass'n*, 499 U.S. at 613; *cf. Hammontree v. NLRB*, 925 F.2d 1486, 1496 (D.C. Cir. 1991) (en banc) ("[C]ourts are obligated to construe statutes harmoniously whenever possible.").

House Report on the resolution incorporating the text of the WMSC Compact noted that the WMSC Compact was not understood to be "duplicative" of existing programs, agencies, offices, or initiatives. H.R. Rep. No. 115-227, at 12, *as reprinted in* 2017 U.S.C.C.A.N. 90, 94, 2017 WL 3113984 (citing Pub. L. No. 111-139, § 21). Rather, the WMSC was created to fill a need to foster rail operation-related safety specifically. 163 Cong. Rec. H5894, H5897 (daily ed. July 17, 2017) (statement of Rep. Bob Goodlatte); *see also id.* at H5897 (statement of Rep. Jamie Raskin) (detailing some of the metrics of Metrorail in discussing the "safety needs of the system" that the WMSC Compact was meant to address); *id.* at H5898 (statement of Rep. Steny Hoyer) (discussing how the WMSC Compact was a "bipartisan effort to enhance America's subway"); *id.* at H5900 (statement of Rep. John Conyers) (referencing "safety violations" precipitating the creation of the WMSC Compact involving an on-track crash and similar events and identifying particular "causes" of those violations to include "aging infrastructure" and "neglected maintenance"); *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 320–21 (2007) (referencing legislative history that confirmed "Congress' objectives" in enacting a statute). And it was created under 49 U.S.C. § 5329(e) specifically to "implement Congress' directive" for states to establish their own oversight authorities "responsible for the safety of fixed rail transit facilities within their respective jurisdictions." *See* 163 Cong. Rec. at H5900 (statement of Rep. John Conyers). "Given this history," reading the WMSC Compact to give the WMSC generic OSH regulatory authority—authority long wielded by other WMATA regulators—"make[s] no sense." *See Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 595 U.S. 178, 187 (2022).

Beyond all this, "common sense" militates against the magistrate judge's reading. *See Fischer v. United States*, 603 U.S. 480, 487 (2024); *United States v. Howell*, 78 U.S. (11 Wall.) 432, 436 (1870) (courts should avoid interpretations "at war with the common sense"). For

instance, given that the WMSC does not have authority over WMATA's bus and paratransit modes of service, on the magistrate judge's view of the WMSC Compact regulation of WMATA's OSH-related issues would be balkanized between rail on one hand (regulated by the WMSC) and bus and paratransit on the other hand (regulated by OSHA, VOSH, MOSH, and the District of Columbia Office of Risk Management), instead of having OSH-related issues regulated generally by the latter, expert agencies.[10] Such a scheme would threaten WMATA with having to follow conflicting directives in different modes of its services, creating inefficiencies and wasting taxpayer resources in the process—not to mention potentially creating different safety standards for the public regarding the same exact issues (such as asbestos-containing tiles located in a bus or transit station) varying only because the modes of service are different.

Not only would such a regulatory scheme "ignore the intent of Congress" and the Signatories in the WMSC Compact, as just discussed, but it would also "render incoherent the overall statutory scheme" of which the WMSC Compact is a part. *See Tunica-Biloxi Tribe of La. v. United States*, 577 F. Supp. 2d 382, 424 (D.D.C. 2008). For this reason also, the magistrate judge's "unreasonable interpretation[] must be rejected." *Id.*

### C.    "Hazards," in Context, Does Not Give the WMSC OSH-Related Authority.

The magistrate judge's treatment of the WMSC Compact term "hazards" fares no better. The WMSC is authorized to "[i]nvestigate ***hazards*** . . . on the WMATA Rail System" as well as "incidents . . . on the WMATA Rail System" and "accidents on the WMATA Rail System." WMSC Compact § 3(d) (emphasis added). The magistrate judge overstated that "hazards"

---

[10]    There is no allegation by the WMSC that the OSH experts at these agencies have performed inadequately. *See* Supplemental Declaration ¶ 25.

encompasses all "[c]onditions that cause injury or illness," "classic examples of workplace safety concerns," and concluded from there that "OSH is within [the] WMSC's purview." ECF No. 9 at 4. But this analysis ignores the statutory context of "hazards."

For one, "hazards" is not used in isolation but in a list of occurrences—"incidents" and "accidents"—that take place "on the WMATA Rail System." WMSC Compact § 3(d). In these circumstances, "a word is known by the company it keeps"—a principle "often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth" to that word. *Dubin v. United States*, 599 U.S. 110, 125–26 (2023) (cleaned up). Applying that principle here means reading "hazards" in a "similar manner to its companions." *Id.* at 126. As applied to occurrences "on the WMATA Rail System," the terms "incidents" and "accidents" in "context . . . connote" happenings that take place in connection with Metrorail's operations, *id.* at 125—occurrences such as "derailments" and railway "fires," 163 Cong. Rec. at H5899 (statement of Rep. Gerry Connolly). "Hazards . . . on the WMATA Rail System" must be read in similar fashion, not to speak to every imaginable condition that could lead to harm, but rather to "hazards" that could manifest themselves in such "incidents" or "accidents"—hazards like "track defects." *See id.*; *see also Dubin*, 599 U.S. at 126–27 (discussing how lists of three are generally construed to identify distinct but complementary, related items).

How "hazards" is used elsewhere in the WMSC Compact reinforces this narrower scope. Ordinarily, "identical words within the same statute should normally be given the same meaning," an interpretive maxim that is "doubly appropriate where . . . Congress employed the same term in multiple places at the same time in the same section of the same public law." *Monsalvo*, 604 U.S. at 726 (cleaned up). "Hazard" appears in the WMSC Compact twice—once in Section 3(d) cited by the magistrate judge, the other time in Section 31(c)(4), authorizing the WMSC to order

WMATA to remove "a specific vehicle, infrastructure element, or hazard from the WMATA Rail System." WMSC Compact §§ 3(d), 31(c)(4). This use of the term doubly forecloses reading it to apply to general OSH issues. For one, the list here clearly envisions tangible items, with "hazard" listed alongside other physical dangers (a "specific vehicle" or an "infrastructure element"). *See Fischer*, 603 U.S. at 487 ("the canon of *noscitur a sociis* teaches that a word is given more precise content by the neighboring words with which it is associated," which "avoids ascribing to one word a meaning so broad that it is inconsistent with the company it keeps" (cleaned up)). Further, the list here clearly speaks of items that can be physically "remove[d]" from the "WMATA Rail System." *See* WMSC Compact § 31(c)(4). Thus, "hazard" cannot be read to encompass general OSH issues but rather must be construed narrowly to speak of hazards that are at least akin, in the dangers they pose, to the sorts of physically removable dangers identified in the WMSC Compact—for instance, a faulty component of a railcar in lieu of the entire vehicle. *See, e.g.*, *Yates v. United States*, 574 U.S. 528, 544 (2015) (plurality opinion) (adopting a "moderate interpretation" of a statutory term in light of the verbs with which the term was associated).

In other words, statutory context demonstrates that "hazard" cannot be read in the limitless manner adopted by the magistrate judge to bring "OSH . . . within WMSC's purview." *Contra* ECF No. 9 at 4. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 118–19 (2022) (per curiam) (recognizing that OSHA's mandate to set "*occupational* safety and health standards" did not authorize OSHA "to regulate the hazards of daily life[] simply because most Americans have jobs and face those same risks while on the clock" but rather more narrowly permitted OSHA to regulate uniquely "work-related dangers" and "occupation-specific risks" (cleaned up)). The magistrate judge's "indiscriminate approach" ignores critical context and thus "fails to account for th[e] crucial distinction" manifest there—the difference between rail-related hazards the WMSC

has authority to regulate and hazards "more generally" that the WMSC does not. *See id.* at 119; *see also Clark v. Martinez*, 543 U.S. 371, 378 (2005) ("To give these same words a different meaning . . . would be to invent a statute rather than interpret one.").

> ### D.    The WMSC's Audit Authority, in Context, Does Not Give the WMSC OSH-Related Authority.

Finally, the magistrate judge's attempt to read in general OSH authority for the WMSC, by virtue of the WMSC's mandate to "audit WMATA's compliance with [its] Safety Plan" and the fact that the Safety Plan contains a section on general OSH programs and policies, does not withstand scrutiny. ECF No. 9 at 5 (referencing WMSC Compact § 30(e)). In accordance with FTA regulations, WMATA prepares a single Safety Plan covering the gamut of its operations. *See* 49 C.F.R. § 673.11(b) ("A transit agency may develop one Public Transportation Agency Safety Plan for all modes of service . . . ."); ECF No. 6-1 ¶ 4 (explaining how the Safety Plan applies "across the entire WMATA transit system"); *see also, e.g.*, ECF No. 1-2 at 8 (identifying that the Safety Plan applies to WMATA's "Rail, Bus, and Paratransit" modes of service). It is undisputed that the WMSC's authority under the WMSC Compact does not extend to these other modes of service. *See, e.g.*, ECF No. 1-10 at 16 (acknowledging that the WMSC's authority does not extend to "Metrobus operations or personnel"); ECF No. 7 at 6 (recognizing that the WMSC lacks authority over "non-rail public transportation, such as buses"). And the WMSC Compact's audit authority is expressly limited to "carry[] out [the WMSC's] purposes . . . consistent with federal law." WMSC Compact § 30.

Thus, the magistrate judge's interpretation "proves too much" because it would "allow" the WMSC to exercise authority that "run[s] counter" to the WMSC Compact's delegation of limited authority to the WMSC, *see Fed. Open Mkt. Comm. of Fed. Rsrv. Sys. v. Merrill*, 443 U.S. 340, 353–54 (1979), over WMATA's "rail services," WMSC Compact §§ 1(m), 3. That is, the

magistrate judge's "analysis" is "fundamentally at odds with the plain language" of the WMSC Compact read in context, and so the Court "must reject" that interpretation. *Merrill*, 443 U.S. at 353–54. The correct reading of the audit provision of the WMSC Compact—that is, the reading that is "consistent" with the WMSC's delegated authority and the WMSC's "purposes," WMSC Compact § 30; *see also supra* Sections I.B.–C.—is that the WMSC may audit the Safety Plan for fixed-rail-safety-related issues. This authority cannot be read, as the magistrate judge's interpretation would require, as opening a back door to the entire WMATA system (not just Metrorail) via an ancillary provision to authority that the WMSC Compact did not vest in the WMSC up front insofar as the WMSC's authority is limited to "Metrorail Safety." *See* WMSC Compact pmbl. & Art. III(A); *see also Nardone v. United States*, 308 U.S. 338, 341 (1939) ("A decent respect for the policy of Congress must save us from imputing to it a . . . disingenuous purpose.").

## II.    The Magistrate Judge Erred by Concluding That the Subpoena Does Not Threaten to Impose an Undue Burden on WMATA.

Alternatively, even if the Court were to conclude that the WMSC has authority under the Compact to issue the Subpoena (though it does not), the magistrate judge wrongly held that the Subpoena does not impose an undue burden on WMATA. WMATA's Chief Safety and Readiness Officer explained that the WMSC's demands have grown so onerous that she estimated that she and her staff—whose day jobs are to manage and implement WMATA's safety program across all modes of service, for the safety of personnel and passengers alike—were spending more than two-thirds of their working days dealing with the WMSC's demands. ECF No. 6-1 ¶¶ 1–2, 4, 7. The burden on WMATA's safety department is "overwhelming," and the WMSC's demands have pulled the Chief Safety and Readiness Officer and supporting staff away from their operational

responsibilities. *Id.* ¶ 7. The WMSC does not dispute Ms. Impastato's recitation of the undue burden, nor could it.

In this WMSC-created context, the Subpoena "threatens to unduly disrupt or seriously hinder [WMATA's] normal operations." *See Texaco*, 555 F.2d at 882; Supplemental Declaration ¶¶ 7, 15–17, 27. Simply, WMATA is already faced with unreasonable administrative burdens from the WMSC's ever-increasing demands, and the Subpoena compounds those burdens. The Subpoena's demands are "duplicative" of oversight exercised by OSH regulators and thus are wasteful and unduly burdensome because they unnecessarily force WMATA to further expend finite time and taxpayer resources on responding to the WMSC's requests. *E.g.*, ECF No. 1-9 at 9, 11–12, 16–19; *see also* Supplemental Declaration ¶¶ 7, 10, 14, 24, 27. WMATA conservatively calculates that responding to the disputed demands in the Subpoena would take about 3,000 working hours—in other words, the equivalent of one employee's entire year and half of another employee's year. *See* Supplemental Declaration ¶ 7.

Further, this burden must be understood in light of the history of the WMSC and WMATA's relationship. *See, e.g.*, *id.* ¶ 8. The WMSC has weaponized WMATA's past good-faith cooperation to demand ever-increasing amounts of information. *See* ECF No. 6-1 ¶ 9. And complying with the WMSC's demands is an iterative process in which the demands themselves balloon as that iterative process wears on and the burden otherwise increases because of follow-up questions from the WMSC that WMATA must devote substantial time to addressing. *See id.* ¶¶ 8–9; *see also* Supplemental Declaration ¶¶ 8, 15–16. In other words, the amount of time required to respond to a WMSC demand evolves and generally grows over the life of the demand. So up-front estimates of the burden WMATA anticipates from responding to the WMSC's demands tend to be conservative. *E.g.*, Supplemental Declaration ¶¶ 7–8, 16.

And that problem will only intensify if the magistrate judge's conclusion that the WMSC Compact grants the WMSC authority over anything that "falls under the umbrella of 'safety'" is sustained. *See* ECF No. 9 at 4. Arguably, anything WMATA does could be considered to fall under that "umbrella." *Cf. Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring) ("[A]s many a curbstone philosopher has observed, everything is related to everything else."). Such a limitless determination by the magistrate judge surely does not comport with the limited scope the WMSC Compact contemplated when it discussed only the areas in which the WMSC had "exclusive" authority and only on the Metrorail system.

Moreover, considering past as prologue, the WMSC's facial demands in the Subpoena will almost certainly transmogrify. In the Subpoena, the WMSC seeks to duplicate OSH regulators' oversight. *See, e.g.*, Supplemental Declaration ¶¶ 14–16; *see also id.* ¶¶ 20–21 (discussing similar duplicative actions by the WMSC from the past several months). If given the green light by the Court to do so based on the magistrate judge's essentially unbounded rationale, the WMSC will likely assert itself redundantly into more regulatory domains—pollution regulated by the Environmental Protection Agency, accessibility-related issues regulated by the Department of Labor, and so on. If not placed in check to only the domain of the WMSC's "exclusive" authority over fixed-rail safety, the burden on WMATA will very likely grow exponentially from its already unduly burdensome levels. *See, e.g.*, ECF No. 6-1 ¶ 9 (emphasizing that WMATA "cannot continue this trajectory" sustainably); Supplemental Declaration ¶ 27 ("[T]he cumulative effect of the demands of the WMSC's expanded audit and enforcement paradigm materially diverts WMATA resources away from rail-specific safety improvements."). Indeed, the WMSC has kept busy expanding its mission creep while this case has been pending. *See, e.g.*, Supplemental

Declaration ¶¶ 18–19 (discussing an October 2025 WMSC audit finding pertaining to elevator-certificate regulations enforced by the Maryland Division of Labor and Industry).

Accordingly, the Subpoena is unduly burdensome, and the magistrate judge erred in concluding otherwise. Even if the magistrate judge's Order regarding burden could be defended on the initial Impastato Declaration, this Court should consider, as a part of its *de novo* review, Ms. Impastato's Supplemental Declaration and deny the Petition. *See, e.g.*, Fed. R. Civ. P. 72(b)(3) ("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may . . . receive further evidence . . . ."); *Roell v. Withrow*, 538 U.S. 580, 585 (2003) ("[N]onconsensual referrals of pretrial but case-dispositive matters under § 636(b)(1) . . . leave the district court free to do as it sees fit with the magistrate judge's recommendations . . . .").

## CONCLUSION

For the foregoing reasons and those set forth in WMATA's prior submissions, WMATA respectfully urges the Court (1) to find that the magistrate judge erred in concluding that the WMSC has authority over general OSH issues and that the Subpoena's demands pertaining to those issues is within its authority to issue; and (2) alternatively, to hold that the magistrate judge erred in concluding that the Subpoena is not unduly burdensome. The Court should reject the Order, should deny the WMSC's Petition, and should grant such further relief as the Court deems proper.

## REQUEST FOR ORAL HEARING

WMATA hereby requests an oral hearing on the foregoing Objections.


Dated: December 31, 2025                    Respectfully submitted,


/s/ Attison L. Barnes, III
Attison L. Barnes, III (DC Bar No. 427754)
George E. Petel (DC Bar No. 1088877)
Joel S. Nolette (DC Bar No. 1781062)
**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20006
Phone: (202) 719-7000
Fax: (202) 719-7049
abarnes@wiley.law
gpetel@wiley.law
jnolette@wiley.law

*Counsel for the Washington Metropolitan Area Transit Authority*