# Exhibit 1

Case No. 1:24-mc-00144-LLA-ZMF

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WASHINGTON METRORAIL SAFETY COMMISSION, | |
|     Petitioner, | Case No. 1:24-mc-00144-LLA-ZMF |
| v. | Judge Loren L. AliKhan |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, | Magistrate Judge Zia M. Faruqui |
|     Respondent. | |

**SUPPLEMENTAL DECLARATION OF THERESA M. IMPASTATO**

I, Theresa M. Impastato, declare, pursuant to 28 U.S.C. § 1746, the following to be a true and correct statement of facts:

1. My name is Theresa M. Impastato, I am over the age of eighteen, and I am competent to make this Declaration.

2. I have reviewed my prior Declaration in this case, ECF No. 6-1, and I reaffirm the accuracy of the content in that Declaration.

3. I have been employed by the Washington Metropolitan Area Transit Authority ("WMATA") since August 2019. From August 2019 to June 2025, I served as Executive Vice President and Chief Safety and Readiness Officer. From June 2025 to the present, I have served as Executive Vice President and Chief Infrastructure Officer.

4. In my former role as Chief Safety and Readiness Officer, I oversaw WMATA's safety, training, quality, accessibility, and occupational health and wellness teams.

5. In my current role as Chief Infrastructure Officer, I supervise approximately 5,000 employees and contractors, including numerous personnel responsible for WMATA's Metrorail

construction and maintenance. In this role, I see firsthand what implementing the Washington Metrorail Safety Commission's (the "WMSC") directives entails.

6. Thus, in my experience at WMATA, I have seen and experienced firsthand both the burdens imposed by the WMSC's audit-related requests and demands and the burdens imposed by the WMSC's directives to WMATA following the WMSC's audits.

7. Based on my first-hand knowledge and direct experience of responding to WMSC requests over the last six years in my prior role as Chief Safety and Readiness Officer, as well as my general familiarity with WMATA's practices responding to WMSC audit requests and demands, I believe that responding to the demands at issue in the subpoena in this case (the "Subpoena") will *conservatively* consume about 3,000 working hours, or about 1.5 full-time employees' entire working year. This estimate reflects internal labor only. The estimate does not include the time that would be required to address any directives the WMSC might seek to impose that may conflict with directives of the agencies specifically charged with, for example, occupational safety and health ("OSH") issues.

8. In my years of experience working with the WMSC, responding to the WMSC's audit requests typically involves multiple sequential phases that extend well beyond document retrieval. These phases include clarification of broadly framed requests, coordination across numerous WMATA departments to identify and reconcile responsive records, production of large volumes of documents, and iterative follow-up productions as the WMSC issues additional or expanded requests. WMATA personnel must also devote substantial time responding to technical questions and providing contextual explanations regarding the materials produced. Collectively, these activities require hundreds if not thousands of staff hours and materially increase the burden of compliance relative to the incremental informational value of the materials sought.

2

9. The burdens imposed by the WMSC's demands, like the demands in the Subpoena, are amplified by the fact that many of them involve programs that WMATA manages on a systemwide basis rather than programs that WMATA manages distinctly for each mode of service (rail, bus, and paratransit, as well as Metro transit police). OSH is a case in point—WMATA implements the requirements of the Occupational Safety and Health Administration ("OSHA") and its partner state-level regulators on a uniform basis across all of WMATA's operations. Thus, when the WMSC demands OSH-related information, WMATA must scour its voluminous records across its entire system for all modes of service and then separate out, to the extent it can, those records that pertain only to Metrorail in order to compile records appropriate to produce to the WMSC for its review, many of which involve private personnel information in paper form, including sensitive medical records.

10. The foregoing burdens also do not include harder-to-quantify, but nevertheless real, costs caused by the WMSC's demands. For instance, the expenditure of staff time responding to audit requests and demands from the WMSC that seek information about topics governed by other regulators requires foregoing devoting that staff time to non-duplicative scheduled safety, maintenance, capital delivery, and supervisory activities. That is, staff time devoted to responding to WMSC inquiries and demands for information relating to matters overseen by other regulators displaces time that would otherwise be devoted to safety improvements, maintenance activities, capital project delivery, and workforce supervision.

11. Further, since the WMSC's inception, its demands of WMATA have increased exponentially over time, in terms of the burdens imposed on WMATA to respond to the WMSC's satisfaction. A review of historical complications with the WMSC is instructive as an indication

of why WMATA takes this position. WMATA routinely complies with safety oversight and regulatory audits conducted by authorized federal and state agencies.

12. To illustrate the escalation of burden caused by the WMSC's decision to continue expanding its reach beyond Metrorail safety, I reviewed records pertaining to two related sets of requests the WMSC made of WMATA: one from a fitness-for-duty audit the WMSC conducted in December 2020, the other from the WMSC's fitness-for-duty and occupational-health-programs audit from February 2024 (the audit in connection with which the WMSC issued the Subpoena).

13. The December 2020 fitness-for-duty audit was itself burdensome. The Federal Transit Administration (the "FTA") had just completed a holistic drug-and-alcohol-program audit of WMATA earlier that month (December 11, 2020), and much of the information sought by the WMSC was already available to and reviewed by the FTA (as part of its audit), a federal regulator with direct statutory authority over the subject matter. Beyond that unnecessary duplication, because WMATA does not have a rail-specific drug-and-alcohol program, the WMSC's requests required WMATA to identify and separate rail-specific records responsive to the WMSC's audit requests. Further, WMATA experienced significant scope expansion as the December 2020 audit progressed—during the audit, the WMSC's document and data requests expanded beyond the original requests to include requests for access to non-Metrorail-specific records. This expansion required additional internal coordination with WMATA personnel, additional review of records not included within the scope of the original requests, and additional data-separation efforts to remove (to the extent possible) records unrelated to WMATA's rail services.

14. Future WMSC audits exponentially expanded the burden. Unlike the December 2020 audit, the February 2024 audit encompassed not only fitness-for-duty topics but also

numerous OSH-related topics within the domain of other regulators with the requisite expertise. *See* ECF No. 1-9 at 9 (Request 2) (demanding "[a]ll policies and procedures . . . related to . . . [o]ccupational health programs"); *id.* at 10 (Request 3) (demanding materials concerning programs implemented pursuant to twelve OSHA safety standards); *id.* at 12 (Request 11) (demanding materials concerning "[a]ll training requirements related to . . . occupational health programs"); *id.* (Request 12) (demanding "[a]ll training curricula, trainings, class schedules, and exams related to . . . occupational health programs"); *id.* at 16 (Request 22) (demanding "[a]ll existing data reports/trend data related to dosimetry testing, indoor air quality, toxic and hazardous substances, Job hazard analyses, PPE usage, training overdue for health and safety programs, [and] employee safety concerns" over a three-year period); *id.* (Request 23) (demanding "all . . . occupational health reporting requirements" mandated by the federal government, the District of Columbia, Maryland, and Virginia); *id.* at 17 (Request 24) (demanding "[a]ll occupational health inspection reports" from OSH agencies in those same four jurisdictions over a two-year period); *id.* (Request 25) (demanding "[a]ll medical monitoring results for welders" and similar employees over a three-year period); *id.* (Request 26) (demanding "[a]ll noise and dosimetry test schedules and results" over a three-year period); *id.* at 18 (Request 27) (demanding "[a]ll exposure reports for air and surface monitoring regarding specific substances including without limitation silica, asbestos, hexavalent chromium, lead, or any other toxic or hazardous substances" over a three-year period); *id.* (Request 28) (demanding "[a]ll exposure reports from bloodborne pathogens and associated medical monitoring results" over a three-year period).

15.     This expansion into various OSH-related topics significantly increases the burden compared to the December 2020 audit. Responding to these OSH-related topics requires sustained

5

involvement from additional WMATA personnel—such as industrial hygienists that did not need to be involved meaningfully in prior audits given the absence of OSH-related topics from those audits—to collect voluminous raw exposure data, laboratory results, and confidential medical monitoring information that require careful validation, privacy review, and cross-departmental coordination to produce. Given just these considerations alone, I estimate a six- to ten-fold increase in burden to produce documents responsive to the OSH-related Subpoena topics. This additional effort does not correspond to a comparable increase in rail-specific safety insight but instead reflects the breadth of systemwide OSH information encompassed by the expanded demands. These additional activities require independent technical judgment, cross-departmental coordination, and iterative review. This scope differs materially from the document-based fitness-for-duty responses required in the 2020 audit.

16.     And that already exponential increase does not account for the fact that the WMSC's demands evolve and increase in scope as WMATA undertakes producing documents and data in response. Nor does it account for the follow-up questions from the WMSC requiring WMATA personnel to devote additional time explaining an even larger set of data and documents than has been produced in connection with prior audits, all of which are already within the jurisdiction of other agencies.

17.     Beyond all this, the burdens WMATA faces from the WMSC's increasing demands are getting worse. Three recent examples underscore how, if not stopped, the WMSC's overreach will continue along a trajectory that substantially overloads staff time and causes unsustainable operational disruption.

18.     First, the WMSC is now openly seeking to encroach on the work of regulators in the State of Maryland, even seeking to enforce Maryland state law with respect to matters

6

unrelated to WMATA's fixed rail. In October 2025, the WMSC issued an audit finding that Metrorail ostensibly was not displaying elevator-inspection certificates correctly under Maryland state law. Maryland Code, Public Safety § 12-811 provides that, upon inspection of an elevator for compliance with the state Safety Code and related regulations, the state Commissioner of Labor and Industry will issue a certificate to the elevator operator verifying the safety of that elevator, which is to be "posted conspicuously in or on the elevator unit." The state's Division of Labor and Industry implements and enforces this elevator-safety law. *See generally* Md. Dep't of Labor, *Division of Labor and Industry*, https://labor.maryland.gov/labor/ (last visited Dec. 30, 2025) ("Our mission is to enforce and promote workplace rights, health and safety standards in the workplace and for the protection of the public . . . . Through its various units, DLI touches almost everyone in Maryland, from boiler and elevator safety, to workplace safety and health, to protecting employee wages and rights."). According to the WMSC's finding, "[a]fter discussion with code compliance officials from the safety inspection unit" of the Maryland Division of Labor and Industry, the WMSC determined that WMATA's certificate-display practices "do[] not meet" the requirements of this Maryland law.

19.  This finding reflects the WMSC's engagement with regulatory requirements that are administered by state labor and code enforcement authorities outside the scope of rail safety oversight. In order to respond to this determination, WMATA must coordinate with multiple regulatory frameworks, provide additional documentation, and undertake actions well beyond those ordinarily associated with fixed-rail oversight. In addition, WMATA would be required to develop and submit a corrective action plan for WMSC review and approval, effectively positioning the WMSC as an intermediary between WMATA and the state authorities that administer and enforce the underlying legal requirements. These additional activities require staff

7

time and resources that are incremental to WMATA's existing compliance obligations and increase the overall administrative burden associated with the audit response.

20. Second, also in October 2025, the WMSC issued an audit finding that certain Metrorail personnel who support elevator operations and maintenance are supposedly trained inadequately on fall-protection requirements. This finding was expressly predicated on 29 C.F.R. § 1910.28(b)(6) and 29 C.F.R. § 1910.30—OSHA's fall-protection safety standards. And the WMSC's audit finding directed WMATA to "train relevant personnel" and "submit evidence of such." WMATA already provides OSHA-compliant fall protection training to the Heavy Repair Journeyman (Special Projects) personnel who handle elevator-maintenance tasks that require such training. Responding to this will require WMATA to review, compile, and present existing training materials and to develop and submit a corrective action plan for WMSC review and approval, resulting in additional documentation, coordination, and verification activities beyond those ordinarily associated with rail-specific safety oversight, resulting in increased administrative burden.

21. Third, in December 2025, the WMSC issued an audit finding that Metrorail ostensibly lacks "adequate supervisory oversight to ensure adherence to testing and replacement requirements for electrical safety gloves." The WMSC's audit finding was expressly predicated on 29 C.F.R. § 1910.137(c)(2)(viii)—OSHA's safety standard for electrical protective equipment—and related OSHA guidance. WMATA maintains an electrical safety glove testing and replacement program already subject to review by OSH regulators. Responding to this finding will require WMATA to review and document its existing program and to evaluate compliance with criteria identified by the WMSC in this audit and to develop and submit corrective action documentation for WMSC review and approval. This will result in additional analysis,

coordination, and administrative efforts beyond WMATA's routine engagement with OSHA and other authorized regulators, as WMATA will be required to assess compliance against criteria not previously applied to its programs by the relevant regulator.

22. Unlike OSHA and other regulators with jurisdiction over OSH issues, the WMSC does not provide defined mechanisms for appeal, administrative review, or independent adjudication of disputed findings. By contrast, OSHA enforcement actions are subject to established notice requirements, contest procedures, and review before the Occupational Safety and Health Review Commission. As a result, WMATA is required to expend significant resources responding to WMSC demands and directives without the procedural safeguards, limiting principles, or avenues for redress that ordinarily accompany regulatory enforcement. This lack of guardrails and structured review further amplifies the burden imposed by the Subpoena. The absence of these mechanisms requires WMATA to comply fully with expansive demands at the outset of an audit, without a clear intermediate process to narrow scope, resolve disputes, or receive a neutral review prior to production of materials.

23. With regard to directives, the WMSC acts outside of meaningful constraints that other regulators face that ensure a sound regulatory framework. For instance, before promulgating safety standards OSHA, as a federal agency, must conduct a cost-benefit analysis to ensure that the standards it issues are warranted. *See, e.g.*, OSHA Electric Power Generation, Transmission, and Distribution; Electrical Protective Equipment, 79 Fed. Reg. 20316, 20560 (Apr. 11, 2014). By contrast, when the WMSC issues findings and directives that require WMATA to assess or demonstrate compliance with OSHA-based requirements, those directives are not subject to comparable analytical or procedural constraints. As a result, WMATA is required to locate, review, and produce large volumes of data and documentation for an oversight body that is not

9

the regulator for these subject areas. WMATA must do so without the benefit of established mechanisms to narrow scope or assess proportionality. These efforts are followed by requirements to develop and implement corrective action plans, which involve additional analyses and documentation and require significant coordination across WMATA functions beyond Metrorail.

24. Based on my experience working with the WMSC, these activities impose substantial administrative and resource demands on WMATA that are incremental to and separate from WMATA's routine compliance obligations with OSHA, EPA, and other authorized regulatory agencies.

25. In my years working with the WMSC, I have never heard its representatives try to justify its actions by claiming that the other agencies (like OSHA) are not qualified to handle the audits.

26. Moreover, to the extent that the WMSC applies interpretations of regulatory requirements administered by other agencies, it inevitably leads to conflicting directives to WMATA as set forth in my initial declaration. Addressing such directives requires WMATA to reconcile the differing interpretations, respond to overlapping or duplicate requests, and allocate staff time to matters that are not directly associated with fixed-rail hazards and that have already been reviewed by agencies with established regulatory authority and relevant expertise over the subject areas involved.

27. In my experience, the cumulative effect of the demands of the WMSC's expanded audit and enforcement paradigm materially diverts WMATA resources away from rail-specific safety improvements. It imposes an overwhelming administrative burden unrelated to fixed-rail hazards, with no appreciable safety benefit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 31, 2025, in Washington, DC.

*Theresa M. Impastato*
Theresa M. Impastato
WMATA Chief Infrastructure Officer