**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

WASHINGTON METRORAIL SAFETY
COMMISSION,

               Petitioner,

v.

THE WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,

               Respondent.

No. 1:24-mc-00144-LLA-ZMF

Hon. Loren L. AliKhan
Hon. Zia M. Faruqui

---

**RESPONSE OF THE WASHINGTON METRORAIL SAFETY COMMISSION TO THE
WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY'S OBJECTIONS
TO THE MAGISTRATE JUDGE'S PROPOSED FINDINGS AND
RECOMMENDATIONS**

**INTRODUCTION**

The Washington Metropolitan Safety Commission (the "WMSC") is charged with, among other things, "review[ing], approv[ing], oversee[ing], and enforc[ing] the safety of the WMATA Rail System" and "investigat[ing] hazards, incidents, and accidents on the WMATA Rail System." Pub. L. 115-54, § 3, 131 Stat. 1093, 1095 (2017) (the "WMSC Compact"). Among the subjects the WMSC must audit and investigate are the efforts of the Washington Metropolitan Area Transit Authority ("WMATA") "to minimize the exposure of the public, *personnel*, and property to hazards and unsafe conditions." 49 U.S.C. § 5329(d)(1)(D) (emphasis added). Based on that authority and its broad safety mandate under federal law, the WMSC initiated an audit of WMATA's occupational safety and health practices and requested that WMATA produce documents and information as the initial step in the audit.

WMATA refused to comply with eleven requests in the audit related to occupational safety and health, prompting the WMSC to issue a subpoena to WMATA and to seek judicial enforcement of the subpoena (the "Subpoena").  WMATA argues that the WMSC somehow lacks the authority to audit or investigate occupational safety and health issues – what it refers to as "OSH" – because OSH issues do not fall within the meaning of "Metrorail safety."  The Magistrate Judge disagreed and ordered WMATA to comply with the Subpoena based on a straightforward application of the controlling statutes.  The Magistrate Judge was right.

WMATA's appeal reduces to two arguments, each equally without merit.  First, WMATA engages in a contorted and transparently result-driven effort to conjure a statutory "context" that can somehow make the WMSC Compact mean something other than what its plain text says.  Fundamentally, WMATA fails to address the fact that the statute authorizes the WMSC to audit and enforce WMATA's obligation to take steps to "minimize the exposure of . . . *personnel* to hazards and unsafe conditions."  Hazard is defined as "any real or potential condition that can cause injury, illness, or death."  That very clearly describes occupational safety and health, making clear that WMATA's interpretive contortions lack merit.

Second, WMATA conflates all of its efforts to respond to the WMSC's *other* audits and directives in an attempt to argue that the Subpoena will cause an "undue burden."  But WMATA cannot point to any specific undue burden that the Subpoena will cause.  The only purported evidence that WMATA offers to show that the Subpoena will meet the high bar of disrupting WMATA's normal business operations is an implausible and unexplained claim that complying with the Subpoena will take approximately two and a half times as many labor hours as WMATA spent on a particularly long previous audit process.  WMATA does not support its claims with any objective evidence.  That is unsurprising, because, as the Magistrate Judge explained, the

Subpoena seeks the type of information regularly collected by businesses and provided to regulators.

In a vain attempt to justify its objections, WMATA spills much ink trying to portray the WMSC as somehow straying from its "lane" in requiring corrective action when there are safety issues. WMATA does not, and cannot, offer any proof that those actions exceed the WMSC's authority. To the contrary, the WMSC hews closely, and narrowly, to the Metrorail safety oversight authority that Congress, Virginia, Maryland, and the District of Columbia have given it.

But the Court need not address WMATA's broader discontent with being a regulated entity or its objections to corrective action in other areas because the issue here is only whether the WMSC has the authority to obtain the information requested in the Subpoena. WMATA's broad (and baseless) jeremiad against the WMSC does not in any way change the simple fact that the occupational safety and health of WMATA's Metrorail workers is one aspect of the WMSC's overall safety authority. The Magistrate Judge was right to order WMATA to comply with the Subpoena, and the Court should affirm that Order.

## BACKGROUND

The Magistrate Judge's summary of the facts accurately describes the background of this case. The WMSC and WMATA were each created by interstate compact. The WMSC conducts a triennial audit of WMATA to ensure safety in the Metrorail system. In early 2024, the WMSC named the occupational safety and health topic in the existing audit of related fitness for duty programs. When WMATA refused to cooperate with portions of the audit, the WMSC issued the Subpoena seeking the documents it had sought in its initial audit requests. WMATA refused to comply with the Subpoena regarding safety and health issues, and so the WMSC initiated this

proceeding.  The Court referred the matter to a Magistrate Judge, which issued an Order enforcing the Subpoena (the "Order").

In its description of the background of this case, WMATA goes far beyond those simple facts and makes a number of statements with which the WMSC disagrees.  In particular, WMATA elides the WMSC's authority over "the WMATA Rail System" to imply that the WMSC has "authority over ***rail*** safety" and "issues specific to fixed-rail safety" only, which is not what the Compact says.  WMATA's Objs. to the Mag. J.'s Proposed Findings and Recommendations, ECF 11, at 5 ("Obj.").  As detailed herein, the WMSC's authority overlaps with that of other regulatory agencies that oversee WMATA.  WMATA also alleges that the WMSC has overreached, causing WMATA significant burden and issuing directives that exacerbated, rather than mitigated, unsafe conditions.  Obj. at 5-8.  The WMSC disputes these allegations, but does not do so in detail here because they are not relevant to the lawfulness or enforceability of the Subpoena.

Finally, WMATA claims that the WMSC has failed to work collaboratively with WMATA to address WMATA's concerns.  Obj. at 9.  That is false.  The WMSC agreed to narrow the scope of certain requests covered by the Subpoena to reduce the burden on WMATA and to accommodate its faulty record-keeping practices, which the WMSC had previously directed WMATA to improve.  WMSC staff agreed to an in-person review of WMATA employee files and designated the records from those files for production, rather than WMATA producing documents without a pre-review.  Similarly, the WMSC and WMATA staff jointly reviewed data available electronically to designate the data more precisely for production.  For every audit, the WMSC offers to discuss the potential burden and solutions to resolve it.  The WMSC did not, however, agree to limit the scope of the audit based on WMATA's erroneous understanding of the WMSC's authority.

# ARGUMENT

## I.    STANDARD OF REVIEW

A District Court reviews a Magistrate Judge's Report and Recommendation de novo in response to a timely objection. *Taylor v. Dist. of Columbia*, 325 F. Supp. 3d 144, 144 (D.D.C. 2018). "An objection is proper when it 'specifically identif[ies] the portions of the proposed findings and recommendations to which objection is made and the basis for the objection.'" *Cube Infra. Fund Sicav v. Spain*, No. 20-cv-1708, 2025 U.S. Dist. LEXIS 157766, at *8 (D.D.C. Aug. 14, 2025) (alteration in original) (quoting Local Civ. R. 72.3(b)). If a party merely "makes conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." *Edwards v. Logan*, No. 23-cv-2258, 2024 U.S. Dist. LEXIS 58648, at *5 (D.D.C. Mar. 29, 2024) (quoting *M.O. v. Dist. of Columbia*, 20 F. Supp. 3d 31, 37 (D.D.C. 2013)). Under that standard, "the magistrate judge's decision is entitled to great deference and is clearly erroneous only if on the entire evidence the court is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *Borushevskyi v. U.S. Citizenship & Immigr. Servs.*, 664 F. Supp. 3d 117, 125 (D.D.C. 2023)).

The Court has the discretion to consider newly submitted evidence or to "make a determination based solely on the record developed before the magistrate judge." *Taylor*, 325 F. Supp. 3d at 144–45 (quoting Local Civ. R. 72.3(c)).

Courts reviewing administrative subpoenas see their roles as "strictly limited," and will inquire only into "whether 'the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant' to the agency's investigation." *United States v. Hill*, 319 F. Supp. 3d 44, 47 (D.D.C 2018) (first quoting *FTC v. Texaco, Inc.*, 555 F.2d 862, 872 (D.C. Cir. 1977), and then quoting *U.S. Int'l Trade Comm'n v. ASAT, Inc.*, 411 F.3d 245,

253 (D.C. Cir. 2005)). Before the Magistrate Judge, WMATA disputed only the first prong, namely whether the Subpoena is within the WMSC's authority. WMATA alluded to a potential undue burden it faced due to the Subpoena, but merely stated conclusorily that the Subpoena caused an undue burden rather than developing any argument. WMATA's Opp. to Pet. for Summary Enforcement of Admin. Subpoena, ECF 6, at 2, 6, 7, 10 n.9, 11, 21. For completeness, the WMSC and the Magistrate Judge addressed whether the Subpoena caused an undue burden. Reply in Support of the WMSC's Pet. for Summary Enforcement, ECF 7, at 13-15 ("Reply"); Order, ECF 9, at 7-9. WMATA has now, for the first time, attempted to develop an argument that the Subpoena is unduly burdensome. In such a circumstance, this Court can and should decline to consider the argument. *See Taylor*, 325 F. Supp. 3d at 145 (distinguishing between arguments not raised and evidence not introduced before a Magistrate Judge).

## II.    THE MAGISTRATE JUDGE CORRECTLY DETERMINED THE WMSC'S AUTHORITY

The Magistrate Judge correctly determined that the WMSC has the authority to request documents and information from WMATA relating to occupational safety and health based on a plain reading of the statutes authorizing and creating the WMSC. The WMSC Compact gives the WMSC the power to "to review, approve, oversee, and enforce the safety of the WMATA Rail System, including, without limitation" the power to "review and approve the WMATA Public Transportation Agency Safety Plan" (PTASP) and to "investigate hazards, incidents, and accidents on the WMATA Rail System." WMSC Compact § 3. For purposes of the WMSC's safety oversight authority, "hazard" includes "any real or potential condition that can cause injury, illness, or death." 49 C.F.R. §§ 673.5, 674.7. Because "occupational safety" is a kind of "safety," because WMATA's PTASP includes occupational safety, and because occupational safety and health considers things that could "cause injury, illness, or death" to WMATA personnel, the Magistrate

Judge properly held that the WMSC request for documents and data relating to WMATA's occupational safety and health practices was within the WMSC's authority.  Order at 3-6.

To challenge that straightforward and common sense reading of the WMSC's authority, WMATA embarks on a quixotic journey to somehow separate occupational safety and health issues from the plain meaning of the WMSC's authority over all aspects of Metrorail safety and hazards in the Metrorail system.  As the Magistrate Judge's straightforward analysis makes clear, WMATA's efforts are unavailing for the simple reason that things that risk the safety and health of Metrorail workers plainly fall within the WMSC's powers to investigate hazards and audit compliance with WMATA's PTASP.  WMATA's dizzying deployment of various principles of statutory construction to create a "context" that excludes occupational safety and health fails to show the error of that analysis.

Fundamentally, WMATA's resort to "context" fails on its own terms because when the full statutory "context" of the WMSC's authority is considered, it is clear that Congress expressly gave the WMSC investigative and enforcement authority regarding occupational safety and health throughout the Metrorail system.

**A.    Congress Expressly Authorized The WMSC to Audit WMATA's Occupational Safety and Health Programs.**

To resolve this case, the plain text of the WMSC Compact suffices.  The WMSC is "empowered . . . to review, approve, oversee, and enforce the safety of the WMATA Rail System." Compact § 3.  Occupational safety is a type of safety.  *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 368 (2018) ("Adjectives modify nouns—they pick out a subset of a category that possesses a certain quality.").  Additionally, the WMSC has the authority to "[i]nvestigate

hazards, incidents, and accidents on the WMATA Rail System."[1]    The Federal Transit Administration ("FTA"), which regulates WMATA, the WMSC, and the relationship between the two agencies, defines hazards expansively to mean "any real or potential condition that can cause injury, illness, or death, damage to or loss of the facilities, equipment, rolling stock, or infrastructure of a rail fixed guideway public transportation system; or damage to the environment."  49 C.F.R. §§ 673.5, 674.7.  Threats to health due to occupational safety hazards can cause injury, illness, or death.  Plainly, occupational safety hazards are a kind of hazard under the Compact.

That is the end of the analysis: the WMSC has jurisdiction over occupational safety on the WMATA Rail System in the same way it has jurisdiction over any other type of safety on the WMATA Rail System.  "[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others," namely the presumption that "a legislature says in a statute what it means and means in a statute what it says there."  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).  "When the words of a statute are unambiguous . . . this first canon is also the last: judicial inquiry is complete."  *Id.* at 254 (internal quotation marks omitted).

But statutory context favors the WMSC too.  The most important "context" with which to interpret the WMSC Compact is that the WMSC is the state safety oversight agency ("SSOA") for WMATA, pursuant to the WMSC Compact.  SSOAs were authorized by the Moving Ahead for Progress in the 21st Century Act, 49 U.S.C. § 5329 ("MAP-21").  MAP-21 requires transit agencies like WMATA to create a PTASP and establishes certain minimum requirements for the PTASP.  49 U.S.C. § 5329(d).  MAP-21 also requires states to create an SSOA to ensure that

---

[1] The reference to the WMATA Rail System defines the WMSC's authority as encompassing Metrorail exclusively, as opposed to the other modes of transportation that WMATA provides.  It does not limit the WMSC's authority in any other way.

transit agencies create and comply with their PTASP and to oversee safety in general. *Id.*
§ 5329(e)(3).

Under that framework, MAP-21 authorizes the WMSC, as a SSOA, to audit and investigate
the occupational safety and health practices of transit agencies like WMATA. First, MAP-21
requires that transit agencies like WMATA:

> establish[] a comprehensive agency safety plan that includes, at a minimum—…
>
> (C) methods for identifying and evaluating safety risks throughout all elements of the public transportation system of the recipient;
>
> (D) strategies to minimize the exposure of the public, *personnel*, and property to hazards and unsafe conditions;

49 U.S.C. § 3529(d)(1) (emphasis added).

By its plain terms, MAP-21 explicitly and expressly requires WMATA to assure the safety
and health of its personnel by requiring PTASPs to include "strategies to minimize the exposure
of the public, *personnel*, and property to hazards and unsafe conditions." *Id.* § 3529(d)(1)(D)
(emphasis added). The breadth of that obligation is clear in the way Congress used the disjunctive
"or" to include both "hazards" *or* "unsafe conditions" and in the obligation's reference to both the
public *and* personnel. The minimization of hazards and unsafe conditions faced by personnel is
the very definition of occupational safety and health. *See* 29 U.S.C. § 652(8) (defining
"occupational safety and health standard" as "a standard which requires conditions . . . reasonably
necessary or appropriate to provide safe or healthful employment and places of employment.").
Accordingly, WMATA is expressly required to address occupational safety and health as part of
its PTASP, which it does. Order at 5.

Second, Subsection C makes clear that WMATA's safety obligations extend "throughout
*all elements* of the public transportation system." Contrary to WMATA's cramped reading, safety
is not limited to physical assets; it extends to "all elements." Employee facilities are an element

of a public transportation system—especially given Subsection D's reference to personnel—even if those facilities may be found in other types of workplaces, too.

Third, MAP-21 confers on the WMSC, as an SSOA, the authority to audit, investigate, and take enforcement action regarding occupational safety and health matters. It does this by giving the WMSC powers and obligations with respect to both WMATA's PTASP and Metrorail safety generally:

> Each State safety oversight program shall establish a State safety oversight agency that . . .
>
> (iv)    has the authority to review, approve, oversee, and enforce the implementation by the rail fixed guideway public transportation agency of the public transportation agency safety plan required under subsection (d);
>
> (v)    has investigative and enforcement authority with respect to the safety of rail fixed guideway public transportation systems of the eligible State;
>
> (vi)    audits, at least once triennially, the compliance of the rail fixed guideway public transportation systems in the eligible State subject to this subsection with the public transportation agency safety plan required under subsection (d) . . . .

49 U.S.C. § 3529(e)(4)(A). Because the "plan in subsection (d)" expressly includes "strategies to minimize the exposure of . . . personnel . . . to hazards and unsafe conditions," SSOAs like the WMSC have the authority to review issues concerning occupational safety and health pursuant to provisions (iv) and (vi) of Section 5329(e)(4)(A). And because "safety" includes "occupational safety," SSOAs have investigative and enforcement authority with respect to occupational safety.

Read in full context, therefore, the WMSC has the express authority to assure that WMATA has "evaluated safety risks throughout all elements of Metrorail" and that WMATA has included strategies to minimize risk to WMATA's Metrorail personnel from hazards and unsafe conditions. That very explicitly authorizes the WMSC to seek the information about occupational safety and health required by the Subpoena.

That conclusion is reinforced by the provisions of the WMSC Compact cited by the Magistrate Judge.  Order at 3-4 (citing Compact §§ 3, 30, 31).  No defensible reading of the Compact given its plain text and most relevant context could construe it as failing to confirm that the WMSC has the power to ensure that WMATA has implemented strategies to protect its personnel from hazards and unsafe conditions throughout the entire Metrorail system.  That is what the WMSC seeks to do in its audit and why the WMSC sought the information at issue in the Subpoena.  Very clearly, the Magistrate Judge correctly ordered WMATA to comply with the Subpoena and produce the requested information.

**B.    None of WMATA's Specific Arguments Have Merit.**

1. *Congress Intended for the WMSC and OSHA to Have Overlapping Jurisdiction.*

WMATA principally argues that the WMSC has jurisdiction only over rail and not "general OSH issues."  Obj. at 14-16.  As described above, that is incorrect because Congress expressly gave the WMSC authority over occupational safety and health issues.  WMATA's argument would require the Court not just to ignore the plain language of the Compact and Section § 3529(d)(1), but to read the rest of MAP-21 in a manner that nullifies both.  Moreover, Subsection D reinforces the Magistrate Judge's plain reading of the Compact that because occupational safety is a form of safety, the WMSC has investigative authority over occupational safety.  Congress would not have expressly required that PTASPs address occupational safety if it intended a narrower reading of the word "safety."  That applies with equal force to the term "hazard" because Congress directed that PTASPs include measures to prevent exposing personnel to "hazards" and "unsafe

conditions."  Occupational safety and health very clearly falls within the WMSC's oversight authority.[2]

Faced with that broad language, WMATA strains to locate a limit on WMSC's power in either the word "exclusive" or other agencies' jurisdictions, but WMATA ignores more natural readings.  WMATA's arguments about the WMSC's "exclusive safety oversight authority" also fails to understand the statutory context.  Obj. at 16-17.  "Safety oversight authority" has specific meaning under Section 5329.  It refers to the oversight authority granted under Section 5329(d), which includes occupational safety as discussed above.  *See* Compact § 3(a) (granting the WMSC "exclusive oversight authority over the WMATA Rail System pursuant to federal law").  The "exclusive" language makes sense in context because as a multi-state entity, WMATA is potentially subject to three separate SSOA's in Virginia, Maryland, and the District of Columbia. *See* 49 U.S.C. § 5329(f)(4)(A)(v), (vi).  The Compact resolves that potential conflict by making the WMSC the exclusive SSOA over WMATA.  Compact § 3(a).  In context, the word "exclusive" is not intended to limit the WMSC's authority over any particular subject matter or to displace the authority of any other regulatory agency besides those other SSOAs.

WMATA's arguments about the WMSC's authority to issue regulations and its "common sense" concerns about potentially conflicting regulations are immaterial and wrong.  Obj. at 17-20.  The only issue before the Court is the WMSC's authority to enforce the Subpoena.  There is no risk of conflicting regulations, "balkanized" "directives" or "safety standards," Obj. at 20, by complying with the Subpoena, because the WMSC is only seeking documents from WMATA.

---

[2] WMATA's argument that the WMSC's audit authority is limited by Section 9 of the Compact, which requires Commission members to have a background in "transit safety," Obj. at 16, is irrelevant because the Commissioner's personal qualifications do not limit the corporate powers of the WMSC as a whole.  In any event, a background in "transit safety" does not exclude rail worker occupational safety.

Should, following compliance with the Subpoena, the WMSC decide to issue a directive, the WMSC will work with WMATA to ensure that the directive targets the problem identified and does not conflict with WMATA's other legal obligations.

In any event, the overlapping jurisdiction of the WMSC and other agencies is intentional. Congress gave those additional powers to the WMSC, including the power to enforce laws primarily administered by other agencies, Compact § 30(d), and did not limit the powers of any other agency. That grant of authority is logical given the WMSC's rail-specific expertise and ability to focus solely on WMATA, rather than all of the employers in a state or the country. Given that clear expression of Congressional intent, the Magistrate Judge correctly found that the WMSC's powers coexist with OSHA's, Order at 6, because "[w]hen two federal statutes overlap, courts must give effect to both, if at all possible." *United States v. Philip Morris*, 263 F. Supp. 2d 72, 76 (D.D.C. 2003) (emphasis omitted).[3] "Mere overlap between or among federal statutes is not enough to show that one of them is meant to be exclusive over a given subject matter . . . ." *Id.* (quoting *United States v. Borden Co.*, 308 U.S. 188, 198 (1939)).

Additionally, even if there were a conflict, "a more specific statute will be given precedence over a more general one." *Corley v. United States*, 556 U.S. 303, 316 (2009) (internal quotation marks omitted). MAP-21 and the WMSC Compact, with their requirement for the WMSC to audit WMATA's compliance with its PTASP, to enforce the laws of other agencies, including OSHA, and to assure overall safety on Metrorail, are more specific than a nationwide statute governing safety standards across countless industries. That result makes sense, because the WMSC has

---

[3] *See also FTC v. Ken Roberts Co.*, 276 F.3d 583, 593 (D.C. Cir. 2001) ("Because we live in an age of overlapping and concurring regulatory jurisdiction, a court must proceed with the utmost caution before concluding that one agency may not regulate merely because another may." (quotation marks and internal citation omitted)).

domain-specific knowledge related to occupational hazards on a rail system. The Court should therefore uphold the WMSC's authority here.[4]

WMATA's appeal to the "broader setting" in which WMATA operates other modes of transportation in addition to rail also fails to somehow excise occupational safety and health issues from the WMSC's authority. Obj. at 18. FTA regulations allow transit agencies to choose whether to include several modes in its PTASP or only rail. 49 C.F.R. § 673.11(b). WMATA's choice to include several modes in its PTASP does not change or reduce its obligations to protect its rail personnel from hazards or unsafe conditions or reduce the WMSC's overall safety, investigation, or audit authority with respect to Metrorail workers. WMATA should not be allowed to evade the WMSC's audit of rail worker safety by choosing to prepare a multi-modal PTASP.

### 2. *"Hazard" is a Broad Term.*

WMATA's argument that the word "hazard" should be understood to exclude occupational safety and health, Obj. at 20-22, is baseless. As the Magistrate Judge noted, hazard is defined by FTA to include "any real or potential condition that can cause injury, illness, or death." Order at 4 (quoting 49 C.F.R. § 674.7). WMATA does not respond to this plain reading or attempt to explain how that definition could *not* include threats to occupational safety. As the word "any" makes clear, the term "hazard" is intended to sweep broadly, and there is no textual or common sensical understanding of the term that would exclude occupational safety and health conditions. Indeed, Congress directed the WMSC to oversee WMATA's "strategies to minimize the exposure

---

[4] The legislative history WMATA cites, *see* Obj. at 18-19, is immaterial and of no persuasive power. *Garcia v. United States*, 469 U.S. 70, 75 (1984) ("While we now turn to legislative history as an additional tool of analysis, we do so with the recognition that only the most extraordinary showing of contrary intentions from those data would justify a limitation on the 'plain meaning' of the statutory language."). WMATA's citations are to generic statements endorsing the Compact. None of the legislators mentioned the WMSC's authority to request documents and data related to the safety of rail workers.

of the public, personnel, and property to hazards and unsafe conditions"    49 U.S.C.

§ 5329(d)(1)(D) (emphasis added).  Plainly, "hazards" does not somehow exclude occupational

safety and health issues, which are definitionally the types of hazards faced by "personnel."

WMATA's facile resort to various canons of statutory construction is unavailing in the

face of the plain meaning of the statute.  The crux of WMATA's "hazard" argument is that the

word hazard is used twice in the Compact and therefore must have the same meaning in both

places.  WMATA argues that "hazard" in one of those places, Section 31(c)(4), must be understood

to exclude occupational safety and health matters based on the canon of *noscitur a sociis*, and so

therefore must the term "hazard" in Section 3(d).  Obj. at 20-22.  WMATA cites no authority for

its trick of using two different rules of statutory construction to change the meaning of the word

"hazard," and that interpretive trick fails for two reasons.

First, the *noscitur a sociis* principle is only needed when a word has multiple meanings and

looking at neighboring words would help determine which meaning to use.  *See, e.g.*, *Jarecki v.

G.D. Searle & Co.*, 367 U.S. 303, 307 (1961); *United States v. Caldwell*, 581 F. Supp. 3d 1, 25

(D.D.C. 2021).  When applied to transit agencies like WMATA and SSOAs like the WMSC,

however, the word "hazard" has only one meaning, as expressly defined by the FTA and used by

the Magistrate Judge.  *See* 49 C.F.R. § 674.7.  Accordingly, there is no reason to resort to the

*noscitur a sociis* principle.

Indeed, FTA's definition of hazard fits perfectly well in both places.  In Section 3(d) the

WMSC is given authority to investigate "hazards," *i.e.*, "conditions that may cause injury, illness,

or death."  Under Section 31(c)(4) of the Compact, WMSC may compel WMATA to remove "a

specific vehicle, infrastructure element, or hazard [*i.e.*, 'conditions that may cause injury, illness,

or death'] from the WMATA Rail System." The same meaning of "hazard" works in both places; there is no reason to look for a different meaning in either place.

Second, WMATA's application of the *noscitur a sociis* principle is wrong. WMATA argues that "hazard" is limited by its use alongside "vehicle" and "infrastructure element" in Section 31(c)(4) of the Compact to mean only "physically removable dangers." Obj. at 22. But WMATA does not explain what "hazards" under FTA's definition of the term are not physically removable or how such a definition would place occupational safety and health beyond the WMSC's authority. Again, there is no need to narrow the meaning of "hazard" to understand the meaning of Section 31(c)(4). Indeed, the use of a word with broad meaning like "hazard" simply underscores the WMSC's broad authority to look holistically at safety and to order the removal of dangerous conditions and things.[5]

### 3. The Subpoena Does Not Apply to Non-Rail Modes.

WMATA's final challenge on the merits is that the Magistrate Judge's order "proves too much" because allowing the WMSC to obtain documents relating to occupational safety and health the WMSC would open "back door" authority to audit the entire WMATA system, including modes other than rail. Obj. at 23-24. Again, the Magistrate Judge only ordered that WMATA

---

[5] WMATA's reliance on *Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022), Obj. at 22-23, is similarly unavailing. That case involved a challenge to OSHA's COVID-era rules to address the risk of COVID in workplaces. The Court held that those were beyond OSHA's authority because COVID was not a hazard unique to any workplace but was a day-to-day danger faced by everyone. On its face that is inapplicable because the WMSC is not imposing any regulations or mandates, but simply requesting documents. In any event, all of the documents the WMSC seeks relate to "work related dangers" and "occupation-specific risks" such as risks from welding, loud noises in the workplace, and exposure to various chemicals. WMATA does not argue that those are not occupational safety issues related to rail-related work by WMATA employees. Such topics easily fall within the WMSC's audit and investigatory authority.

comply with the Subpoena and produce the documents the WMSC requested, all of which relate only to Metrorail personnel, which WMATA concedes is within the WMSC's authority.

For all of the reasons stated above, the WMSC has the authority to audit WMATA's rail-worker occupational safety and health. The Magistrate Judge confirmed that authority and this Court should too.[6]

## III.    THE SUBPOENA IS NOT UNDULY BURDENSOME

Although WMATA has waived any argument regarding the burden caused by the Subpoena by failing to develop it before the Magistrate Judge, the Subpoena is reasonable and not unduly burdensome. A "district court is authorized to impose reasonable conditions and restrictions with respect to the production of . . . subpoenaed material if the demand is unduly burdensome." *FTC v. Texaco, Inc.*, 555 F.2d 862, 881 (D.C. Cir. 1977). A subpoenaed party bears the burden of showing that a request for documents is so burdensome as to be "unreasonable." *Id.* at 882. Even such a subpoena may be modified or conditioned, rather than quashed entirely. *See id.* at 881.

A subpoenaed party claiming a burden is undue faces an uphill climb. "Some burden on subpoenaed parties is to be expected," so "the question is whether the denial is *unduly* burdensome or *unreasonably* broad." *Id.* at 882 (emphasis in original). A subpoenaed party's "burden is not easily met where . . . the agency inquiry is pursuant to a lawful purpose and the requested documents are relevant to that purpose." *Id.* That is so because if an administrative agency is tasked with significant oversight responsibility, its "investigative power must necessarily be

---

[6] *Fed. Open Mkt. Comm. of Fed. Rsrv. Sys. v. Merrill*, 443 U.S. 340 (1979), Obj. at 12, is inapposite. There, the agency tried to apply an exception to a document disclosure statute in a way that would have allowed it withhold almost any document, thus defeating the purpose of the disclosure law. 443 U.S. at 353-54. Nothing like that is occurring here, where WMATA is being ordered to produce documents and information related to rail-worker health and safety. That is fully consistent with the WMSC's authority under MAP-21 and the Compact.

broad." *U.S. Commodities Futures Trading Comm'n v. Ekasala*, 62 F. Supp. 3d 88, 93 (D.D.C. 2014). And an agency with a broad mandate is entitled to "extreme breadth in conducting its investigation." *Linde Thomson Langworth Kohn & Van Dyke, P.C. v. Resolution Tr. Corp.*, 5 F.3d 1508, 1517 (D.C. Cir. 1993) (internal quotation marks omitted). Courts will therefore only modify burdensome subpoenas if the burden is so great that "compliance threatens to unduly disrupt or seriously hinder normal operations of a business." *Texaco*, 555 F.2d at 882.

WMATA does not and cannot contend that compliance with the Subpoena would seriously hinder WMATA's ability to safely provide its transportation services. WMATA makes a single specific reference to a claimed burden imposed by the Subpoena, asserting that "responding to the disputed demands in the Subpoena would take about 3,000 working hours." Obj. at 25. But that figure appears to be mere speculation. It is unsupported by any calculation or explanation, and is grossly disproportional to the 1200-hour figure cited before the Magistrate Judge as evidence of the purported burden the WMSC has historically imposed. Decl. of Theresa M. Impastato, ECF 6-1, at 6.

The absence of any supporting explanation is particularly notable given the Magistrate Judge's findings regarding the deficiencies in WMATA's original submissions. The Magistrate Judge specifically found that the requests in the Subpoena are noncomplex because they ask for existing policies and related documents and "require[] collection and production of data of the type routinely collected and maintained by businesses pursuant to their legal reporting obligations to governmental agencies such as OSHA." Order at 8–9 (cleaned up) (quoting *U.S. EEOC v. AAM Holding Corp.*, 736 F. Supp. 3d 186, 191 (S.D.N.Y. 2024)). WMATA does not offer any explanation of why "[c]ompiling this standard data . . . [that] is exactly the type of data that [WMATA is] otherwise periodically required to compile and report," and that WMATA itself has

called duplicative, Order at 9, would take a single employee approximately a year and a half. WMATA does not even identify a particular request that it believes will cause it such a burden, despite the Magistrate Judge describing "many of the requests" as not "particularly complex." Order at 8–9. WMATA's vague assertion without explanation cannot support a claim of undue burden. *AAM Holding Corp.*, 736 F. Supp. 3d at 192.

Nor is WMATA's claim that responding to the Subpoena requires 3000 hours of labor plausible. A typical audit lasts six months from the initiation of the audit to the publication of the final report. For the audit to require 3000 hours of labor, three WMATA staff members would have to work on a single audit exclusively for six months. And if WMATA intends to refer to document requests specifically—as it must, if it is attempting to make a claim about the Subpoena—the claim is even less plausible. WMATA has 30 days to respond to document requests from the WMSC. Program Standard § 5(E)(1). While WMATA has, at times, requested extensions, it usually requests an additional 7-10 days. Assuming an employee works an 8-hour day, 5 days per week, WMATA would need at least 12 employees working exclusively on the document requests to hit the 3000-hour mark within even the extended 40-day (or 30-workday) period. WMATA offers no explanation for how it could possibly require such resources.

WMATA's other arguments are similarly insufficient to clear the high bar it faces. First, WMATA repeats the arguments that it fruitlessly advanced before the Magistrate Judge regarding the generalized burden imposed by the WMSC as an organization, Obj. at 24–25, but those arguments do not address the problem identified by the Magistrate Judge, namely that other audits have no bearing on whether a particular request in the Subpoena is burdensome, Order at 8. This Court's decision in enforcing the Subpoena must rest on whether compliance with the Subpoena would be so burdensome that it would unduly disrupt WMATA's business operations, not on

whether compliance with any other document request may do so. WMATA has failed to demonstrate that it faces such a burden despite having had multiple opportunities to do so, including before the Magistrate Judge and during collaborative discussions with the WMSC.[7]

Faced with an inability to support an argument based on the particulars of the Subpoena, WMATA argues without support that the Subpoena must be understood in context of other demands from the WMSC. Obj. at 25–26. WMATA further speculates baselessly that WMATA will assert itself into additional regulatory domains. Obj. at 26–27. But, again, those additional purported assertions of authority are not in dispute currently: only the Subpoena is. WMATA will have an opportunity to identify burdens from future document requests when the WMSC makes those requests.

## CONCLUSION

This Court should adopt the findings of the Magistrate Judge and issue an order enforcing the Subpoena.

Dated:  January 14, 2026

By: ___/s/ W. Eric Pilsk_____
W. Eric Pilsk (DC Bar No. 419901)
Charles A. Spitulnik
KAPLAN KIRSCH LLP
1634 I (Eye) Street, NW, Suite 300
Washington, DC  20006
Phone: (202) 955-5600
Facsimile: (202) 955-5616

Grant M. Glovin
KAPLAN KIRSCH LLP
1500 Broadway, Suite 1605
New York, NY 10036
Phone: (646) 883-5110

ATTORNEYS FOR THE WASHINGTON
METRORAIL SAFETY COMMISSION

---

[7] Indeed, the WMSC refined other, undisputed document requests in response to WMATA's concerns. *See* Reply at 14.

20

## CERTIFICATE OF SERVICE

I hereby certify that I have, on the 14th of January 2026, caused a copy of the foregoing WASHINGTON METRORAIL SAFETY COMMISSION'S RESPONSE TO THE WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY'S OBJECTIONS TO THE MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDATIONS to be served upon all parties of record in this proceeding by the Court's electronic filing system.

/s/  *W. Eric Pilsk*
W. Eric Pilsk

Dated: January 14, 2026