**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WASHINGTON METRORAIL SAFETY COMMISSION,<br><br>*Petitioner*,<br><br>v.<br><br>WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,<br><br>*Respondent*. | Miscellaneous Action No. 24 - 144 (LLA) |

**MEMORANDUM OPINION**

Petitioner Washington Metrorail Safety Commission (the "WMSC" or "Commission") seeks an order enforcing a subpoena it issued to Respondent Washington Metropolitan Transit Authority ("WMATA"). ECF No. 1. After the court referred the case for random assignment to a magistrate judge, ECF No. 8, Magistrate Judge Zia M. Faruqui issued an order in December 2025 granting the Commission's petition to enforce the subpoena, ECF No. 9. The parties and the court agree that the Magistrate Judge's order should be construed as a report and recommendation ("R&R"). WMATA has filed objections to the R&R, ECF No. 11, which are fully briefed, ECF Nos. 11, 15, 16. For the reasons discussed below, the court will overrule WMATA's objections.

## I. BACKGROUND

Neither party objects to the facts set forth in the background section of the Magistrate Judge's order, so the court will adopt those findings. *See Interstate Fire & Cas. Co. v. Wash. Hosp. Ctr. Corp.*, 917 F. Supp. 2d 87, 89 (D.D.C. 2013) (construing the magistrate judge's

memorandum opinion as an R&R and adopting the factual findings in the opinion's background section). The court further summarizes the relevant facts below.

### A. The Commission's Authority Over WMATA

The District of Columbia, Maryland, and Virginia created WMATA to "plan, develop, finance, and . . . operate[]" a comprehensive mass transit system for the Washington, D.C. metropolitan area. Pub. L. No. 89-774, § 2, 80 Stat. 1324, 1325 (1967). Today, WMATA is comprised of Metrorail, a rail-operated public transportation system; Metrobus, a fixed-route bus service; MetroAccess, a door-to-door shared-ride "paratransit service[]"; and the Metro Transit Police Department. ECF No. 6, at 1-2.

In the Moving Ahead for Progress in the 21st Century Act of 2012, Pub. L. No. 112-141, 126 Stat. 405 (the "Act"), Congress directed public transit systems like WMATA, which receive certain federal funds, to each establish a "comprehensive agency safety plan" containing safety targets and requirements, including "strategies to minimize the exposure of the public, personnel, and property to hazards and unsafe conditions, and consistent with guidelines of the Centers for Disease Control and Prevention or a State health authority, minimize exposure to infectious diseases," 49 U.S.C. § 5329(d)(1)(D); *see id.* § 5329(d)(1)(A)-(H). The Act also requires funding-eligible states—or in WMATA's case, the District, Maryland, and Virginia, collectively—to create a "State safety oversight program" that "assumes responsibility for overseeing rail fixed guideway public transportation safety," 49 U.S.C. § 5329(e)(3)(A); "adopts

and enforces Federal and relevant State laws on rail fixed guideway public transportation safety," *id.* § 5329(e)(3)(B); and "establishes a State safety oversight agency," *id.* § 5329(e)(3)(C).[1]

The District, Maryland, and Virginia subsequently entered into the Washington Metrorail Safety Commission Interstate Compact, Pub. L. No. 115-54, 131 Stat. 1093 (2017) (the "Compact"), which designates the Commission as the "safety oversight agency" for WMATA's Metrorail system,[2] ECF No. 1 ¶¶ 10-11; ECF No. 6, at 4, 17; *see State Safety Oversight Contacts*, Fed. Transit Admin.[3] The scope of the Commission's oversight power is governed by Section 5329 and the Compact. The Commission has "exclusive safety oversight authority and responsibility over the WMATA Rail System pursuant to federal law." § 3(a), 131 Stat. at 1095. Put differently, the Commission is vested with "investigative, inspection, and enforcement authority with respect to the safety of [WMATA's] rail fixed guideway public transportation system[]"—that is, Metrorail. 49 U.S.C. § 5329(e)(4)(A)(v).[4] Likewise, the Commission is

---

[1] Because WMATA operates in the District, Maryland, and Virginia, all three must "[d]esignate a single entity" to "serve" as the state safety oversight agency. 49 C.F.R. § 674.15(b).

[2] Before Congress passed the Act in 2012, the Tri-State Oversight Committee ("TOC") had authority to "review" and "monitor" WMATA's "safety program plan." 49 U.S.C. § 5330(c) (2006); *FTA Safety Oversight of the Washington Metropolitan Area Transit Authority (WMATA) Metrorail System*, Fed. Transit Admin., https://perma.cc/8Z4J-7M7Q (hereinafter "FTA Safety Oversight"); *Tri-State Oversight Committee*, Md. Manual Online, https://perma.cc/83SB-3ML8. The TOC then served as WMATA's oversight safety agency until October 2015, when the U.S. Secretary for Transportation directed the Federal Transit Administration to assume temporary oversight authority over WMATA. FTA Safety Oversight, *supra*; *see* 49 U.S.C. § 5329(e)(8) (allowing the Secretary of Transportation to temporarily administer a safety oversight program if the Secretary determines that the program fails to meet certain standards). The Federal Transit Administration later ceded control of Metrorail's safety oversight to the Commission. ECF No. 6, at 4.

[3] *Available at* https://perma.cc/9Z23-EXPB.

[4] A "'fixed guideway'" is a "public transportation facility" (A) "using and occupying a separate right-of-way for the exclusive use of public transportation"; (B) "using rail"; (C) "using a fixed catenary system"; (D) "for a passenger ferry system"; or (E) "for a bus rapid transit system." 49 U.S.C. § 5302(8).

empowered to "review, approve, oversee, and enforce [WMATA's] implementation" of the safety plan as it applies to Metrorail. *Id.* § 5329(e)(4)(A)(iv); *see* §§ 3(c), 30(b), 131 Stat. at 1095, 1098. As WMATA's safety oversight agency, the Commission must also "audit[], at least once triennially, the compliance of [WMATA's] rail fixed guideway transportation system[] . . . with the . . . agency safety plan." 49 U.S.C. § 5329(e)(4)(A)(vi); *see* § 30(e), 131 Stat. at 1098.

In performing its duties, the Commission may "[i]nvestigate hazards, incidents, and accidents on the WMATA Rail System," § 3(d), 131 Stat. at 1095, and may "[c]onduct . . . inspections, investigations, examinations, and testing of WMATA personnel and contractors, property, equipment, facilities, rolling stock, and operations of the WMATA Rail System, including, without limitation, electronic information and databases through reasonable means," *id.* § 31(a), 131 Stat. at 1098. The Compact empowers the Commission to issue subpoenas as part of its investigations, *id.*, and this court has jurisdiction to hear actions brought by the Commission to enforce subpoenas issued pursuant to the Compact, *id.* § 48, 131 Stat. at 1101.

### B. The Commission's Subpoena

In October 2023, WMATA provided the Commission with a report indicating the presence of lead dust in several cabinets—located in at least one Metrorail station—that were used to store emergency medical equipment. ECF No. 1 ¶ 17; *see* ECF No. 1-3, at 20-21. In response, the Commission added a "specific focus on workplace safety" to its upcoming triennial audit of WMATA's "fitness for duty programs." ECF No. 1 ¶ 19. The parties corresponded over several months as the Commission asked lead-related follow-up questions and WMATA generally supplied the requested information. *See id.*; ECF No. 1-3, at 4-20.

In February 2024, the Commission provided WMATA with written notice of a "safety audit of WMATA's fitness for duty and occupational health programs." ECF No. 1 ¶ 20 (quoting

ECF No. 1-4, at 1). The notice indicated that the Commission was conducting its safety audit pursuant to 49 C.F.R. part 674—the federal regulations for state safety oversight pursuant to Section 5329. ECF No. 1-4, at 1; *see, e.g.*, 49 C.F.R. § 674.31 (requiring state safety oversight agencies to conduct triennial audits as required by Section 5329(e)(4)(A)(vi)). The fitness for duty portion of the audit addressed the "mitigation of hazards related to an individual's physical and mental condition," whereas the occupational health inquiry focused on the "mitigation of hazards related to workplace conditions." ECF No. 1-4, at 1. The Commission stated that it would "conduct field observations in or around the WMATA Rail System," interview relevant individuals, and review records. *Id.* The written notice expressly exempted "alternate exit routes, emergency action plans, and fire prevention plans" from the scope of the occupational health audit "to prevent confusion regarding regulations set by the federal Occupational Safety and Health Administration" ("OSHA"). *Id.* at 2 n.2.

Along with notice of the audit, the Commission sent WMATA a request for twenty-eight categories of documents and information concerning "employee fitness, occupational health, training, various bodily and environmental safety programs, drug and alcohol testing, and exposure to hazardous substances," ECF No. 1 ¶ 22; *see* ECF No. 1-5, and requested a response by March 11, 2024, ECF No. 1 ¶ 23. Days before the deadline to respond, WMATA informed the Commission that the occupational health portion of the audit exceeded the Commission's authority, duplicated existing oversight by other state and federal agencies, and risked subjecting WMATA to inconsistent regulatory requirements. ECF No. 1-6, at 2-3. WMATA also maintained that compliance would be overly burdensome. *Id.* at 2.

In April 2024, the Commission served WMATA with an administrative subpoena demanding responses to the twenty-eight requests for documents and information. *See* ECF No. 1

¶ 29 ("The Subpoena does not expand the scope of the Initial Request."); *see also* ECF No. 1-9.[5] WMATA sent the Commission general and request-specific objections to the subpoena, *id.*, and the Commission responded to WMATA's concerns, ECF No. 1-10. By June 2024, WMATA had produced "only a few documents" in response to the subpoena and had "left many requests unaddressed." ECF No. 1 ¶ 32. The parties conferred for several months to resolve the disagreements; as a result, WMATA has now provided "acceptable initial responses to fitness for duty requests and most drug and alcohol program-related requests,"[6] but it "refuse[s] to produce information in response to the requests regarding workplace health." *Id.* ¶ 34. Still outstanding are requests 2(b), 3, 22, and 24 through 28, and the parts of requests 11, 12, and 23 that concern occupational health. *Id.* Those requests concern the following information:

- Request 2(b): "All policies and procedures (Metrorail-wide, departmental, organizational unit level and all documents from policy instructions down to work instructions) related to . . . [o]ccupational health programs."
- Request 3: "[C]urrent program documents including any governing documents and procedures (Metrorail-wide, departmental, organizational unit level and all documents from policy instructions down to work instructions)" for various programs.[7]

---

[5] Inexplicably, the parties have not provided the court with a copy of the subpoena at issue, so the court has relied on WMATA's objections to the subpoena and the Commission's responses in order to understand the subpoena's scope. *See* ECF No. 1-9 (WMATA's objections); ECF No. 1-10 (the Commission's responses).

[6] The "acceptable" responses covered requests 1, 2(a), 4 through 10, 14 (although not in the Commission's preferred format), 15 through 21, and parts of requests 11, 12, and 23. ECF No. 1 ¶ 34.

[7] This request included documents covering (a) walking-working surfaces like "[l]adder [s]afety, stairways, platforms, manlifts, scaffolding, [and] protection from falling objects"; (b) environmental control, including "ventilation, noise exposure . . . , and nonionizing radiation"; (c) hazardous materials like "compressed gases, petroleum gases, hazardous chemicals, and hazardous waste"; (d) personal protective equipment; (e) general environmental controls, including "safety color codes for marking physical hazards, specifications for accident prevention

(*continued on next page*)

- Request 11: "All training requirements related to . . . occupational health programs."

- Request 12: "All training curricula, trainings, class schedules, and exams related to . . . occupational health programs."

- Request 22: "All existing data reports/trend data related to dosimetry testing, indoor air quality, toxic and hazardous substances, [j]ob hazard analyses, PPE usage, training overdue for health and safety programs, [and] employee safety concerns for the period January 1, 2021 through December 31, 2023."

- Request 23: "[A]ll . . . occupational health reporting requirements required by the federal government, the District of Columbia, Maryland, and Virginia."

- Request 24: "All occupational health inspection reports that relate to the WMATA Rail System from the federal Occupational Safety and Health Administration, [and] the occupational health agencies from the District of Columbia, Maryland, and Virginia for the period January 1, 2022 through January 31, 2024."

- Request 25: "All medical monitoring results for welders and other employees who engage in hot work from January 1, 2021 through December 31, 2023."

- Request 26: "All noise and dosimetry test schedules and results from January 1, 2021 through December 31, 2023"; "[a]ll documents confirming that audible or hearing tests are undertaken for personnel working in areas above WMATA's time-weighted average for noise levels"; and "[a]ll medical monitoring results for employees exposed to an 8-hour time-weighted average (TWA) noise level of 85 decibels (dBs) or above or per the thresholds in WMATA's hearing conservation program."

- Request 27: "All exposure reports for air and surface monitoring regarding specific substances including without limitation, silica, asbestos, hexavalent chromium, lead, or any other toxic or hazardous substances from January 1, 2021 through December 31, 2023."

---

and tags, permit-required confined spaces, and control of hazardous energy"; (f) medical and first aid; (g) materials handling and storage like "powered industrial trucks, overhead and gantry cranes, crawler locomotive and truck cranes, and slings"; (h) machinery and machine guarding for "woodworking or metal machinery, abrasive wheel machinery, forging machines, and mechanical power-transmission apparatuses" like "mechanical and hydraulic power presses"; (i) hard and portable powered tools and hand-held equipment guarding; (j) any type of welding; (k) electrical safety, including "wiring design protection, specific purpose equipment and installations, hazardous (classified) locations, third rail safety on the right-of-way, and safety-related work practices"; and (l) various toxic and hazardous substances, including asbestos, carcinogens, benzene, and bloodborne pathogens, among others. ECF No. 1-5 ¶ 3.

- Request 28: "All exposure reports from bloodborne pathogens and associated medical monitoring results from January 1, 2021 through December 31, 2023."

ECF No. 1-5 ¶¶ 2(b), 3, 11-12, 22-28 (footnote omitted).

## II. PROCEDURAL HISTORY

In October 2024, the Commission filed a petition seeking an order enforcing the subpoena. ECF No. 1. After briefing, ECF Nos. 1, 6, 7, the court referred the matter to a magistrate judge in December 2024 for full case management, ECF No. 8. In December 2025, the Magistrate Judge issued an order granting the petition. ECF No. 9. He concluded that the Compact authorized the Commission to issue the subpoena because a subpoena targeting WMATA's occupational safety and health ("OSH") practices falls within the Commission's general authority to investigate safety-related risks and hazards on WMATA's Metrorail system. *Id.* at 3-5. In so concluding, he rejected WMATA's argument that only state and federal occupational safety and health agencies may regulate OSH. *Id.* at 5-6. Additionally, the Magistrate Judge concluded that WMATA's compliance with the subpoena would not pose an undue burden. *Id.* at 7-9.

As required by 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 72(b)(2), WMATA filed timely objections to the Magistrate Judge's order, ECF No. 11, which are fully briefed, ECF Nos. 11, 15, 16. Based on the parties' agreement, ECF Nos. 12, 14, the court has stayed WMATA's obligation to respond to the subpoena until the issuance of this opinion, Jan. 8, 2026 Minute Order.

## III. LEGAL STANDARD

"Administrative agencies wield broad power to gather information through the issuance of subpoenas." *Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 688 (D.C. Cir. 2017) (quoting *Resol. Trust Corp. v. Thornton*, 41 F.3d 1539, 1544

(D.C. Cir. 1994)); *see Fed. Trade Comm'n v. Ken Roberts Co.*, 276 F.3d 583, 586 (D.C. Cir. 2001) (noting the "long-standing doctrine that administrative agencies must be given wide latitude in asserting their power to investigate by subpoena"). The federal courts of appeals have therefore "consistently deferred to agency determinations of their own investigative authority" and "generally refused to entertain challenges to agency authority in proceedings to enforce compulsory process." *Ken Roberts Co.*, 276 F.3d at 586 (collecting cases). But the "[s]ubpoena enforcement power is not limitless." *Id.* The court plays a "limited" role, *id.* at 587, to ensure that (1) "the inquiry is within the authority of the agency" and does not "exceed[] an express statutory limitation on the agency's investigative powers"; (2) "the demand is not too indefinite"; and (3) "the information sought is reasonably relevant," *id.* at 586 (internal quotation marks omitted). On the first question, the D.C. Circuit "[has] held that enforcement of an agency's investigative subpoena will be denied only when there is a 'patent lack of jurisdiction' in an agency to regulate or to investigate." *Id.* at 587 (quoting *Civil Aeronautics Board v. Deutsche Lufthansa Aktiengesellschaft*, 591 F.2d 951, 952 (D.C. Cir. 1979), and collecting cases); *see Fed. Trade Comm'n v. CVS Health Corp.*, No. 25-MC-3, 2025 WL 3546175, at *2 (D.D.C. Feb. 24, 2025).

In addition to assessing an agency's authority and the terms of a subpoena, the court must consider whether an entity's compliance with the subpoena would be "unduly burdensome." *Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d at 689; *United States v. Legal Servs. for N.Y.C.*, 249 F.3d 1077, 1084 (D.C. Cir. 2001) (explaining that while "concerns over burden are related to relevance," the two involve distinct inquiries). For unduly burdensome requests, the court may "impose reasonable conditions and restrictions with respect to the production of the subpoenaed material." *Fed. Trade Comm'n v. Texaco, Inc.*, 555 F.2d 882, 881 (D.C. Cir. 1977). The subpoenaed party bears the burden of establishing that compliance is unreasonable. *Id.* at 882.

Some burden is "expected" and will be "necessary" to further the "agency's legitimate inquiry and the public interest"; accordingly, the burden of proving unreasonableness is "not easily met" where the "inquiry is pursuant to a lawful purpose and the requested documents are relevant to that purpose." *Id.* Courts in this Circuit have therefore rejected undue-burden arguments even when "compliance would be extremely costly, labor intensive, and in certain cases, impossible." *CVS Health Corp.*, 2025 WL 3546175, at *3 (quoting *Fed. Trade Comm'n v. Invention Submission Corp.*, No. 89-MC-272, 1991 WL 47104, at *3 (D.D.C. Feb. 14, 1991)); *see Texaco*, 555 F.2d at 882 (explaining that courts "have refused to modify investigative subpoenas unless compliance threatens to unduly disrupt or seriously hinder normal operations of a business").

## IV. DISCUSSION

### A. Standard of Review

The parties first address the legal effect of the Magistrate Judge's order and what standard of review this court should apply. Unless the parties have consented to proceed before a magistrate judge for all purposes, a district judge's review of a magistrate judge's decision takes one of two forms. If the issue is "dispositive of a claim," the magistrate judge must make "proposed findings of fact" and "enter" an R&R. Fed. R. Civ. P. 72(b)(1); *see* 28 U.S.C. § 636(b)(1)(B)-(C); *see also* Local Civ. R. 72.3. The district court must then "determine de novo any part of the magistrate judge's disposition" subject to an objection and "accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); *see* 28 U.S.C. § 636(b)(1)(B)-(C); *see also* Local Civ. R. 72.3(c). In contrast, for non-dispositive matters, the magistrate judge "issue[s] a written order stating the decision," which the district court, upon objection by a party, may modify or set aside

only to the extent that it is "clearly erroneous" or "contrary to law." Fed. R. Civ. P. 72(a); *see* 28 U.S.C. § 636(b)(1)(A); *see also* Local Civ. R. 72.2.

The statute governing the jurisdiction and authority of magistrate judges sets forth several dispositive matters, including motions to dismiss for failure to state a claim, motions for judgment on the pleadings, and motions for summary judgment, among others. 28 U.S.C. § 636(b)(1)(A). A petition to enforce an administrative subpoena is not on that list. *See id.* While the list "appears to be exhaustive," the Supreme Court "has identified some judicial functions as dispositive notwithstanding" the statute's failure to expressly include them. *Flam v. Flam*, 788 F.3d 1043, 1046 (9th Cir. 2015); *see, e.g.*, *Gomez v. United States*, 490 U.S. 858, 873-74 (1989) (holding that although Congress "did not identify the selection of a jury as either a 'dispositive' matter . . . or a 'nondispositive' pretrial matter . . . jury selection is more akin to those precisely defined, 'dispositive' matters [that require] de novo review"). Courts employ a "functional approach that looks to the effect of the motion" to "determine whether it is properly characterized as dispositive or non-dispositive of a [party's] claim." *ML-CFC 2007-6 P.R. Props., LLC v. BPP Retail Props., LLC*, 951 F.3d 41, 47 (1st Cir. 2020) (quoting *Flam*, 788 F.3d at 1046); *see Vogel v. U.S. Off. Prods. Co.*, 258 F.3d 509, 515 (6th Cir. 2001) ("The list of dispositive motions contained in [Section] 636(b)(1)(A) is nonexhaustive, and unlisted motions that are functionally equivalent to those listed in [Section] 636(b)(1)(A) are also dispositive."). For example, the Sixth Circuit has held that motions for default judgment, for sanctions under Federal Rules of Civil Procedure 11 and 37, and to proceed *in forma pauperis* are all dispositive because they are functionally equivalent to the motions listed in Section 636(b)(1)(A). *Vogel*, 258 F.3d at 515 (collecting cases).

Here, neither party consented to referral to a magistrate judge for all purposes, so the Magistrate Judge lacked authority to issue a binding ruling if the matter was dispositive. *See* ECF

No. 8; *CPC Patent Techs. PTY Ltd. v. Apple, Inc.*, 34 F.4th 801, 807 (9th Cir. 2022) (explaining that "a magistrate judge may not issue binding rulings on case-dispositive matters without the parties' consent"). The issue before the Magistrate Judge here—the Commission's petition to enforce the administrative subpoena—was the sole legal claim in the case. *See* ECF No. 8, at 1; ECF No. 9, at 1 (noting that the court was considering the Commission's petition). Yet the Magistrate Judge granted the petition in full and directed WMATA to produce documents within thirty days. ECF No. 9, at 1, 10. In doing so, he viewed the petition to enforce as a "non-dispositive matter" like a motion to compel discovery and subject to this court's review for clear error or conclusions that are contrary to law. *Id.* at 10 n.4 (quoting *United States v. All Assets Held at Bank Julius*, No. 04-CV-798, 2016 WL 11609892, at *2 (D.D.C. Jan. 12, 2026)).

The court agrees with the parties that the Magistrate Judge's order was dispositive and, pursuant to Section 636(b), Federal Rule of Civil Procedure 72, and Local Civil Rules 72.2 and 72.3, should be construed as an R&R. *See* ECF No. 11, at 10; ECF No. 15, at 5. Whereas a motion to compel discovery involves a discrete dispute that is "part of a larger case," the Commission's petition—which does not arise out of a preexisting enforcement proceeding before the court—is itself the entire pending action. *See Nat'l Lab. Rels. Bd. v. Frazier*, 966 F.2d 812, 817 (3d Cir. 1992) (reversing a district court's determination that a magistrate judge's order enforcing a subpoena was "nondispositive"); *CPC Patent Techs. PTY Ltd.*, 34 F.4th at 808 (concluding that a "freestanding" request to enforce a subpoena under 28 U.S.C. § 1782, "filed on its own and not in conjunction with another federal lawsuit," was dispositive because deciding it resolved the "ultimate" request for relief even if discovery motions are typically non-dispositive (internal quotation marks omitted)); *see also Equal Emp. Opp. Comm'n v. City of Long Branch*,

866 F.3d 93, 100-01 (3d Cir. 2017) (reversing a district court that failed to apply *Frazier* by treating a magistrate judge's order enforcing an agency's administrative subpoena as non-dispositive).

The Magistrate Judge considered the parties' briefing, evaluated WMATA's declaration, determined that the Commission was entitled to enforce its subpoena, and ordered WMATA to comply. Because the validity of the administrative subpoena presents the sole claim for review in this case, the Magistrate Judge's order was dispositive, much like one granting a motion for judgment on the pleadings or for summary judgment. *See* Fed. R. Civ. P. 72(b)(1)(A); Local Civ. R. 72.3(a)(3); *cf. Frazier*, 966 F.2d at 817 (concluding that a magistrate judge's denial of a petition to enforce a subpoena had the same effect as granting a motion to dismiss). Accordingly, the Magistrate Judge's decision functions as an R&R to this court, which triggers this court's de novo review of WMATA's objections. *See Interstate Fire & Cas. Co.*, 917 F. Supp. 2d at 89, 94 (construing the magistrate judge's order as an R&R and "accordingly, review[ing] the portions to which [the party] ha[d] objected under a de novo standard"); *id.* at 89 (concluding that the party objecting to the magistrate judge's decision would "not [be] prejudice[d]" by the court's treatment of the decision as an R&R because it "had the opportunity to lodge its objections . . . and to brief the relevant issues fully"); *see also Fed. Trade Comm'n v. Bisaro*, 757 F. Supp. 2d 1, 2 (D.D.C. 2010) (conducting de novo review of a magistrate judge's R&R recommending that an agency's petition to enforce a subpoena be granted); *Commodity Futures Trading Comm'n v. First State Depository Co.*, No. 21-MC-48, 2021 WL 7448016, at *1 n.1 (D.D.C. June 23, 2021) (concluding that a magistrate judge's R&R "was appropriate" because a petition to enforce a subpoena "is a case-dispositive matter").

### B. Merits

WMATA lodges four objections to the Magistrate Judge's order. The first three concern the Magistrate Judge's conclusion that the administrative subpoena seeks information "within the WMSC's authority." ECF No. 11, at 9. In WMATA's view, the Magistrate Judge incorrectly concluded that the subpoena is consistent with the Commission's (1) "authority over 'safety'"; (2) responsibility to "'audit' WMATA's compliance with its Safety Plan"; and (3) power to "investigate 'hazards.'" *Id.* at 9-10 (quoting ECF No. 9, at 4-5); *see id.* at 12-24; *see also* ECF No. 9, at 4-6. Finally, WMATA contends that the Magistrate Judge erred in determining that its compliance with the subpoena does not pose an undue burden. ECF No. 11, at 10; *see id.* at 24-27; *see also* ECF No. 9, at 7-9. None of WMATA's objections has merit. On de novo review, the court agrees with the Magistrate Judge's "disposition" of the petition: the Commission has authority to issue its subpoena and WMATA has failed to establish that compliance poses an undue burden. Fed. R. Civ. P. 72(b)(3). Accordingly, the court will overrule WMATA's objections.

Before turning to WMATA's specific objections, the court notes that WMATA appears to misunderstand the nature of this dispute. WMATA suggests that this case, including the Magistrate Judge's R&R, implicates the question whether the Commission may conduct "general regulation of workplace health and safety" outside of Metrorail. ECF No. 6, at 17; *see* ECF No. 11, at 15 (arguing that the Commission was not "created . . . to regulate safety generally in whatever form it is implicated" and asserting that the Compact does not "grant[] [the Commission] plenary authority over all aspects of WMATA operations"). WMATA's concerns are somewhat understandable, especially in light of Request 11, seeking "[a]ll training requirements related to . . . occupational health programs," ECF No. 1-5 ¶ 11; Request 12, seeking "[a[ll training curricula, trainings, class schedules, and exams related to . . . occupational health programs," *id.*

¶ 12; and Request 23, seeking "[a]ll . . . occupational health reporting requirements," *id.* ¶ 23—none of which appear to be facially limited to Metrorail. But WMATA's framing is incorrect. The Commission has repeatedly stated that—even as to those facially broader requests—its oversight authority extends only to Metrorail, and not to Metrobus, MetroAccess, or the Metro Transit Police Department. ECF No. 15, at 8 n.1 ("[T]he WMSC's authority . . . encompass[es] Metrorail exclusively, as opposed to the other modes of transportation that WMATA provides."). For that reason, the Commission represents that its subpoena only seeks documents related to Metrorail. *Id.* at 17 (noting that all the subpoenaed documents "relate . . . to Metrorail personnel"); *see, e.g.*, ECF No. 1-5 ¶ 24 (Request 24, seeking all "occupational health inspection reports that *relate to the WMATA Rail System*" (emphasis added) (footnote omitted)). That view is consistent with the Compact, which limits the Commission's "safety regulatory and enforcement authority" to "the WMATA Rail System." § 2, 131 Stat. at 1095. The court therefore understands the contested requests in the subpoena—and the Magistrate Judge's order directing WMATA's compliance with those aspects of the subpoena—to relate only to Metrorail. With that framing, the court turns to WMATA's specific objections.

**1. The Commission's oversight concerning the "safety" of the Metrorail system**

WMATA asserts that the Magistrate Judge erroneously concluded that the Commission has authority to issue the contested portions of the subpoena in an exercise of its general oversight of safety-related issues on the Metrorail system. ECF No. 11, at 9-10, 12-20; *see* ECF No. 9, at 3-4. The court is unpersuaded because the Magistrate Judge correctly determined that the Commission holds broad power to investigate issues implicating Metrorail safety. The Commission's authority stems from multiple sources. First, federal law gives the Commission "investigative, inspection, and enforcement authority with respect to the safety of [the Metrorail

system]." 49 U.S.C. § 5329(e)(4)(A)(v). In turn, the Compact vests the Commission with the power to "enforce relevant federal and State laws and regulations relating to safety of the WMATA Rail System." § 30(d), 131 Stat. at 1098. These two provisions plainly authorize the Commission to investigate and enforce safety-related issues—and to do so, the Commission may issue subpoenas. *Id.* § 31(a), 131 Stat. at 1098. Whether this oversight power includes the OSH-related topics in the subpoena thus turns on the meaning of the term "safety."

The court begins with the text and statutory context of both Section 5329 and the Compact. *See Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 143 F.4th 518, 532 (D.C. Cir. 2025). Neither Section 5329 nor the Compact defines the term "safety," *see* 49 U.S.C. §§ 5302, 5329; 131 Stat. at 1093-1104, so the court interprets the term according to its "ordinary, contemporary, common meaning," *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433-34 (2019) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979) (looking to dictionaries at the time a statute was enacted). The court also considers "the context in which [the term 'safety'] is used." *Solar Energy Indus. Ass'n v. Fed. Energy Regul. Comm'n*, 154 F.4th 863, 868 (D.C. Cir. 2025) (quoting *Reno v. Koray*, 515 U.S. 50, 56 (1995)). At the time Congress passed the Act, the ordinary, common meaning of "safety" referred to the "condition of being safe from undergoing or causing hurt, injury, or loss." *Safety*, Merriam Webster's Collegiate Dictionary 1095 (11th ed. 2011); *see Safety*, American Heritage Dictionary 728 (5th ed. 2012) ("[f]reedom from danger, risk, or injury"); *Safety*, Webster's New World College Dictionary 1279 (5th ed. 2014) ("freedom from danger, injury, or damage"). The same contemporary meaning existed several years later when the District, Maryland, and Virginia formed the Commission. *See Safety*, Merriam-Webster Dictionary 637 (2016) ("freedom from danger"). As these definitions make plain, the meaning of the term "safety" is broad—covering any risk of pain, injury, loss, danger, or damage—and plainly encompasses

OSH as WMATA uses the term. *See* ECF No. 1-2, at 37 (explaining that WMATA's Office of Occupational Safety and Health's "priority is the health, safety, and well-being of Metro's workforce by minimizing injuries and illnesses from exposure to occupational hazards").[8] And "safety" likewise covers the items in the Commission's subpoena because they relate to issues that may cause or mitigate risk, danger, or injury. *See, e.g.*, ECF No. 1-5 ¶ 3 (Request 3, seeking program documents that cover things like scaffolding and cranes, falling objects, ventilation, hazardous chemicals and toxic substances, physical hazards, first aid, machinery and tools, and electrical equipment); *id.* ¶¶ 22, 27 (Requests 22 and 27, seeking reports on air quality, toxic and hazardous substances, and employee safety concerns); *id.* ¶ 25 (Request 25, seeking "medical monitoring results for welders and other employees who engage in hot work"). Accordingly, the Commission's "investigative, inspection, and enforcement authority with respect to the safety of [the Metrorail system]," 49 U.S.C. § 5329(e)(4)(A)(v), and power to "enforce relevant federal and State laws and regulations relating to safety of the WMATA Rail System," § 30(d), 131 Stat. at 1098, allow the Commission to issue and enforce its subpoena.[9]

WMATA reads the Compact to limit "safety" to issues arising out of the physical operation of rail cars on Metrorail tracks—or, in other words, those matters connected to the "rail fixed

---

[8] The citations to ECF No. 1-2 refer to the CM/ECF-generated page numbers at the top of each page rather than any internal pagination.

[9] WMATA also points out that Commission members must have "backgrounds in transit safety, transportation, [or] relevant engineering disciplines," expertise that WMATA asserts does not overlap with OSH issues. ECF No. 11, at 5 (alteration in original) (quoting § 9, 131 Stat. at 1096)). In WMATA's view, that requirement proves that the Commission lacks oversight over anything related to OSH. *Id.* at 15-16. But even if the Compact's employment qualifications could upend its plain text giving the Commission authority over Metrorail safety—and it cannot—WMATA's argument is unpersuasive because it is circular: the Commission members' "rail-focused expertise" bears no connection to "OSH issues" *only if* "transit safety" does not encompass some OSH principles, which is the very conclusion WMATA seeks to prove. *Id.*

guideway public transportation" system. ECF No. 11, at 15. Not so. The Compact contemplates that the Commission will conduct oversight of anything relating to the safety of the "the rail fixed guideway public transportation system *and all other* real and personal property owned, leased, operated, or otherwise used by WMATA rail services and shall include WMATA rail projects under design or construction by owners other than WMATA." § 1(m), 131 Stat. at 1094 (emphasis added) (defining "WMATA Rail System" or "Metrorail"). While WMATA only focuses on the first portion of that definition, the second half sweeps much broader and gives the Commission authority over anything that poses a risk of pain, injury, loss, danger, or damage on or to Metrorail-related property or projects. And the Commission, when exercising its oversight power, may investigate "WMATA personnel and contractors, property, equipment, facilities, rolling stock, and operations of the WMATA Rail System." *Id.* § 31(a), 131 Stat. at 1098. Together, the various overlapping provisions in the Compact support an interpretation of "safety" oversight that authorizes the portions of the subpoena that WMATA finds objectionable. For example, WMATA contends that "lead-exposure issues" on the Metrorail have no bearing on "fixed-rail safety." ECF No. 11, at 5; *see* ECF No. 1-5 ¶ 27. But lead exposure at a Metrorail station undeniably poses a risk of danger and injury to those on the "rail fixed guideway public transportation system." § 1(m), 131 Stat. at 1094. Likewise, documents concerning ladder safety, scaffolding, and protection from falling objects, ECF No. 1-5 ¶ 3(a), plainly address potential injury or damage to WMATA employees and contractors on "WMATA rail projects under design or construction" and to WMATA's "real and personal property." § 1(m), 131 Stat. at 1094. Because Section 5329 and the Compact use "safety" in the broad way the word is ordinarily used, and because the Commission's subpoena conforms to that definition, the court rejects WMATA's cramped reading.

WMATA next argues that OSH issues fall outside the Commission's ambit because the Compact "grant[s] [the Commission] '*exclusive* safety oversight authority and responsibility over the WMATA Rail System.'" ECF No. 11, at 16 (quoting § 3(a), 131 Stat. at 1095); *see* ECF No. 9, at 5-6. As the argument goes, because the Commission exercises *exclusive* authority, and because state and federal OSH-specific agencies (like OSHA) regulate occupational safety and health, the Commission cannot oversee OSH at all because it would necessarily share that responsibility with other agencies. ECF No. 11, at 16-17. The court reads the Compact, and its relation to Section 5329, differently. While it is true that the Commission has "exclusive safety oversight authority" under the Compact, § 3(a), 131 Stat. at 1095, that exclusivity concerns only the Commission's role as the "safety oversight authority for WMATA under 49 U.S.C. § 5329," *id.* § 2, 131 Stat. at 1095. Section 5329 requires the District, Maryland, and Virginia to establish *one* safety oversight agency for Metrorail. *See* 49 U.S.C. § 5329(e)(3)(C) (requiring each state to create a "safety oversight program" that, in turn must "establish[] a State safety oversight agency"); *id.* § 5329(e)(5)(B) (requiring all states in which one rail transit system operates to "designate *an* entity" that establishes a safety oversight agency (emphasis added)).[10] Whereas Section 5329's use of the singular "agency" when describing a rail system's safety oversight body naturally

---

[10] It makes no difference that Section 5329 refers to the "safety oversight *agency*" and the Compact refers to the Commission as the exclusive "safety oversight *authority*." *Compare* 49 U.S.C. § 5329(e)(3)(C) ("agency"), *with* §§ 2, 3(a), 131 Stat. at 1095 ("authority"). The text of the Compact makes clear that the Commission serves as the safety oversight agency in the manner contemplated by Section 5329. *See, e.g.*, § 10, 131 Stat. at 1096 (requiring Commission members to be independent as required by 49 U.S.C. § 5329(e)(4)(A)(i)); *id.* § 30(a), 131 Stat. at 1098 (requiring the Commission to adopt and distribute a "State Safety Oversight Program," as required under 49 U.S.C. § 5329(e)(3)); *id.* § 30(e), 131 Stat. at 1098 (directing the Commission to audit WMATA's compliance with the safety plan every three years as required by 49 U.S.C. § 5329(e)(4)(A)(vi)). WMATA does not contend that the Commission operates as anything other than WMATA's state safety oversight agency.

accounts for the Commission's "exclusive" role, nothing in the Compact prohibits other entities from conducting their own lawful oversight.

WMATA's position—that the Commission alone has jurisdiction "over rail-related safety issues," ECF No. 11, at 17—also cannot be squared with Section 5329, which allows the Department of Transportation to oversee WMATA's safety even though the Commission is primarily responsible for doing so. In carrying out Section 5329, the Secretary of Transportation may inspect, investigate, audit, and test WMATA's "equipment, facilities, rolling stock, and operations of the public transportation system," 49 U.S.C. § 5329(f)(1); investigate "a pattern or practice of conduct that negatively affects public safety," *id.* § 5329(f)(3); and investigate "public transportation accidents and incidents," *id.* § 5329(f)(5). The Secretary of Transportation can also take enforcement action against WMATA, including by "requiring" it to spend federal funds on "correcting safety deficiencies" the Secretary has identified. *Id.* § 5329(g)(1)(D). WMATA's argument also blinks reality: as WMATA's own safety plan explains, the Department of Transportation is not alone in exercising concurrent oversight over some rail-safety issues—the National Transportation Safety Board also conducts "hazard analysis," ECF No. 1-2, at 32, and "issue[s] findings requir[ing] Metro to develop suitable [Corrective Action Plans]," *id.* at 45. At bottom, the Commission exclusively performs only the role created by the Act and codified at Section 5329(e)(4)(A), and the Compact does not purport to deprive other state and federal agencies of their regulatory authority.[11] The court therefore overrules WMATA's first objection.

---

[11] Indeed, Request 23, in which the Commission seeks "occupational health reporting requirements required by the federal government, the District of Columbia, Maryland, and Virginia," ECF No. 1-5 ¶ 23, reflects the Commission's own understanding that it exercises concurrent authority over OSH-related issues.

### 2. The Commission's power to audit for compliance with WMATA's Safety Plan

WMATA next objects to the Magistrate Judge's conclusion that the Commission may enforce its subpoena as an exercise of its power "to audit WMATA's compliance with th[e] Safety Plan, including the OSH provisions." ECF No. 9, at 5; *see* ECF No. 11, at 23-24. The court disagrees and will overrule the objection because the Magistrate Judge correctly decided that the audit-related provisions "further cement[] that OSH oversight is squarely within [the Commission's] responsibilities." ECF No. 9, at 5.

The Commission's power to investigate WMATA's compliance with WMATA's safety plan—including by issuing subpoenas—again derives from Section 5329 and the Compact. Pursuant to Section 5329(d) and the Compact, the Commission must audit Metrorail's compliance with the agency safety plan that WMATA's Department of Safety is required to develop. 49 U.S.C. § 5329(d)(1), (e)(4)(A)(vi); § 30(e), 131 Stat. at 1098; *see* ECF No. 1-2, at 8 (indicating that WMATA creates its safety plan to comply with the Federal Transit Administration's ("FTA") regulations implementing 49 U.S.C. § 5329). The plain text of Section 5329(d) and the Compact direct the Commission to audit—and issue subpoenas concerning—any provision in WMATA's safety plan that affects Metrorail. *See* 49 U.S.C. § 5329(e)(4)(A)(vi); § 30(e), 131 Stat. at 1098. And both do so without creating exceptions for OSH. Accordingly, as long as the safety plan contains OSH principles, those principles apply to Metrorail, and the subpoena demands information related to those principles, the subpoena is a proper exercise of the Commission's audit power.[12]

---

[12] Section 5329's requirement that each "State safety oversight program" conduct an audit of the "rail fixed guideway public transportation" system's "compliance" with "the public transportation agency safety plan," 49 U.S.C. § 5329(e)(4)(A)(vi), is a "federal . . . law[] . . . relating to [the]

(*continued on next page*)

Section 5329(d) neither directs nor prohibits WMATA from including OSH requirements in the safety plan. *See* 49 U.S.C. § 5329(d)(1). Here, WMATA has exercised its discretion to adopt a safety plan incorporating OSH principles—a point WMATA has effectively conceded. *See* ECF No. 16, at 11 (arguing only that the Commission lacks authority to audit OSH "by virtue of WMATA's inclusion of OSH issues in th[e] safety plan"). The plan adopts a Safety Management System ("SMS") philosophy and approach to safety management. ECF No. 1-2, at 8, 17. "SMS is a formal, organization-wide approach to managing safety risk and assuring the effectiveness of a transit agency's safety risk mitigation." Fed. Transit Admin., U.S. Dep't of Transp., National Public Transportation Safety Plan: Version 2, at 16 (2024).[13] WMATA's safety plan explicitly applies to Metrorail, *see* ECF No. 1-2, at 8, and various provisions illustrate why the subpoena is within the Commission's power to investigate Metrorail's compliance with that document.

First, the plan clarifies that the OSH team is part of WMATA's Department of Safety. *Id.* at 24-25. And the plan documents how multiple departments, including the Department of Safety, conduct safety trainings on a wide range of topics: first aid skills for station managers; safe use of substances for maintenance and support personnel who access chemical and hazardous materials; and awareness of bloodborne pathogens for those who may be exposed to blood or infectious materials as part of their employment. *Id.* at 47. The Department of Safety also has trainings on asbestos, aerial lifts, cranes, electrical safety, fall protection, hearing conservation, PPE, powered

---

safety of the WMATA Rail System," § 30(d), 131 Stat. at 1098. For that reason, and the reasons already explained, the subpoena is a proper exercise of the Commission's oversight authority. *See supra* Section IV.B.1. Here, the court considers WMATA's distinct objection that the audit provision in the Compact does not empower the Commission to issue and enforce its subpoena.

[13] *Available at* https://perma.cc/RTM2-GY3X.

work platforms, and more. *Id.* at 48-49. These safety training requirements map on to the Commission's requests for occupational health training requirements and related materials. ECF No. 1-5 ¶¶ 11-12 (Requests 11 and 12).

Second, the OSH team focuses on "minimizing [employees'] injuries and illnesses from exposure to occupational hazards" and "designing solutions and workplace practices to mitigate" any "workplace hazardous conditions." ECF No. 1-2, at 37. The Department of Safety's Operations Safety Oversight team "oversee[s] safety in Metro construction projects," while the Safety Certification and Engineer team "develops and implements Metro's Safety and Security Certification Program Plan, ensuring hazards are mitigated . . . to reduce safety risks and prevent incidents." *Id.* at 24. The Environmental Management and Compliance Team "set[s] the standards for the correct handling and disposal of hazardous materials" and "provide[s] services to effectively manage and minimize pollution." *Id.* at 25. And the plan further directs WMATA's departments to "identify, collect[,] and analyze the data required to measure the effectiveness of the actions taken to reduce their safety risks as low as reasonably practicable." *Id.* at 43. These measures, coupled with the plan's focus on data collection to encourage risk minimization, demonstrate that Requests 3, 22, 25, 26, 27, and 28—which seek documents related to construction, machinery, hazardous materials, toxic substances, air quality, PPE usage, decibel exposure, and employee safety concerning Metrorail—are justified by the Commission's audit authority. *See* ECF No. 1-5 ¶¶ 3, 22, 25-28.

Not only does WMATA concede that its comprehensive safety plan contains provisions related to OSH, *see* ECF No. 16, at 11, it never argues that including OSH principles in the plan was unlawful or otherwise improper. Nor could it. WMATA's systemwide approach to risk management is endorsed by the FTA as a best practice that is consistent with Section 5329 *and*

designed to give WMATA flexibility to identify and mitigate all WMATA-specific safety risks. Indeed, in its first rule implementing the Act and addressing state safety oversight, the FTA explained that SMS is preferred because it "is flexible," "does not impose a one-size-fits-all methodology," and allows a "transit agency to identify its own safety risks" for risk management. State Safety Oversight, 81 Fed. Reg. 14230, 14232-33 (Mar. 16, 2026) (codified at 49 C.F.R. § 674.5 (2016)); *cf. id.* at 14243 (noting that state oversight safety agencies "must make determinations based on their own expertise and authority" when ensuring that a transit agency complies with federal regulations). Consistent with that view, WMATA has identified OSH issues that implicate safety concerns across WMATA's platform. Because WMATA includes OSH standards in its safety plan and those standards apply to Metrorail, the Commission is allowed to audit Metrorail's compliance with the plan, including by issuing subpoenas associated with WMATA's rail personnel, property, equipment, facilities, and operations. 49 U.S.C. § 5329(e)(4)(A)(iv); § 31(a), 131 Stat. at 1098.

What is more, the FTA *encourages* transit systems like WMATA to include certain OSH-related matters in their safety plans—several of which are directly targeted by the Commission's subpoena. The FTA is responsible for setting forth a national public transportation safety plan, 49 U.S.C. § 5329(b)(1), and the current iteration of the national plan includes "voluntary safety standards and recommended practices" that the FTA "strongly encourages transit agencies . . . [to] incorporate . . . into *their* operations and maintenance," National Public Transportation Safety Plan, *supra*, at 16 (emphasis added). One category of voluntary standards that the FTA encourages transit systems to adopt concerns rail transit worker protection. *Id.* at 19-20. Among those worker protection standards are recommendations that rail systems adopt safety requirements for PPE use in work zones, fall protection, electrical and power protections,

fire prevention measures, use of tools and equipment, and first aid and medical assistance, among others. *See id.* at 20; Am. Pub. Transp. Ass'n, No. APTA-RT-OP-S-004-03, Rev. 3, Work Zone Safety Practices, at 2-3 (2023).[14] Another category of FTA-recommended voluntary standards addresses tunnel ventilation and fire safety. National Public Transportation Safety Plan, *supra*, at 17. These voluntary safety standards meaningfully overlap with WMATA's safety plan. *See* ECF No. 1-2, at 36 (noting that "Personal Protective Equipment" is a criterion for safety risk mitigation); *id.* at 48-49 (identifying "required [safety] training" for employees, including "Fall Protection" and "Electrical Safety," among others). Additionally, these rail safety components from the voluntary standards, as reflected in WMATA's safety plan, are integral to the Commission's subpoena. *See* ECF No. 1-5 ¶ 3(a) (Request 3(a), seeking documents about fall protection); *id.* ¶ 3(b) (Request 3(b), seeking documents about "ventilation, noise exposure . . . , and nonionizing radiation"); *id.* ¶¶ 3(d), 22 (Requests 3(d) and 22, seeking documents and reports about PPE); *id.* ¶ 3(f) (Request 3(f), seeking documents related to "medical services and first aid"); *id.* ¶ 3(h)-(j) (Requests 3(h) through 3(j), seeking documents about machinery and equipment); *id.* ¶ 25 (Request 25, seeking "medical monitoring results for welders and other employees who engage in hot work"). Notwithstanding WMATA's effort to distance its own safety plan from Metrorail's operations by insisting on a narrow interpretation of "safety," the plan's incorporation of OSH principles into safety management reflects the FTA's preference for how rail transit systems *should* be mitigating rail-related safety risks.

Against the plain text of Section 5329 and the Compact, the FTA's preference for SMS safety-mitigation practices that reflect a jurisdiction's needs, and the FTA's encouragement that

[14] *Available at* https://perma.cc/X3ZW-YNNY.

transit systems include OSH principles in their safety plans, WMATA nevertheless insists that the Commission's mandate to audit Metrorail's compliance with the plan does not permit the subpoena. ECF No. 11, at 23-24; *see* ECF No. 16, at 11-12. In WMATA's view, if the Commission were allowed to audit WMATA's compliance with any provision of the safety plan, then the Commission could audit WMATA's *non*-Metrorail operations, which would exceed the Commission's authority under the Compact. ECF No. 11, at 23. That argument rests on a faulty premise. Just because the Commission cannot audit WMATA's non-Metrorail operations under the Compact does not mean that the Commission cannot audit *Metrorail*'s compliance with the plan. And as a matter of plain text, nothing in Section 5329 or the Compact prohibits the Commission from auditing WMATA's compliance with the safety plan *as it concerns Metrorail* when the plan also applies to Metrobus, MetroAccess, and the Metro police force.[15] *See generally* 131 Stat. at 1093-1104. The Commission asserts that authority and no more. *See* ECF No. 1 ¶ 8 (arguing that the Commission has jurisdiction over only "the entire Metro rail 'system' under WMATA's control"); ECF No. 7, at 3 (explaining that the Commission has authority only "over 'safety' in all of its forms within Metrorail"); ECF No. 15, at 3 (describing the Commission's audit as "ensur[ing] safety in the Metrorail system"). WMATA is therefore incorrect to suggest that the Commission "would have this Court make a sweeping conclusion that every word in [its safety

[15] While WMATA confines this argument to a purported conflict between the Commission's subpoena and *the Compact*, the court notes that WMATA's argument is inconsistent with the FTA's understanding of how *Section 5329* operates. The FTA has acknowledged that its regulation addressing state safety oversight agencies "does not prevent" such agencies "from performing additional oversight activities at their discretion pursuant to their State laws" when a safety plan "address[es] both rail and bus operations." State Safety Oversight, 89 Fed. Reg. 83956, 83965 (Oct. 18, 2024). It therefore would not surprise federal regulators if the Commission did audit non-Metrorail operations for compliance with WMATA's safety plan, as long as the Compact permitted it.

plan] falls within the WMSC's . . . limited authority." ECF No. 6, at 16 n.11; *see supra* pp. 14-15. The court declines to adopt WMATA's view of Section 5329 and the Compact and will overrule WMATA's audit-related objection.

### 3. The Commission's ability to investigate hazards

WMATA objects to the Magistrate Judge's conclusion that the subpoena is justified by the Commission's ability to investigate "hazards . . . on the WMATA Rail System." ECF No. 9, at 4 (quoting § 3(d), 131 Stat. at 1095); *see* ECF No. 11, at 20-23. The court once again concludes on de novo review that the Magistrate Judge appropriately rejected WMATA's effort to narrowly construe the Commission's investigative and enforcement authority. The court will therefore overrule the objection.

The Compact was designed to "empower[]" the Commission to "[i]nvestigate hazards" only in its capacity as a "safety oversight authority" under Section 5329. § 3(d), 131 Stat. at 1095.[16] The court thus looks to how the term "hazards" is used in Section 5329. There, Congress mandated that a transit system's comprehensive safety plan include "strategies to minimize the exposure of the public, personnel, and property to hazards and unsafe conditions, and consistent with guidelines of the Centers for Disease Control and Prevention or a State health authority, minimize exposure to infectious diseases." 49 U.S.C. § 5329(d)(1)(D). The term

---

[16] WMATA does not assert that the Commission lacks power to investigate "hazards" because that term appears in Article II of the Compact (addressing the Commission's purpose and functions) rather than Article IV (addressing the Commission's powers). *See generally* ECF Nos. 6, 11. Because the court "reviews 'only those issues that the parties have raised in their objections,'" it need not consider the argument here. *Edward M.-R. ex rel. T.R.-M. v. District of Columbia*, 660 F. Supp. 3d 82, 97 (D.D.C. 2023) (quoting *Taylor v. District of Columbia*, 205 F. Supp. 3d 75, 79 (D.D.C. 2016)).

"unsafe conditions" is as broad as the definition of "safety," *see supra* pp. 15-18, and supports reading "hazards" to encompass the OSH-related items in the Commission's subpoena.

Understanding "hazards" to encompass the OSH matters listed in the subpoena is further supported by the FTA's understanding of that term. Although the court's task is to "independently interpret" Section 5329, rather than rely on any agency's construction, the court nonetheless finds that the FTA's interpretation of the Act, issued shortly after the law was enacted, is "especially useful in determining the statute's meaning." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). In its regulations implementing the Act's provisions for state safety oversight, the FTA defined "hazard" to "mean[] any real or potential condition that can cause injury, illness, or death; damage to or loss of the facilities, equipment, rolling stock, or infrastructure of a public transportation system; or damage to the environment." 49 C.F.R. § 674.7. That sweeping interpretation is fully consistent with Section 5329's broad reach.

To be sure, some OSH requirements might not fall within Section 5329's or the FTA's conception of "hazards." But the court need not entertain those hypotheticals because the OSH-related requests in the subpoena—for example, requests for documents about falling objects (Request 3(a)), hazardous chemicals and waste (Request 3(c)), medical monitoring for welders (Request 25), and bloodborne pathogens (Request 28)—concern conditions that could cause injury, illness, or death. ECF No. 1-5 ¶¶ 3(a), 3(c), 25, 28. The subpoena therefore seeks information about "hazards" as Section 5329 uses, and the FTA understands, the term.

In arguing otherwise, WMATA invokes the *noscitur a sociis* canon and argues that because the Compact authorizes the Commission to "[i]nvestigate hazards, incidents, and accidents on the WMATA Rail System," § 3(d), 131 Stat. at 1095, the term "hazards" must be read in context with "incidents" and "accidents," ECF No. 11, at 21. WMATA then narrowly defines "incidents" and

"accidents" to include only "happenings that take place in connection with Metrorail's operations . . . such as derailments and railway fires." *Id.* (internal quotation marks omitted). From there, WMATA reaches the conclusion that "'[h]azards . . . on the WMATA Rail System' must be read . . . not to speak to every imaginable condition that could lead to harm, but rather to 'hazards' that could manifest themselves in such 'incidents' or 'accidents'—hazards like 'track defects.'" *Id.* WMATA further contends that its narrow definition of "hazard" is necessary to conform with how the term is used in another provision of the Compact authorizing the Commission to order WMATA to "remove 'a specific vehicle, infrastructure element, or hazard from the WMATA Rail System.'" *Id.* at 22 (quoting § 31(c)(4), 131 Stat. at 1098). Again relying on the *noscitur a sociis* canon, WMATA further narrows its definition of "hazards" to "physically removable dangers." *Id.*

WMATA's invocation of the *noscitur a sociis* canon is unpersuasive for three reasons. First, as the court has just explained, such a cramped definition cannot be squared with Section 5329's use of "hazards and unsafe conditions," 49 U.S.C. § 5329(d)(1)(D), or the FTA's broad regulatory definition, 49 C.F.R. § 674.7. Indeed, Section 5329 identifies one type of hazard or unsafe condition—"exposure to infectious diseases," 49 U.S.C. § 5329(d)(1)(D)—that has no connection to "physically removable dangers," ECF No. 11, at 22, rendering WMATA's narrow interpretation incompatible with the plain language of Section 5329.

Next, the court has already rejected WMATA's argument that the Compact limits the Commission's oversight to issues arising out of the physical operation of rail cars on Metrorail tracks given the Compact's definition of "WMATA Rail System." § 1(m), 131 Stat. at 1094; *see supra* pp. 17-18. Accordingly, even if the term "hazards" is limited to only those conditions that

"could manifest themselves in . . . 'incidents,' or 'accidents,'" ECF No. 11, at 21, a "hazard" like lead dust in a Metrorail station could result in an "incident" of lead poisoning.

Finally, WMATA's narrow definition of "hazard" conflicts with its public position outside this litigation. While the Commission included WMATA's 2024 safety plan as an exhibit to the petition to enforce the subpoena, ECF No. 1-2, the court takes judicial notice of WMATA's 2026 safety plan for purposes of evaluating WMATA's "hazards" argument, *see* Fed. R. Civ. P. 72(b)(3) (allowing district courts to "receive further evidence" when resolving a party's objections to a magistrate judge's R&R); *Arab v. Blinken*, 600 F. Supp. 3d 59, 63 n.1 (D.D.C. 2022) (taking judicial notice of "information posted on official public websites of government agencies"). In the 2026 plan, WMATA includes a screenshot of a "Hazard Report," which is managed by WMATA's Safety Risk Coordinators. WMATA, Public Transportation Agency Safety Plan 12 (Dec. 31, 2025).[17] Among the hazards that the report identifies are "Vent Shaft Ballston," presumably corresponding to the Ballston Metro station in Arlington, Virginia; "WMSC Water in Elevator Pits"; and "Diesel Exhaust in Tunnels & Employee Exposure." *Id.* While the hazard report is not an authoritative source on the proper meaning of the term "hazards," the court nevertheless highlights the document as evidence that even WMATA—in its comprehensive safety plan—considers OSH-related risks to employees like poor ventilation, water danger, and exhaust exposure as Metrorail-related "hazards" that must be mitigated. The court will therefore overrule WMATA's objection.

[17] *Available at* https://perma.cc/EL3W-R723.

**4. No undue burden**

Aside from WMATA's scope-of-authority objections, WMATA contends that the Magistrate Judge erroneously concluded that compliance with the subpoena would not be unduly burdensome. ECF No. 11, at 24-27; ECF No. 16, at 12-15; *see* ECF No. 9, at 7-9. Based on the declaration from Theresa Impastato, WMATA's then-Executive Vice President and Chief Safety and Readiness Officer, the Magistrate Judge determined that WMATA had "fail[ed] to sufficiently explain why [the] WMSC's current subpoena is burdensome" because it vaguely asserted that the subpoena contained complex requests, failed to provide "particularized information about the burden that the subpoena imposes," and offered no evidence that compliance would imperil WMATA's "usual course of business." ECF No. 9, at 8-9. WMATA disputes that conclusion and has provided a supplemental declaration from Ms. Impastato. *See* ECF No. 11-1. In response, the Commission asserts that WMATA forfeited any undue-burden argument by failing to raise the issue before the Magistrate Judge, ECF No. 15, at 17, and that, on the merits, WMATA has not adequately proved an undue burden, *id.* at 17-20. The court concludes that WMATA has failed to establish that compliance would be so burdensome as to justify denying the petition.[18]

The Magistrate Judge correctly concluded that Ms. Impastato's original declaration does not substantiate WMATA's undue burden claim. In that declaration, Ms. Impastato explained at a high level of generality that WMATA has produced a large number of documents in response to the Commission's audit requests over the last seven years. ECF No. 6-1 ¶ 6. Responding to one

[18] The court declines to address the Commission's forfeiture argument because the Commission has not properly presented it. The Commission devotes just half a sentence to WMATA's purported forfeiture. ECF No. 15, at 17. "Mentioning an argument 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones' is tantamount to failing to raise it." *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019) (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005)).

request during the COVID-19 pandemic required 1,200 hours of work. *Id.* Although Ms. Impastato asserted that she and her staff spend seventy percent of their time "dealing with WMSC requests and orders," *id.* ¶ 7, some burden on WMATA "is to be expected" and "necessary" to further the Commission's "legitimate inquiry and the public interest," *Texaco*, 555 F.2d at 882. Because the subpoena has a "lawful purpose" and the "requested documents are relevant to that purpose," *id.*, Ms. Impastato's general discussion of the labor required to respond to all types of requests does not prove that responding to *this* subpoena would pose an *undue* burden, *see CVS Health Corp.*, 2025 WL 3546175, at *3 (noting that courts have rejected undue-burden arguments when "compliance would be extremely costly, labor intensive, and in certain cases, impossible" (quoting *Invention Submission Corp.*, 1991 WL 47104, at *3)).

WMATA's supplemental declaration is more specific than the first but fares no better. Ms. Impastato, now WMATA's Chief Infrastructure Officer, asserts that responding to the subpoena "will *conservatively* consume about 3,000 working hours, or about 1.5 full-time employees' entire working year." ECF No. 11-1 ¶ 7. She also explains that WMATA manages many of the programs implicated by the subpoena on a systemwide basis, as opposed to organizing information by Metrorail, Metrobus, and MetroAccess, so responding to the subpoena may require employees to segregate Metrorail-specific documents to the extent doing so is possible. *Id.* ¶ 9. In total, Ms. Impastato expects compliance with the subpoena to be six to ten times more burdensome than WMATA's compliance with the 2020 audit, which did not include requests for OSH information. *Id.* ¶ 15. And, like in the original declaration, Ms. Impastato describes examples of past audits that led to audit findings, which in turn required WMATA to take additional steps to comply with the Commission's determinations. *Id.* ¶¶ 18-21.

The court is sympathetic to WMATA's position. Yet the supplemental declaration fails to establish an undue burden. Ms. Impastato's estimation that compliance will require 3,000 hours of work—a year's worth of time for one or two employees—does not prove that it would be unduly burdensome for *WMATA* to respond. *See* ECF No. 11-1 ¶ 7; ECF No. 6-1 ¶¶ 4, 7 (explaining that Ms. Impastato and her staff, which was then more than 1,000 employees, devoted considerable time to responding to all of the Commission's requests). And the court is unpersuaded by WMATA's emphasis on the burdens WMATA has faced when responding to the Commission's prior audit findings. *See* ECF No. 11-1 ¶¶ 18-21. Those burdens are irrelevant to the court's undue-burden analysis here, which only concerns the effort needed to comply with one subpoena, not the directives or findings that follow once the Commission reaches a post-audit conclusion. *See id.* ¶ 20 (discussing the burden on WMATA in responding to an audit finding, including the obligation to "develop and submit a corrective action plan for WMSC review," which would not be necessary when complying with the subpoena). And even if the prior burdens WMATA has faced in responding to audit findings were relevant, the court cannot evaluate Ms. Impastato's comparison because WMATA has not provided the subpoenas that were issued as part of those earlier audits.

In sum, nothing in Ms. Impastato's declaration suggests that compliance would "unduly disrupt or seriously hinder [WMATA's] normal operations." *Texaco*, 555 F.2d at 882 (explaining that courts have not even *modified* investigative subpoenas that failed to meet that standard, let alone refused to enforce such demands). Ms. Impastato does warn that "if [it is] not stopped, the WMSC's overreach will continue along a trajectory that . . . causes unsustainable operational disruption." ECF No. 11-1 ¶ 17. At best, that projection is conclusory and cannot sustain WMATA's burden because it lacks relevant details about when or why compliance will result in

operational disruption. At worst, the assertion is non-responsive because it focuses on WMATA's concern for the Commission's "overreach" generally, rather than the burden on WMATA to respond to the sole subpoena contested here. *See id.* ¶¶ 17-21; *see also* ECF No. 11, at 26-27 (focusing on the Commission's purported "mission creep"). The court, on de novo review, thus concludes that compliance does not pose an undue burden and will overrule WMATA's objection.

## V. CONCLUSION

For the foregoing reasons, the court will construe the Magistrate Judge's Order, ECF No. 9, as a report and recommendation. Upon de novo review, the court will overrule Respondent's objections, adopt the report and recommendation, and enforce the subpoena. The court will further direct the parties to file a joint status report on or before October 9, 2026, proposing a deadline for Respondent's production of materials responsive to the subpoena. A contemporaneous order will issue.

LOREN L. ALIKHAN
United States District Judge

Date: September 25, 2026